1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   MICHAEL NEWMAN, State Bar No. 222993
    Senior Assistant Attorney General
3   KATHLEEN BOERGERS, State Bar No. 213530
    Supervising Deputy Attorney General
4   NELI N. PALMA, State Bar No. 203374
    KARLI EISENBERG, State Bar No. 281923
5   STEPHANIE YU, State Bar No. 294405
    Deputy Attorneys General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone: (916) 445-2482
8   Fax: (916) 322-8288
    E-mail: Neli.Palma@doj.ca.gov
9   *Attorneys for Plaintiff State of California, by and*
    *through Attorney General Xavier Becerra*

10

11                  IN THE UNITED STATES DISTRICT COURT

12                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15  **STATE OF CALIFORNIA, BY AND THROUGH**
    **ATTORNEY GENERAL XAVIER BECERRA,**

16                                              **COMPLAINT FOR DECLARATORY**
                                        Plaintiff,  **AND INJUNCTIVE RELIEF**
17
                                                Administrative Procedure Act Case
18        **v.**

19  **ALEX M. AZAR, IN HIS OFFICIAL CAPACITY**
    **AS SECRETARY OF THE U.S. DEPARTMENT OF**
20  **HEALTH & HUMAN SERVICES; U.S.**
    **DEPARTMENT OF HEALTH AND**
21  **HUMAN SERVICES; DOES 1-100,**

22                                       Defendants.

23

24

25                          **INTRODUCTION**

26        1.    The State of California, by and through Attorney General Xavier Becerra, challenges

27  the final rule titled "Protecting Statutory Conscience Rights in Health Care; Delegations of

28  Authority," RIN 0945-AA10, issued by the U.S. Department of Health and Human Services

                                        1

(HHS) on May 2, 2019 (Rule), and published in the Federal Register on May 21, 2019.[1]  84 Fed. Reg. 23170 (May 21, 2019).  The State seeks to have the Rule set aside because the Rule, in violation of the Administrative Procedure Act (APA), the Spending Clause, and the Establishment Clause of the United States Constitution, impedes access to basic healthcare, including reproductive and emergency care; threatens billions of dollars in federal funding for California's public healthcare and other federally funded programs; and encourages discrimination against vulnerable patients, including women; lesbian, gay, bisexual, transgender, and queer or questioning (LGBTQ) individuals; and other vulnerable populations.

2.    The Rule creates a broad exemption that permits any individual, entity, or provider—from doctors to front office staff—to deny patients basic healthcare, including reproductive and emergency care, not just on the basis of federally protected conscience protections, but also on the basis of "ethical or other reasons."  84 Fed. Reg. at 23264.  A provider can therefore deny service on the basis of a hunch or prejudice, without any supporting evidence, without notifying a supervisor of the denial of service, and without providing notice or alternative options and/or referrals to patients in need.[2]  *Id.* (broadly defining "referral or referral for").

3.    Allowing such denial of service would be contrary to federal and state laws enacted to ensure patient safety and nondiscriminatory access to care, and contrary to medical ethics. Further, the Rule will create rampant confusion about basic patient rights and federally entitled healthcare services, such as Medicaid and Medicare, while discouraging providers from offering safe, legal medical care to their patients.

4.    In promulgating the Rule, Defendants failed to engage in reasoned decisionmaking, and there is no evidence that HHS considered the impact on patients.  84 Fed. Reg. at 23230-23239 (failing to quantify the impact of this Rule on patients).  Moreover, the effects of the Rule would be widespread as it implicates "an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity

---

[1] Available at https://www.govinfo.gov/content/pkg/FR-2019-05-21/pdf/2019-09667.pdf.
[2] *See* American Medical Association, Policy E-1.1.1, "Patient-Physician Relationships," 1.1.2, "Prospective Patients," 1.1.3., "Patient Rights," 1.1.6, "Quality," and 1.1.7, "Physician Exercise of Conscience," available at https://www.ama-assn.org/system/files/2019-01/code-of-medical-ethics-chapter-1_0.pdf.

1  undertaken by or with another person or entity." 84 Fed. Reg. at 23263.  The consequences of

2  this broad, vague Rule will disproportionately affect vulnerable populations, and will have a

3  chilling effect on those seeking to exercise their constitutionally protected healthcare rights.

4       5.      The Rule is also unlawful because it threatens the termination of billions of dollars

5  (over half a trillion dollars) in federal funds to California for labor, education, health, and human

6  services programs unless the State surrenders to the Rule's unlawful, vague provisions.  Its notice,

7  assurance and certification, recordkeeping, and reporting requirements needlessly impose

8  administrative burdens and onerous costs of implementation on the State.  As such, the Rule is an

9  assault on California's sovereignty, which is directly targeted by the Rule, and poses a real risk to

10  the health and welfare of all Californians.

11       6.      The State also seeks injunctive, declaratory, and other appropriate relief against HHS

12  to remedy HHS's violations of the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

13                         **JURISDICTION AND VENUE**

14       7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

15  laws of the United States), 28 U.S.C. § 1346 (civil action against the United States founded upon

16  the Constitution, an Act of Congress, or an executive regulation), 28 U.S.C. § 1361 (action to

17  compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706

18  (Administrative Procedure Act).  An actual controversy exists between the parties within the

19  meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and

20  other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

21       8.      Defendants' issuance of the Rule on May 21, 2019, constitutes a final agency action

22  and is therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5

23  U.S.C. §§ 704, 706.

24       9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because this is a

25  judicial district in which the State of California resides and this action seeks relief for the State

26  against federal agencies and officials acting in their official capacities.

27  / / /

28  / / /

**INTRADISTRICT ASSIGNMENT**

10.     Pursuant to Civil Local Rules 3-2(c) and 3-5(b), there is no basis for assignment of this action to any particular location or division of this Court.

**PARTIES**

11.     Plaintiff, the State of California, by and through Attorney General Xavier Becerra, brings this action.  The Attorney General is the chief law officer of the State and has the authority to file civil actions in order to protect public rights and interests.  Cal. Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

12.     The State of California has an interest in ensuring that all healthcare is accessible to all those within its borders.  Regulating healthcare is within the police power of the States.  California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal Rule, and by Defendants' threat to terminate billions of dollars in federal funding, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.  California is also harmed by the Rule because it requires the State to establish a costly and onerous bureaucratic structure to ensure that the Rule's expansive and unlawful provisions are complied with, including compliance by any downstream sub-recipients.  California will suffer concrete and substantial harm because the Rule frustrates California's public health interests by, among other things, curtailing access to contraceptive care, abortion, and other healthcare services.  The Rule will also burden the State with increased costs—for example, increased costs resulting from unintended pregnancies and untreated medical conditions.  The Rule's position on vaccinations and its possible sanctioning of doctors opposed to efforts to ensure that all children and their families follow the recommended childhood vaccination schedule could also adversely affect California's public health efforts to control the spread of preventable diseases such as measles.  Additionally, the Rule will chill many Californians' (for example, transgender individuals' and other LGBTQ community members') ability to access healthcare, further exacerbating long-term health problems.

13.     States have a sovereign interest in the power to create and enforce a legal code. Pursuant to that interest, California has an interest in challenging (1) HHS's assertions of authority to regulate matters within California's police power, and (2) HHS's interference with the enforcement of state law—particularly California's laws regulating behavior of and providing for the administration and regulation of state licensed professionals.

14.     Defendant Alex M. Azar is Secretary of U.S. Department of Health and Human Services (HHS) and is sued in his official capacity.  Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution and other federal law, including the Patient Protection and Affordable Care Act (ACA) and the APA.

15.     Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  The Office for Civil Rights (OCR) is an entity within HHS.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.     CALIFORNIA LAWS AND REGULATIONS**

### A.     Laws Protecting Religious Freedoms

16.     Ensuring access to healthcare is a key element in shaping overall health and well-being of California residents, and is therefore a critical component of the State's public health programs and laws.  At the same time, and in enacting the California Religious Freedom Act in 2017,[3] California Government Code section 8310.3, the California Legislature found and declared that "California must uphold the protection of religious freedom enshrined in the United States Constitution for all of its people, and the state has a moral obligation to protect its citizens from religious persecution."

17.     But the California Supreme Court has concluded that the right to freely exercise one's religious rights is not violated by laws ensuring full and equal access to healthcare.  *N. Coast Women's Care Med. Group, Inc. v San Diego Cty. Superior Court*, 44 Cal.4th 1145 (2008);

_____

[3] Generally, the California Religious Freedom Act prohibits California state and local governments from initiating, participating in, or assisting with any program to create a religious list, registry, or database, or using information about people's national origin or ethnicity to achieve the same basic purpose.

*Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal.4th 527 (2004).  Toward this end, California has struck a careful balance between the provision of healthcare and conscience protections.

18.     Under California law**,** a healthcare provider—defined as a person who is licensed, certified, or otherwise authorized by state law to provide health care—may decline to comply with an individual healthcare instruction or healthcare decision for reasons of conscience (but not on the basis of discrimination).  Cal. Prob. Code §§ 4621, 4734(a).  Also, a healthcare institution—defined as an institution, facility, or agency licensed, certified, or otherwise authorized by law to provide healthcare—may decline to comply with an individual healthcare instruction if that is contrary to a policy of the institution that is expressly based on reasons of conscience, if the policy was timely communicated to the patient.  Cal. Prob. Code §§ 4619, 4734(b).  However, a healthcare provider or institution that declines to comply with an individual healthcare instruction must (1) promptly so inform the patient; (2) immediately make all reasonable efforts to assist in the transfer of the patient to another provider or institution that is willing to comply with the instruction; and (3) provide continuing care to the patent until the transfer is accomplished or until it appears that a transfer cannot be accomplished.  Cal. Prob. Code § 4736.

19.     California laws also carefully balance protections for conscience protections and a woman's right to reproductive health.  For example, California law provides that no employer or other person shall require a physician, a registered nurse, a licensed vocational nurse, or any other person employed or with staff privileges at a hospital, facility, or clinic to directly participate in the induction or performance of an abortion "if the employee or other person has filed a written statement with the employer or the hospital, facility, or clinic indicating a moral, ethical, or religious basis for refusal to participate."  Cal. Health & Safety Code § 123420(a).  No employee or person shall be subject to any penalty or discipline for refusing to participate in the induction or performance of an abortion.  *Id.*

20.     However, to balance the needs of the patient who may be in urgent need of care and in recognition that emergency medical care is a vital public service, this provision does not apply to "medical emergency situations and spontaneous abortions" (also known as miscarriages,

1   *People v. Davis*, 7 Cal. 4th 797, 840 n.14 (1994) (en banc)).  Cal. Health & Safety Code

2   § 123420(d); *see also* Cal. Health & Safety Code § 1317(a) & (e) (requiring that emergency

3   services be provided to a patient for any condition in which the person is in danger of loss of life,

4   or serious injury or illness, at any health facility that maintains and operates an emergency

5   department; or if the facility does not maintain an emergency department, "its employees shall

6   nevertheless exercise reasonable care to determine whether an emergency exists and shall direct

7   the persons seeking emergency care to a nearby facility that can render the needed services, and

8   shall assist the persons seeking emergency care in obtaining the services, including transportation

9   services, in every way reasonable under the circumstances").

10      21.    California law requires that a female survivor of sexual assault shall be provided with

11   "the option of postcoital contraception by a physician or other health care provider" and that

12   "[p]ostcoital contraception . . . be dispensed by a physician or other health care provider upon the

13   request of the victim at no cost to the victim."  Cal. Penal Code §§ 13823.11(e)(1), (e)(2),

14   (g)(4)(A), (g)(4)(B).  If a hospital is unable to comply, hospitals must adopt a protocol for the

15   immediate referral of these individuals to a local hospital that complies with these requirements,

16   and notify local law enforcement agencies, the district attorney, and local victim assistance

17   agencies of the adoption of the referral protocol.  Cal. Health & Safety Code § 1281.

18      22.    Moreover, a California healthcare licentiate "shall not obstruct a patient in obtaining a

19   prescription drug or device that has been legally prescribed or ordered for that patient."  Cal. Bus.

20   & Prof. Code § 733(a); *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076-1088 (9th Cir.

21   2015) (rejecting First Amendment challenge to state regulation that requires pharmacists to timely

22   dispense all prescription medications, even if the pharmacist has a religious objection), *cert.*

23   *denied* 136 S.Ct. 2433 (2016).  But a licentiate may decline to dispense a prescription drug or

24   device on the basis of an ethical, moral, or religious objection, but only if the licentiate has

25   previously notified his or her employer, in writing, of the drug or class of drugs to which he or

26   she objects, and the licentiate's employer can, without creating undue hardship, provide a

27   reasonable accommodation and establish protocols to address the licentiate's objection and also

28

7

1  ensure that the patient has timely access to the prescribed drug or device.  Cal. Bus. & Prof. Code

2  § 733(b)(3).

3        23.    In keeping with the careful balance that California has struck, California laws protect

4  employees from discrimination based on religious beliefs, unless accommodation of those beliefs

5  would result in undue hardship to the employer.[4]  FEHA (which applies to employers with five or

6  more workers) requires that an employer reasonably accommodate an employee's bona fide

7  religious beliefs, including moral and ethical beliefs about what is right and what is wrong.  Cal.

8  Gov't Code § 12926 (d) & (q); 29 C.F.R. § 1605.1, *Friedman v. So. Calif. Permanente Med.*

9  *Group*, 102 Cal.App. 4th 39, 45 (2002).  Depending on the circumstances, "reasonable"

10  accommodation could include schedule changes, reassignment, and modification of work

11  practices, among other options.  29 C.F.R. § 1605.2(d)(1); 2 C.C.R. § 11062(a).  Undue hardship

12  is defined as "an action requiring significant difficulty or expense" and the calculus requires that

13  the employer consider a variety of factors, including the nature and cost of accommodation, the

14  facility's financial resources, the number of employees, operational impacts, the type of

15  operations, and the employer's overall financial resources and size.  Cal. Gov't Code § 12926(u).

16  However, a religious accommodation cannot cause the employer to violate other laws prohibiting

17  discrimination or protecting civil rights, including, for example, California Civil Code § 51(b)

18  (the Unruh Act) and California Government Code § 11135 (concerning discrimination by state

19  agencies).  Cal. Gov't Code § 12940(l)(3).  Like Title VII, FEHA requires a dialogue, as needed,

20  between the employer and the employee that permits the consideration of an accommodation's

21  impact on a patient's right to care.

22        **B.    Laws Guaranteeing Access to Healthcare**

23        24.    Women have historically faced unfair and discriminatory insurance practices, such as

24  being denied coverage for services that only women need—for example, maternity care.  For this

25  reason, California law requires that health care service and insurance plans provide coverage for

26  ───────────────
[4] In addition, for the purpose of Fair Employment and Housing Act or FEHA protections, "sex" includes, but is not limited to, "pregnancy or medical conditions related to pregnancy" and

27  gender, which includes gender identity and gender expression ("gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.").  Cal.

28  Gov't Code § 12926(r).

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

1    maternity services.  Cal. Health & Safety Code §§ 1345, 1367(i); Cal. Code Regs., tit. 28,

2    § 1300.67; Cal. Ins. Code §§ 10123.865, 10123.866.

3         25.    In 1972, California voters amended the state Constitution to include a right of privacy

4    among the inalienable rights protected by article I, section 1.  *Chico Feminist Women's Health*

5    *Ctr. v. Butte Glen Med. Soc'y*, 557 F. Supp. 1190, 1201-1202 (E.D. Cal. 1983) (citing *White v.*

6    *Davis*, 13 Cal. 3d 757 (1975)).  Under article I, section 1, "all women in this state rich and poor

7    alike possess a fundamental constitutional right to choose whether or not to bear a child."  *Comm.*

8    *to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981).  Under state law, private parties

9    cannot interfere with the right to procreative choice under article I, section 1.  *Chico*, 557 Supp. at

10   1202-03; *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994).  In addition, the right of

11   procreative choice, guaranteed under article I, section 1, is protected from State interference.

12   *Chico*, 557 F. Supp. at 1202; *Myers*, 29 Cal. 3d at 284.  Therefore, California law requires

13   coverage of all lawful abortions for enrollees and beneficiaries in both the Medi-Cal program and

14   commercial health coverage.

15        26.    Echoing these constitutional protections, the Reproductive Privacy Act of 2002

16   (RPA) declares as state public policy that "[e]very woman has the fundamental right to choose to

17   bear a child or to choose and to obtain an abortion."  Cal. Health & Safety Code § 123462(b).

18   The RPA expressly provides that: "The state may not deny or interfere with a woman's right to

19   choose or obtain an abortion . . . ."  Cal. Health & Safety Code § 123466.

20        27.    Contraceptives are among the most widely used medical services in the United States.

21   They are much less costly than the medical consequences of pregnancy, including maternal

22   deliveries, for patients, insurers, employers and states.  The use of contraceptives has been shown

23   to result in net savings to women and their employers.

24        28.    Starting in 2012, the Women's Health Amendment to the ACA gave women across

25   the country guaranteed access to preventive healthcare by requiring certain group health

26   insurance plans to cover preventive care, including all Food and Drug Administration (FDA)-

27   approved contraceptive methods and contraceptive counseling for women without cost-sharing

28

9

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

for beneficiaries.  42 U.S.C. § 300gg-13(a)(4).[5]  In addition, the Women's Health Amendment requires coverage of other preventive care for women, including an annual well-woman preventive care visit, counseling and screening for HIV and domestic violence, and services for the early detection of reproductive cancers and sexually transmitted infections.

29.    Under California law, it is unlawful for an insurance or health care service plan to refuse to enter into any contract, or to cancel or decline to renew or reinstate any contract, because of a person's race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, or age.  Cal. Health & Safety Code § 1365.5(a);[6] Cal. Ins. Code § 10140.2 (barring premium, price, or charge differentials due to insured's sex, including gender identity and expression); Cal. Penal Code § 422.56 ("gender" means sex and includes a person's gender identity and gender expression defined as a "person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth").  It is also unlawful for an insurance or health care service plan to modify the terms of the contract or to impose any limitations, exceptions, exclusions, reductions, copayments, coinsurance, deductibles, reservations, or other modifications because of a person's race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, or age.  Cal. Health & Safety Code § 1365.5(b); Cal. Ins. Code § 10140.2.

---

[5] On October 6, 2017, HHS issued two interim final rules purporting to implement the ACA's contraceptive coverage requirement.  The regulations, which went into effect immediately, permit nearly any employer with any moral or religious objection to contraception to exempt themselves from the requirement.  The rules thus transformed an important legal entitlement to no-cost contraceptive coverage into a conditional benefit subject to the employer's veto.  The States of California, Delaware, Maryland, New York, and Virginia immediately sought and received an injunction.  *California v. HHS*, 281 F. Supp. 3d 806 (N.D. Cal. 2017); *California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (largely affirming district court); *see also Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017), appeal pending (3rd Cir.).  Final rules issued on November 15, 2018, have now also been enjoined.  *California v. HHS*, 351 F. Supp. 3d 1267 (N.D. Cal. 2019); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019).

[6] In enacting this provision as part of Assembly Bill 1586 (2005-2006), the California Legislature considered a 2002 report from the Transgender Law Center and the National Center for Lesbian Rights entitled "Trans Realities: A Legal Needs Assessment of San Francisco's Transgender Communities," in which nearly one in three respondents stated that they had experienced some form of healthcare-related gender identity discrimination, including routine denial of coverage by health insurers for transition-related procedures, and discriminatory or inappropriate behavior by healthcare providers and staff.  *See* September 8, 2005 Assembly Floor Analysis available at http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=200520060AB1586.

1          30.     California, through its Department of Management Health Care (DMHC), also

2    regulates licensed health plans under the Knox-Keene Health Care Service Plan Act of 1975.  Cal.

3    Health & Safety Code §§ 1340-1399.818.  The Knox-Keene Act requires coverage of all FDA-

4    approved contraceptive drugs, devices, and other products for women, including all FDA-

5    approved contraceptive drugs, devices, and products available over the counter, as prescribed by

6    the insured's provider; patient education and counseling on contraception; and any follow-up care

7    for same, including, but not limited to, management of side effects, counseling for continued

8    adherence, and device insertion and removal.  Cal. Health & Safety Code § 1367.25.  However,

9    pursuant to Health and Safety Code section 1367.25(c), a religious employer may request a health

10   care service plan contract without coverage for FDA-approved contraceptive methods that are

11   contrary to the religious employer's religious tenets, and, if so requested, a health care service

12   plan contract shall be provided without coverage for contraceptive methods.

13          31.     California further regulates insurers through its Department of Insurance.  Insurance

14   Code section 10123.196(b)(1) requires coverage of all FDA-approved contraceptive drugs,

15   devices, and other products for women, including all FDA-approved contraceptive drugs, devices,

16   and products available over the counter, as prescribed by the insured's provider; patient education

17   and counseling on contraception; and any follow-up care for same, including, but not limited to,

18   management of side effects, counseling for continued adherence, and device insertion and

19   removal.  However, pursuant to Insurance Code section 10123.196(e), a religious employer may

20   request an insurance policy without coverage for contraceptive methods that are contrary to the

21   religious employer's religious tenets, and, if so requested, an insurance policy shall be provided

22   without coverage for contraceptive methods.

23          32.     To further access to family planning services, California offers such services to those

24   eligible for Medicaid (known as Medi-Cal), administered by the Office of Family Planning

25   (OFP).  *See* Cal. Welf. & Inst. Code § 14501(a) (OFP is tasked with ensuring that citizens of

26   childbearing age have comprehensive medical knowledge, assistance, and services relating to the

27   planning of families).  For those not eligible for Medicaid, OFP also administers the Family

28   Planning, Access, Care, and Treatment (Family PACT) program for persons with incomes at or

                                                    11

below 200% of the federal poverty guidelines and who have no other source of healthcare

coverage for family planning services.  And while access to contraceptive coverage has increased

under the ACA, the Rule's likely reversal of this progress[7] will burden the State with increased

costs of providing contraceptive care through programs like Family PACT and the increased costs

resulting from unintended pregnancies.[8]

**C.   Regulation of Medical Professions**

33.    California regulates its medical professionals, including physicians, physician

assistants, nurses, nurse practitioners, psychologists, midwives, and pharmacists, among others.

Cal. Bus. & Prof. Code § 101 (composition of the Department of Consumer Affairs includes the

Medical, Pharmacy, Nursing, Behavioral Sciences, and Psychology Boards, and the Physician

Assistant Committee, among others); *see also* Cal. Bus. & Prof. Code § 101.6 (the purpose of the

boards of the Department of Consumer Affairs is to ensure the public health, safety and welfare

by establishing minimum qualifications and levels of competency, and to provide a means for

redress of grievances by investigating allegations of unprofessional conduct, incompetence,

fraudulent action, or unlawful activity and, as necessary, to institute disciplinary action against

licensees).

34.    California licensed doctors, as part of their continuing medical education, are required

to meet cultural competency standards that include "understanding and applying cultural and

ethnic data to the process of clinical care, including, as appropriate, information pertinent to the

appropriate treatment of, and provision of care to, the lesbian, gay, bisexual, transgender, and

intersex communities."  Cal. Bus. & Prof. Code § 2190.1(c)(1)(D).

_____

[7] The Rule's impact on California's family planning efforts only increases harms that will result from Defendants' recent Title X regulations, 84 Fed. Reg. 7714 (2019).  *See California v. Azar*, No. 3:19-cv-01184-EMC, 2019 WL 1877392, *10-11 (N.D. Cal. Apr. 26, 2019).

[8] In 2010, for example, 64% of the 393,000 unintended pregnancies in California were paid for by Medicaid and other public insurance programs, costing the State approximately $689 million and the federal government approximately $1.06 billion.  Kathryn Kost, Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002, Guttmacher Institute (2015), 8, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.  Adam Sonfield and Kathryn Kost, Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010, Guttmacher Institute (2015), 13, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

12

35.     A California licensed healthcare professional is subject to discipline "if, because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 of the Civil Code [sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status], he or she refuses to perform the licensed activity or aids or incites the refusal to perform that licensed activity by another licensee, or if, because [of such characteristics], he or she makes any discrimination, or restriction in the performance of the licensed activity."  Cal. Bus. & Prof. Code § 125.6.

36.     By promulgating the Rule, HHS has infringed upon California's interest in the laws it has enacted to regulate matters concerning the health and safety of its residents and its medical professions, which are integral to ensuring Californians' access to healthcare.

37.     "[T]he structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks and citation omitted).  But the Rule encourages California licensed physicians and other healthcare professionals to disregard their licensure requirements, and freely interfere with patients' access to healthcare while disregarding anti-discrimination protections, thereby threatening California's sovereign and quasi-sovereign interests in regulating healthcare and California licensed entities and professionals.

38.     The Rule is a direct assault on California's sovereign and quasi-sovereign interests in regulating healthcare and California licensed entities and professionals because it broadly defines "discriminate or discrimination" to include the acts of making unavailable or denying any license, certification, accreditation, title, or other similar interest.  84 Fed. Reg. at 23263.

39.     The Rule has likely already impacted the provision of healthcare by encouraging healthcare professionals to refuse to provide care.  In fall 2018, a pharmacy refused a Michigan woman a prescription to treat her miscarriage.[9]  In summer 2018, an Arizona transgender woman

---

[9] https://www.aclumich.org/en/press-releases/aclu-files-complaint-meijer-after-pharmacist-refused-fill-prescription-customer-who.

was refused a prescription for hormone therapy.[10]  These incidents highlight discrimination that takes place even without this Rule, and that could be encouraged by the Rule's provisions.

40.    California's Unruh Civil Rights Act, Civil Code sections 51 *et seq*., bars business establishments from discriminating in the delivery of services and goods, including discrimination based on sex, which includes gender identity and gender expression.  Cal. Civ. Code § 51(b);[11] *N. Coast*, 44 Cal.4th at 1145, 1158 (the Unruh Act furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation).

## II.    HHS'S UNLAWFUL NEW RULE

### A.    Current Regulatory Scheme and Background

41.    On December 19, 2008, Defendants issued a final rule to "provide for the enforcement of the Church Amendments…the Public Health Service Act [Coats-Snowe Amendment] and the Weldon Amendment."  73 Fed. Reg. 78072, 78074 & 78098.  The regulation purported to authorize HHS to terminate and/or compel the return of all HHS funds from state and local governments that violate its prohibition against "discrimination on the basis that the health entity does not provide, pay for, provide coverage of, or refer for abortion.  *Id*. at 78074 & 78098.  The 2008 final rule went into effect on January 20, 2009 except that its certification requirement never took effect, as it was subject to information collection approval process under the Paperwork Reduction Act, which was never completed.  76 Fed. Reg. 9968, 9971 (Feb. 23, 2011).

42.    On March 10, 2009, HHS proposed a rule to rescind the 2008 rule.  74 Fed. Reg. 10207 (Mar. 10, 2009).  In it, HHS discussed that commenters of the previous rule "raised a number of questions that warrant[ed] further careful consideration."  *Id*.  In that proposed rule and

---

[10] https://www.aclu.org/blog/lgbt-ri ghts/transgender-rights/my-pharmacist-humiliated-me-when-he-refused-fill-my-hormone.

[11] "For purposes of this section . . .'Sex' includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth.  'Sex' also includes, but is not limited to, a person's gender.  'Gender' means sex, and includes a person's gender identity and gender expression.  'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth."  Cal. Civ. Code § 51 (e)(5).

the resulting 2011 final (and current) rule, HHS also noted "[n]o statutory provision, however, requires promulgation of a rule."  *Id*.; 76 Fed. Reg. 9968, 9975 (Feb. 23, 2011) (the Church, Weldon, and Coat-Snowe Amendments do not require "promulgation of regulations for their interpretation.").

43.    The 2011 rule changed the 2008 rule by indicating that its purpose was to provide for the enforcement of Church, Weldon, and Coat-Snowe Amendments and by removing provisions containing definitions of terms, requirements, prohibitions, and a certification requirement.  *See* 73 Fed. Reg. 78072 and 76 Fed. Reg. 9968, generally.  The 2011 rule also provided that the Office for Civil Rights (OCR) of HHS is designated to "receive complaints based on the Federal health care provider conscience protection statutes," and is further directed to "coordinate the handling of complaints with [HHS] funding components from which the entity, to which a complaint has been filed, receives funding."  76 Fed. Reg. at 9975, 9977.  But the 2011 rule also made clear that "[f]ederal provider conscience statutes…were never intended to allow providers to refuse to provide medical care to an individual because the individual engaged in behavior the health care provider found objectionable."  *Id*. at 9973-74.

44.    And since receiving the aforementioned designation on 2011, OCR had received a total of 44 complaints by the time Defendants issued their Notice of Proposed Rulemaking (NPRM) on January 26, 2018.  83 Fed. Reg. 3880, 3886 (Jan. 26, 2018).

**B.    Proposed Rule and Public Comments**

45.    In the January 26, 2018 NPRM, HHS proposed to revise the 2011 rule to ensure that "persons or entities are not subjected to certain practices or policies that violate conscience, coerce, or discriminate, in violation of such Federal laws."  83 Fed. Reg. at 3880.  The NPRM proposed a broad exemption to opt out of any healthcare service on the basis of "conscience, religious beliefs, or moral convictions" to medical providers but also to anyone with an "articulable connection" to the provision of that service, including helping to make a referral for that service.  Specific scenarios included in the NPRM included abortion, sterilization, euthanasia, certain vaccinations if there is an "aborted fetal tissue" connection, contraception,

15

1   gender transition/gender dysphoria, tubal ligations, hysterectomies, assisted suicide, and referrals

2   for advanced directives, and "other health services."  83 Fed. Reg. at 3903.

3       46.    HHS also proposed to grant overall responsibility for ensuring that those who

4   participate in HHS programs or activities comply with Federal conscience laws to its Office for

5   Civil Rights by initiating compliance reviews, conducting investigations, supervising and

6   coordinating compliance, and using enforcement tools otherwise available in civil rights law to

7   address violations and resolve complaints, including:

8       (i) Temporarily withholding cash payments, in whole or in part, pending correction of the

9       deficiency;

10      (ii) Denying use of Federal financial assistance or other Federal funds from the Department,

11      including any applicable matching credit, in whole or in part;

12      (iii) Wholly or partly suspending award activities;

13      (iv) Terminating Federal financial assistance or other Federal funds from the Department,

14      in whole or in part;

15      (v) Withholding new Federal financial assistance or other Federal funds from

16      the Department, in whole or in part, administered by or through the Secretary for which an

17      application or approval is required, including renewal or continuation of existing programs

18      or activities or authorization of new activities;

19      (vi) Referring the matter to the Attorney General for proceedings to enforce any rights of

20      the United States, or obligations of the recipient or subrecipient, created by Federal law;

21      and

22      (vii) Taking any other remedies that may be legally available.

23  84 Fed. Reg. at 23272.

24      47.    In response to the NPRM, HHS received over 242,000 comments.[12]  Comments

25  opposed to the NPRM came from a broad array of individuals, medical associations, state and

26  ────────────────
    [12]Comments are available at
27  https://www.regulations.gov/docketBrowser?rpp=50&so=DESC&sb=postedDate&po=0&dct=PS
    &D=HHS-OCR-2018-0002.  Although the website shows 72,417 comment submissions, some
    are batch comments comprising thousands of individual comments.  The Rule provides a total of
28  over 242,000 as of the date the Rule was published.  84 Fed. Reg. at 23180, n. 41.

local governments, reproductive rights organizations, children's rights organizations, disease advocates, and civil liberties organizations.

48.    The nation's trusted major medical organizations raised grave concerns about the legality and reasonableness of the proposed regulation.  For example, the American Medical Association (AMA) commented that the proposed rule "would undermine patients' access to medical care and information, impose barriers to physicians' and health care institutions' ability to provide treatment, impede advances in biomedical research, and create confusion and uncertainty among physicians, other health care professionals, and health care institutions about their legal and ethical obligations to treat patients."  The Association stated that the proposed rule "would legitimize discrimination against vulnerable patients and in fact create a right to refuse to provide certain treatments or services."[13]

49.    The American Academy of Family Physicians (AAFP), which represents 129,000 physicians and medical students across the country, noted it was "concerned that the [proposed rule] could restrict access to care for vulnerable patients seeking the aid of their family physician or other health care professionals."[14]

50.    The American Nurses Association (ANA) and the American Academy of Nursing (AAN) stated that while they "strongly support the right and prerogative of nurses—and all healthcare workers—to heed their moral and ethical values," they had concerns that the proposed rule would "lead to inordinate discrimination against certain patient populations—namely individuals seeking reproductive health care services and lesbian, gay, bisexual, transgender, and queer or questioning (LGBTQ) individuals."  This proliferation of discrimination could "result in reduced access to crucial and medically necessary health care services and the further exacerbation of health disparities between these groups and the overall population."[15]

---

[13] AMA comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564.
[14] AAFP comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-34646.
[15] ANA-AAN comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-55870.

17

51.     The American Congress of Obstetricians and Gynecologists (ACOG) noted that under the American Medical Association's Code of Medical Ethics, responsibility to the patient is paramount for all physicians, and that providers with moral or religious objections should ensure that processes are in place to protect access to and maintain a continuity of care for all patients; but in an emergency in which referral is not possible or might negatively impact the patient's physical or mental health, providers have an obligation to provide medically indicated and requested care.[16]

52.     The American College of Emergency Physicians (ACEP), on behalf of its 37,000 members, expressed concerns that the proposed rule failed to reflect the moral and legal duty of emergency physicians to treat everyone "who comes through our doors," stating that [b]oth by law and by oath, emergency physicians care for all patients seeking emergency medical treatment," and concluding that "[d]enial of emergency care or delay in providing emergency services on the basis of race, religion, sexual orientation, gender identity, ethnic background, social status, type of illness, or ability to pay, is unethical."[17]

53.     The American Academy of Pediatrics (AAP), which represents 66,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists, urged HHS to ensure that children have appropriate access to needed healthcare in the areas of vaccines, mental health services, newborn hearing screening, reproductive health, medical neglect, treatment for sexual assault, including screening for sexually transmitted diseases and pregnancy prevention, and supportive care for LGBTQ youth.[18]

54.     On behalf of more than 123,000 physician assistants, the American Academy of PAs (AAPA) expressed concerns that the proposed rule could have a negative impact on access to healthcare for patients, especially those who are most vulnerable and those who may live in rural

---

[16] ACOG comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70647.
[17] ACEP comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71219.
[18] AAP comment at 4-14, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71022.

or underserved areas, and that the new paperwork requirements related to the assurance and certification provisions could be excessively burdensome to healthcare providers.[19]

55.     The American Health Care Association (AHCA) and National Center for Assisted Living (NCAL) expressed concerns that the increased regulatory burden of the proposed rule for long term and post-acute care providers could reduce time for providing high quality patient-centered care.[20]

56.     The American Physical Therapy Association (APTA) urged that the proposed rule not be finalized because discrimination under the guise of religion or morality runs counter to their Code of Ethics and the principle of patient-centered care, both of which are foundational to the physical therapy profession.  In their view, the proposed rule also would severely compromise patient access to medically necessary healthcare services.[21]

57.     Physicians for Reproductive Health (PRH) warned that the proposed rule unlawfully exceeds HHS's authority by impermissibly expanding federal conscience laws, creates barriers to healthcare and exacerbates already existing inequities, and will cause severe consequences for providers while undermining the provider-patient relationship.[22]

58.     The American Hospital Association (AHA)[23] and hospital associations from around the country, including the Wisconsin Hospital Association, Inc. (WHA),[24] the Greater New York Hospital Association (GNYHA),[25] the Texas Hospital Association (THA),[26] the Ohio Hospital

---

[19] AAPA comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65085.

[20] AHCA-NCAL comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-29924.

[21] APTA comment at 2-3, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-28624.

[22] PRH comment at 2-7; 9-11, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71284.

[23] AHA comment at 4, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65761.

[24] WHA comment at 3-4, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-66144.

[25] GNYHA comment at 2; 4-5, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71154.

[26] THA comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67485.

Association (OHA),[27] and the Massachusetts Health and Hospital Association (MHA)[28] objected to the proposed rule imposing regulatory burdens on hospitals that should instead be focused on providing patient care; also the overbroad and expanded definitions further run the risk of creating unintended consequences for patient care and run counter to hospital policies not to discriminate in the delivery of emergency, urgent, and necessary care on the basis of a patient's race, color, national origin, citizenship, alienage, religion, creed, sex, sexual orientation, gender identity, age, or disability.

59.    The Association of American Medical Colleges (AAMC) asked that the proposed rule be withdrawn because there is no demonstrable need for the proposed rule due to existing laws and protections.  AAMC asserted that the paucity of complaints does not justify an expansion of enforcement authority, that the proposed rule is overly expansive in its reach and incongruous with medical professionalism, and that it will do harm to lower-income Americans, racial and ethnic minorities, the LGBTQ community, and patients in rural areas.[29]

60.    The Association of Women's Health, Obstetric and Neonatal Nurses (AWHONN) opposed the proposed rule as unnecessary to protect the rights of providers, and noted that the existing rule issued in 2011 adequately protects the conscience of providers while also protecting patients; the proposed rule also undermines the Title X program.[30]

61.    Other major medical organizations also submitted comments, including the National Association of Councils on Developmental Disabilities,[31] the National Association of Pediatric Nurse Practitioners,[32] the National Community Pharmacists Association,[33] and the National Family Planning & Reproductive Health Association.[34]

---

[27] OHA comment at 1, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70015.
[28] MHA comment at 1-3, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71172.
[29] AAMC comment at 1-2; 4-5, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67592.
[30] AWHONN comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71214.
[31] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-66494.
[32] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71063.
[33] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71176.
[34] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70260.

20

62.     Numerous comments raised concerns regarding the proposed rule's impact on healthcare access, noting that refusal of care would be especially dangerous for those already facing barriers in healthcare, including patients in rural communities where there may be no other sources of health and life preserving medical care.[35]  Others expressed similar concerns:

- "As a transgender individual, I have been refused important treatment at local doctors.  I have to drive for 2 hours in order to receive basic medical care, because I cannot find a doctor who will help me in my town. Someday this very well might kill me if I need immediate, life-saving care."[36]

- "Because I am gay and live in a rural area, my son (who is not gay) and I have been refused healthcare by our local clinic.  As a result, we have been forced to seek a physician in another town rather than receive treatment from our local provider."[37]

- "If a doctor can refuse to treat me, then I know I will be at my most vulnerable in emergency medicine situations….If this is passed, I will no longer feel safe traveling the 1700 miles between my home and where my family lives.  My family is poor and can't afford to come see me.  Effectively, I will be cut off from my loved ones for fear of what might happen to me in transit."[38]

- "My wife was born intersexed. She is considered transgender and we rely on trans healthcare for her daily medications.  We already drive 2 hours from Colorado Springs to Denver for qualified doctors that take our insurance.  She needs this care to be able to function without pain at work.  Reducing the number of doctors and prescriptions available will only make it harder for us to continue working and will further drain our time and money."[39]

- "I live in an area where I have few health insurance options (currently two).  If healthcare providers are allowed to opt out of providing care to me because I am a

---

[35] National Council of Jewish Women New York comment at 4-5, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-56027.
[36] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-34687.
[37] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-54505.
[38] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-56725.
[39] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71419.

gay American, My chronic disease could become a much more expensive life threatening disease that would ultimately cost me, other tax payers and/or the government more money for treatment."[40]

- "When I was coming out as transgender, I had a difficult time finding a doctor who was willing to treat me, and I live in the San Francisco Bay Area.  I cannot imagine how difficult it is for transgender people in more conservative areas of the country to find healthcare providers who are willing to treat them."[41]

63.    Several comments highlighted the negative impacts the proposed rule would have on the interests of Californians:

- The California Attorney General commented that the proposed rule violated the APA because it construed numerous terms, including "assist in the performance," "health care entity," and "referral or refer for," so broadly as to materially alter well-established statutory language in the Church Amendments, the Coats-Snowe Amendment, and the Weldon Amendment.  Further, California explained that the proposed rule violated several constitutional provisions, including the Spending Clause, and the Establishment Clause, and would result in significant negative impacts on California, its residents, and California state entities that receive federal funding.[42]

- The California Insurance Commissioner's comment letter emphasized that existing state and federal law provide healthcare provider conscience protections; however, these laws rightly do not allow objectors to interfere with patient access to care or civil rights protections that prohibit discrimination.  In contrast, the proposed rule would harm patients and encourage discrimination against people on the basis of

---

[40] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71960.
[41] Available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-72133.
[42] California Attorney General comment at 2-6, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70182.

race, sex, sexual orientation, gender, gender identity, and almost any other kind of bias due to its overbroad scope.[43]

- The California Medical Association, on behalf of its 43,000 physician members and medical students, cautioned that the proposed rule could lead to discrimination prohibited under federal and state law, insert politics into the patient-physician relationship, increase administrative burdens on doctors, and, due to its broad application, allow any entity or individual to use their personal beliefs to dictate patient care.[44]

- The California Primary Care Association, which represents over 1,300 not-for-profit community clinics and health centers in California, expressed concern about the proposed rule's potential disparate impact on vulnerable groups such as those seeking end-of-life care, persons affected by HIV/AIDS, women, persons of color, and the LGBTQ community.  The Association cautioned that the proposed rule is so broad and ambiguous that medical staff may interpret it to allow them to decline to tell a patient where s/he would be able to obtain lifesaving services, putting them and others at risk, and further, threatening patient informed consent.[45]

- California county public safety-net healthcare providers, including the Santa Clara Valley Medical Center[46] and the San Francisco Department of Public Health,[47] also opposed the proposed rule due to its impermissible expansion of federal laws that could sanction discrimination against vulnerable communities, including the

---

[43] California Insurance Commissioner comment at 1-2; 5-6, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70956.
[44] CMA comment at 1-5, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71550.
[45] CPCA comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70654.
[46] County of Santa Clara comment at 2-8, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-54930.
[47] SFDPH comment at 2-3, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-69109.

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

LGBTQ community, and the proposed rule's unnecessary new burdens on public healthcare providers.[48]

- The California LGBT Health & Human Services Network, a coalition of 60 non-profit providers, community centers, and researchers, expressed that the proposed rule "tramples on California's efforts to protect patients' health and safety, including through the California Insurance Gender Nondiscrimination Act" and other rules that make clear that all people have the right to access coverage for necessary healthcare regardless of their gender identity or gender expression.[49]

- The Latino Coalition for a Healthy California objected to the proposed rule's broad and poorly defined language in comparison to existing law that already provides ample protections to healthcare workers that refuse to participate in a healthcare service to which they have a moral objection, and warned that the proposed rule could result in medical, behavioral and oral health care that fails to comply with established medical practice guidelines; also the proposed rule fails to account for the significant burden that will be imposed on patients, a burden that will fall disproportionately on women, people of color, persons with disabilities, and LGBTQ individuals, communities that already experience severe health disparities and discrimination.[50]

- The American Civil Liberties Union Foundation of California cautioned that the proposed rule's expansion of definitions, covered entities, and enforcement mechanisms invite violation of California laws that safeguard patients from substandard healthcare and ensure patients' health, access, and choice.  These include state laws that mandate minimum educational requirements for licensed medical professionals, medically necessary services in emergency situations,

---

[48] See also comments submitted by the National Association of County and City Health Officials; available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70228.

[49] California LGBT Health and Human Services Network comment at 2-3, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-56435.

[50] LCHC comment at 1-2, available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67994.

1   managed care health plans' coverage of abortion as basic healthcare under the

2   Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act), and

3   informing patients when they are not offered all medical options.[51]

4   64.   On February 15, 2019, California representatives met with HHS's Office of Budget

5   Management to discuss California's concerns regarding the proposed rule, including concerns

6   that the proposed rule unfairly targets California and interferes with the State's policy making,

7   encourages discrimination, impedes access to healthcare and information, violates various federal

8   laws, and imposes administrative burdens and costs on states and other entities.  The California

9   representatives also raised California's outstanding FOIA request to HHS (discussed further

10  below) and provided a copy of the FOIA request with the State's numerous follow-up

11  communications.

12  **C.   HHS Issues a Largely Unchanged and Arbitrary and Capricious Rule**

13  65.   On May 21, 2019, HHS issued its final rule.  Like the proposed rule, the final rule

14  conflicts with existing law and impedes the provision of and access to medical information and

15  healthcare by attempting to create limitless categories under which medical information and care

16  can be refused.  The final Rule (which did little to address the proposed rule's errors in this

17  respect, notwithstanding the large volume of intervening comments) so conflicts by

18  misconstruing and exceeding the bounds of federal statutes, including well-established statutory

19  language and definitions.

20  66.   Although the Rule states that it seeks to only clarify federal conscience protection

21  laws—particularly the Church Amendments, 42 U.S.C. 300a–7; the Coats-Snowe Amendment,

22  42 U.S.C. 238n; and the Weldon Amendment in HHS's yearly appropriations acts, *e.g.,* the

23  Consolidated Appropriations Act, 2018, Pub. L. 115–141 (H.R. 1625)—the Rule greatly expands

24  the breadth of these laws, which (at most) address only exemptions to abortion and sterilization

25  procedures.  *See Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 312 (1974).[52]

26  ---

[51] ACLU of California comment at 3-5; 10-11, available at
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71871.
[52] Indeed, the case studies referenced in the Rule indicate that it is intended to include refusals for
gender transition-related services (reference to *Minton v. Dignity Health,* San Francisco Superior

25

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

67.     The Rule defines "assist in the performance" of an activity to encompass an action that has a "specific, reasonable, and articulable connection" to furthering a procedure, health service program, or research activity, including "counseling, referral, training, or otherwise making arrangements" for the procedure, health program, or research activity.  84 Fed. Reg. at 23263.  Only the Church Amendments refer to "assist in the performance" of an activity, and nothing in that statutory scheme envisions the broad definition in the Rule.  42 U.S.C. § 300a-7. Congress's specific references to "counsel[ing]" in a separate Church Amendment provision, "training" in the Coats-Snowe Amendment, and "refer for" in the Weldon Amendment evidence Congress's intent to keep these actions separate in meaning from the performance of a procedure and confirm that the Rule's expansive definition of "assist in the performance" should not include a panoply of additional activities.

68.     Similarly, "health care entity" is defined in the Coats-Snowe Amendment and the Weldon Amendment, yet the Rule expands these definitions to include "health care personnel," as distinct from a "health care professional," such as a doctor, nurse or other licensed medical provider.[53]  Thus, the Rule suggests significantly broader categories of personnel could refuse to

---

Court Case No. CGC 17-558259, 2017 WL 7733922 at 84 Fed. Reg. at 23176, n. 27) and circumstances that may involve California's End of Life Option Act, California Health and Safety Code sections 443, *et seq*.  (84 Fed. Reg. at 23177).  But as discussed in section I, the Rule is unnecessary because the End of Life Option Act, like other California provisions, contains a conscience exemption: "Participation in activities authorized pursuant to this part shall be voluntary.  Notwithstanding Sections 442 to 442.7, inclusive, a person or entity that elects, for reasons of conscience, morality, or ethics, not to engage in activities authorized pursuant to this part is not required to take any action in support of an individual's decision under this part."  Cal. Health & Safety Code § 443.14 (e)(1).  Moreover, the Act specifically provides that that a conscientious objector cannot be sanctioned, disciplined, or penalized "for refusing to inform a patient regarding his or her rights under this part, and not referring an individual to a physician who participates in activities authorized under this part."  Cal. Health & Safety Code § 443.14(e)(2).

[53] *Compare* 42 U.S.C. § 238n(c)(2) (defining "health care entity" to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions") *and* P.L. 115-141, the Consolidated Appropriations Act of 2018 (H.R. 1625), Div. H, sec. 507(d)(2) (defining "health care entity" to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan") *with* 84 Fed. Reg. at 23264 (defining "health care entity" to include "health care personnel" and describing listed entities included in the definition as "illustrative, not exhaustive").

26

provide services—potentially including even a receptionist at a doctor's office making an appointment for a patient, for example—based on his or her moral objections.

69.    The Rule's definition of "health care entity" is also overbroad, given that it includes "a plan sponsor, issuer, or third-party administrator, or any other kind of health care organization, facility, or plan." 84 Fed. Reg. at 23264.  Such a broad definition, well beyond the definition in the statutory text, could result in limitless categories of individuals and entities with absolutely no ethical obligation to the patient or involvement in direct patient care to sabotage and delay the provision of healthcare to patients.

70.    The Rule's definition of "referral or refer for" is particularly broad, including "the provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure."  Thus, under the Rule, even the posting of notices, would be considered a "referral." 84 Fed. Reg. at 23264.

71.    Reading and interpreting these statutes in such an overly broad manner will permit unlawful refusals of any healthcare service by almost any individual, even those not at all involved in the provision of healthcare; whereas the Weldon, Church, and Coats-Snowe Amendments refer to only specific circumstances in which healthcare providers or certain enumerated healthcare entities may not be required to participate in abortions, sterilizations, or certain health service programs and research activities.

72.    In addition, the Rule's implementation of specific penalties for noncompliance is unmoored from any statutory text.  Although the Weldon Amendment purports to strip noncompliant states of broad categories of federal funding (which raises its own legal problems), nothing in the Weldon Amendment, or elsewhere in federal law, supports the separate, discretionary enforcement mechanisms asserted in the Rule.  P.L. 115-141, the Consolidated Appropriations Act of 2018 (H.R. 1625), Div. H, sec. 507(d)(1).

///

27

73.     Defendants justify the Rule in part on "presidential priority of protecting conscience and religious freedom."  84 Fed. Reg. at 23227, *citing* Executive Order 13798, 82 FR 21675 (May 4, 2017).  But the validity of the Rule depends on its relationship to legislative, not executive, action: if the underlying federal statutes do not support the Rule, additional executive action cannot change this basic fact.

74.     The Rule also conflicts with several other federal statutes, and is written so broadly it implicates several others.  For starters, the Rule clashes with the following provisions of the ACA:

- Section 1554, which prohibits the Secretary of HHS from promulgating any regulation that (1) creates unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to healthcare; (3) interferes with communications regarding a full range of treatment options; (4) restricts the ability of providers to provide full disclosure of all relevant information to patients making healthcare decisions; (5) violates the principles of informed consent and the ethical standards of medical professionals; or (6) limits the availability of treatment for the full duration of a patient's medical needs (42 U.S.C. § 18116); and

- Section 1557, which prohibits discrimination in health programs or activities, including gender discrimination (42 U.S.C. § 18116).

75.     The Rule further fails to address and acknowledge the employers' legal obligations under Title VII of the Civil Rights Act of 1964.  Title VII (which applies to employers with 15 or more employees) prohibits an employer from discriminating on the basis of religion, and absent undue hardship (*e.g.*, "more than a de minimis cost"), imposes a duty that an employer reasonably accommodate an employee's religion, including all aspects of religious belief, observance and practices.  42 U.S.C. § 2000e (a); *Opuku-Boateng v. State of California*, 95 F.3d 1461, 1467-1468 (9th Cir. 1996).  An undue hardship may also exist if accommodating the employee would result in the employer violating state or federal law or if it would have a discriminatory impact on the rights of other employees.  *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir.

28

1    1999); *Peterson v. Hewlett Packard Co.,* 358 F.3d 599, 606-607 (9th Cir. 2004).  Yet under the

2    Rule, there is no workable requirement that there be dialogue between the employer and

3    employee.  The Rule's requirement that an employer "may," no more than once a year, require an

4    employee to "inform it of objections to performing, referring for, participating in, or assisting in

5    the performance of specific procedures, programs, research, counseling, or treatments, but only to

6    the extent that there is a reasonable likelihood that the protected entity may be asked in good faith

7    to perform, refer for, participate in, or assist in the performance of, any act or conduct just

8    described," 84 Fed. Reg. at 23263, fails to comport with the accommodation process under Title

9    VII.  The Rule thus suggests that an employee can simply opt out of providing comprehensive

10   healthcare to a patient, depriving the patient of emergency medical care or of state- and federally

11   entitled healthcare rights, without consequence and without considering alternatives that would

12   accommodate both the employee's religion and the patient's needs.  Such a deprivation creates

13   unnecessary tension with state and federal laws barring discrimination of the basis of other

14   protected categories, including sex and gender.[54]

15        76.    The Rule also contravenes Title X of the Public Health Service Act, 42 U.S.C.

16   §§ 300-300a-6, which provides federal funding for family-planning services.  Congress required

17   Title X grantees to operate "voluntary family planning projects which shall offer a broad range of

18   acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).  Title X

19   appropriations bills, e.g., 2019 Continuing Appropriations Act, Pub. L. No. 115-245, Div. B., Tit.

20   II, 132 Stat. 2981, 3070-71 (2018), require that "all pregnancy counseling shall be nondirective";

21   in other words, funded projects are to offer pregnant women neutral, non-judgmental information

22   and counseling regarding their options, including prenatal care and delivery; infant care, foster

23   care, or adoption; and pregnancy termination.

24        77.    In the preamble to the Rule, Defendants justify their action in part by explaining that

25   they have "amended the Title X regulations to remove the requirements for abortion counseling,

26   information, and referrals." 84 Fed. Reg. at 23200.  But Defendants' attempted amendment to

27

28   [54] Title VII prohibits both discrimination on the basis of sex and gender. *Schwenk v. Hartford*,
     204 F.3d 1187, 1202 (9th Cir. 2000) (Title VII extends protections to transgender individuals).

29

1    Title X regulations has, as of the date of this complaint, been rejected by three separate district

2    courts on the grounds that it likely violates federal law and is an arbitrary and capricious exercise

3    of agency authority.  *See, e.g.*, *California v. Azar*, No. 3:19-cv-01184-EMC, 2019 WL 1877392

4    (N.D. Cal. Apr. 26, 2019), appeal docketed, No. 19-15974 (9th Cir. May 6, 2019); *Oregon v.*

5    *Azar*, 6:19-cv-00317-MC, 2019 WL 1897475 (D. Or. Apr. 29, 2019), appeal docketed, No. 19-

6    35386 (9th Cir. May 6, 2019); *Washington v. Azar*, No. 1:19-cv-03040-SAB, 2019 WL 1868362

7    (E.D. Wash. Apr. 25, 2019), appeal docketed, No. 19-35394 (9th Cir. May 6, 2019) (all granting

8    preliminary injunction of new rule regarding Title X).

9         78.    Additionally, the Rule disregards the Emergency Medical Treatment & Labor Act

10   (EMTALA) enacted by Congress in response to growing concern about the provision of adequate

11   medical services to individuals, particularly the indigent and the uninsured, who seek care from

12   hospital emergency rooms.  42 U.S.C. § 1395dd(a); *Jackson v. East Bay Hosp*., 246 F.3d 1248,

13   1254 (9th Cir. 2001).  In this case, the Rule places conscience protection over patient care without

14   exception, even for emergencies.  Defendants summarily dismissed these concerns, merely stating

15   that "[w]ith respect to EMTALA, the Department generally agrees with its explanation in the

16   preamble to the 2008 Rule that the requirement under EMTALA that certain hospitals treat and

17   stabilize patients who present in an emergency does not conflict with Federal conscience and anti-

18   discrimination laws."  84 Fed. Reg. at 23183.  By disregarding these concerns, Defendants failed

19   to meaningfully respond to comments and "failed to consider an important aspect of the

20   problem[.]"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S.

21   29, 43 (1983).

22        79.    Defendants also minimize concerns regarding the Rule's impact on patients in rural

23   communities.  While conceding that "patients in rural area are more likely than patients in urban

24   areas to suffer adverse health outcomes as a result of being denied care, 84 Fed. Reg. at 23253,

25   Defendants, without any actual evidence, conclude that rural residents would be better off

26   because providers will enter and stay in the field due to the Rule's protections; and in any event,

27   rural resident are less likely to request potentially objectionable care and/or may share the same

28   values with objecting providers.  But this Court recently concluded that Defendants' failure to

30

1    adequately consider the patient harms renders a rule arbitrary and capricious.  *See California v.*

2    *Azar*, 2019 WL 1877392, at *29-32 (N.D. Cal. Apr. 26, 2019) (also rejecting unsubstantiated

3    assertions of providers waiting in the wings to enter the field as a result of Defendants'

4    regulations).

5          80.    Nor do the estimated costs of the Rule justify its benefits, revealing it to be greatly

6    wasteful of public funds.  Defendants admit in their NPRM that OCR received only 44

7    complaints over the last 10 years of alleged instances of violations of conscience rights.  83 Fed.

8    Reg. at 3886.[55]  Yet, as HHS further admits, it will cost nearly $1.06 billion over the first years to

9    implement the Rule, and for the affected entities to comply with the new assurance and

10   certification requirements.[56]  84 Fed. Reg. at 23240.  And these costs fail to account for cost to

11   patients that will result from refusals of care.  Meanwhile, HHS disclaims any ability to

12   specifically quantify the benefits.  *Id.* at 23227, 23246-23254.

13   **III.   CALIFORNIA'S SOVEREIGNTY AND FEDERAL FUNDING TARGETED BY RULE**

14         81.    California and its laws balancing conscience protections and patient rights are

15   expressly targeted by the Rule.  The Rule's suggestion that California laws "discriminate" is

16   based on a faulty and biased read of these laws, meant to justify an unlawful expansion of federal

17   laws.  The threat to revoke California's federal health, education and labor federal funds is a

18   direct assault on state sovereignty and puts the state in an illusory choice—comply with the Rule

19   that conflicts with California's laws and policies or risk losing half a trillion dollars in funds for

20   critical programs that help residents—it is not a choice at all.

21         82.    The Rule states that the Rule resolves confusion caused by OCR's "sub-regulatory

22   guidance" issued through OCR's "high-profile" closing of three Weldon Amendment complaints

23   ---

[55] Although Defendants report receiving 343 complaints in fiscal year 2018, 84 Fed. Reg. at
24   23229, they have refused to comply with FOIA requests for records of complaints to OCR (as
     discussed further below).

25   [56] And as the California Medical Association correctly notes, the Departments' estimated costs of
     implementation fail to consider the significant time and resources it will take to continuously
26   implement and enforce the Rule, as well as the numerous other administrative and regulatory
     burdens physicians and providers already face and the degree to which each additional burden
27   detracts from actual care to patients and improving quality.  CMA comment at 8, available at
     available at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71550.  84 Fed.
28   Reg. at 23230-23246.

against California.  84 Fed. Reg. at 23178-23179.  The three complaints,[57] which were filed by a religious organization, churches and a church-run school, and employees of a religiously affiliated university, alleged that the Department of Managed Health Care (DMHC) (the state agency responsible for regulating California's managed care health plans) contacted seven health plans offering products without abortion coverage on August 22, 2014, and required those health plans to include abortion coverage.[58]

83.     On June 21, 2016, OCR closed the three complaints in favor of California, finding that the Weldon Amendment was not violated because the seven health plans that received the letter had not objected to providing such coverage on religious or moral grounds, a requirement for protection under the Weldon Amendment.  Additionally, OCR noted that after receipt of DMHC's August 22, 2014 letter, the health plans modified their health products, without objection.[59]  Citing *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*), OCR also determined that this approach avoided a potentially unconstitutional application of Weldon, given Weldon's threat to rescind "all funds appropriated under the Appropriations Act to the State of California – including funds provided to the State not only by HHS but also by the Departments of Education and Labor, as well as other agencies."[60]

84.     In closing the complaints in favor of California, OCR also noted that one of the health plans, Blue Cross of California, subsequently sought and received from California an exemption to allow it to offer a plan product excluding abortion services for "religious employers" as defined under California law, specifically, California Health and Safety Code section 1367.25(c)(1).

85.     Although litigation is still ongoing, California has been successful in challenges stemming from DMHC's 2014 letters.  *See Missionary Guadalupanas of the Holy Spirit, Inc., v. Rouilllard*, Sacramento Superior Court Case No. 34-2015-80002226 (rejecting claim under the California APA because its provisions do not apply when the agency's action merely confirms

---

[57] OCR Complaint Nos. 14–193604, 15–193782, and 15–195665.
[58] DMHC explained in its August 22, 2014 letter that the Knox-Keene Act requires the provision of basic healthcare services and the California Constitution prohibits health plans from discriminating against women who choose to terminate a pregnancy.
[59] Letter from OCR Director to Complainants (June 21, 2016), https://perma.cc/G4WP-V69V.
[60] *Id.*

32

law and the agency's application of the law is the only legally tenable interpretation), appeal pending to the Third District Court of Appeal, Case No. C083232; *Skyline Wesleyan Church v. Rouillard*, United States District Court for the Southern District of California, Case No. 3:16-cv-00501 (granting defendants' motion for summary judgment because plaintiffs lacked standing and claims were not ripe); Ninth Circuit appeal pending, Case No. 18-55451; *Foothill Church v. Department of Health Care*, United States District Court for the Eastern District of California, Case No. 2:15-cv-02165-KJM-EFB (granting defendants' motion to dismiss), Ninth Circuit appeal pending, Case No. 19-15658.

86.     The Rule states that, based on its review of OCR's previous closure of complaints against California's August 22, 2014 letter, it has concluded that the aforementioned "sub-regulatory guidance" previously issued by OCR with respect to interpretation of the Weldon Amendment no longer reflects the current position of HHS, OCR, or the HHS Office of the General Counsel.  84 Fed. Reg. at 23179.  The Rule states that HHS "continues to hold the views it expressed" in the NPRM, *Id.*, which noted that despite the constitutional concerns cited in OCR's June 21, 2016 letter, HHS nonetheless remained obligated "to not make certain funding available to covered entities that discriminate in violation of the Weldon Amendment."  83 Fed. Reg. at 3890.

87.     Starting on August 30, 2018, OCR sent a letter to California informing it that OCR has reviewed a September 2017 complaint based on the previously closed complaints stemming from the August 22, 2014 DMHC letter to health plans and determined that OCR has sufficient authority and cause to investigate the allegations raised under the Weldon Amendment, the Coats-Snowe Amendment, and the Church Amendments.

88.     As noted *infra*, although "health care entity" is defined by the Weldon Amendment (and the Coats-Snowe Amendment), the Rule includes a far broader definition that includes "a plan sponsor, issuer, or third party administrator," thus allowing an employer, as expressly stated by the Rule, to deny coverage for reproductive services to its employees.  And the Rule also expands Weldon protection to *any* reason for refusing such coverage, not just religious and moral objections.

89.   Both the promulgation of the proposed and final rule shows OCR's intent to not only target the State of California and its residents, healthcare system and laws, but also sets up an unavoidable clash.  Evidence of this has been demonstrated to California throughout the trajectory of this rulemaking.

90.   And on January 17, 2019, OCR issued a letter, entitled a Notice of Violation, regarding California's Reproductive FACT Act, and concluded that California violated the Weldon Amendment and the Coats-Snowe Amendment.[61]  In its letter, OCR claimed it investigated complaints by four California clinics.  The letter concluded that California "engaged in impermissible discrimination" by subjecting the complainants to "potential fines" under the Reproductive FACT Act.  But in light of the permanent court injunctions entered against the FACT Act and the State's statement that it has no intention of enforcing the Act, OCR concluded that no further remedial action is warranted.

91.   Thus although Defendants state in the Rule that they do "not opine upon, and [have] not yet made a judgment on the compatibility of California's policy with the Weldon Amendment," 84 Fed. Reg. at 23179, California has reason to believe its state sovereignty and federal funding are at risk under the Rule given the direct attack on California, the Rule's impermissibly broad interpretation of Weldon which permits a non-covered entity to claim discrimination against the State, and the subsequent receipt of a letter from OCR finding California in violation.  That is because section 88.6(d)(iii) of the Rule makes clear that an OCR "determination of noncompliance [will be used] to inform [HHS's] decision whether to approve, renew, or modify Federal funding to the recipient," and the Rule notes that OCR has already made a determination of noncompliance against California.  84 Fed. Reg. at 23177, 23262.  These actions thus place California in the difficult position of either continuing to uphold its Constitution and state laws or risking loss of billions of dollars of critical federal funds.

92.   California received billions of dollars in funds under the Public Law 115-245, the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (H.R. 6157)—and billions more under future

---

[61] https://www.hhs.gov/sites/default/files/california-notice-of-violation.pdf.

appropriations acts—for labor, education, and health and human services.  This crucial funding

necessary for multiple state agencies and their programs is now at risk   Threatened funding

includes:[62]

- The Elementary and Secondary Education Act of 1965, Title I (funding for schools
  with a high percentage of students with low-income families, 20 U.S.C. § 6301 et.
  seq.); and Title II, part B, subpart 2 (federal support to states to develop, revise, or
  update comprehensive literacy, evidence-based, instruction plans, 20 U.S.C.
  § 6641);

- The Social Security Act, Title XIX, to operate and make payments for Medicaid
  which provides healthcare coverage for low-income adults, families and children,
  pregnant women, the elderly, and people with disabilities;

- The Social Security Act, the State Unemployment Insurance Program, to provide
  payments to laid-off workers;

- The Individuals with Disabilities Education Act to ensure free appropriate public
  education to children with disabilities, including special education and related
  services to those children;

- The Child Care and Development Block Grant Act of 1990 to help low-income
  parents obtain childcare so they are able to work or go to school;

- The Child Support Enforcement and Family Support Programs for child support
  enforcement and family support programs;

---

[62] Section 507(d)(1) of Division B of H.R. 6157 states: "None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  And as is specified in Section 3 of H.R. 1625, "[e]xcept as expressly provided otherwise, any reference to 'this Act' contained in any division of this Act shall be treated as referring only to the provisions of that division."  Public Law 115-245, the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (H.R. 6157), Division B, https://www.congress.gov/bill/115th-congress/house-bill/6157.

- The Workforce Innovation and Opportunity Act, including grants to states for adult employment and training activities, youth activities, and dislocated worker employment and training activities;

- The Wagner-Peyser Act of 1933 to establish a nationwide system of public employment offices to assist individuals seeking employment;

- The Occupational Safety and Health Act, section 23(g), to assist states in administering and enforcing programs for occupational safety and health;

- The Jobs for Veterans State grants program under 38 U.S.C. 4102A(b)(5) to support disabled veterans' outreach program specialists;

- The National Apprenticeship Act to expand apprenticeship and on-the-job training programs;

- The Social Security Block Grant Program to assist states in delivering social services by helping reduce dependency, increase self-sufficiency, prevent abuse and neglect, and limit institutional care, if possible;[63]

- The Older Americans Act of 1965, Section 361, for disease prevention and health promotion programs and activities;

- The 21st Century Cures Act, section 1003(c), and the State Opioid Response Grants Program to assist state response to the opioid crisis;

- The Ryan White HIV/AIDS Program to provide primary medical care and essential support for people with HIV/AIDS;

- The Rehabilitation Act of 1973 to ensure that disabled individuals have access to programs and activities that are funded by federal agencies and to federal employment;

- The Helen Keller National Center Act to assist deaf-blind persons; and

- The McKinney-Vento Homeless Assistance Act to provide assistance to the homeless, especially elderly persons, handicapped persons, and families with children.

[63] https://www.benefits.gov/benefit/775.

1    93.    Specific programs at risk include, among many others: (1) the Public Health

2  Emergency Preparedness Program, which coordinates preparedness and response activities for all

3  public health emergencies, including natural disasters, acts of terrorism, and pandemic diseases

4  and plans and supports surge capacity in the medical care and public health systems to meet needs

5  during emergencies, (2) Chronic Disease Prevention and Health Promotion programs, which work

6  to prevent and control chronic diseases, injuries, and violence, (3) the Health Facilities Licensing

7  Program, which, among other functions regulates the quality of care in over 10,000 public and

8  private health facilities, clinics, and agencies throughout the State, and (4) refugee social services

9  programs for elder care, school impact services, and youth mentoring programs.

10    94.    In addition, California's public universities receive hundreds of millions of dollars of

11  grant funding for medical and scientific research from the National Institutes of Health and the

12  Centers for Disease Control and Prevention, among other agencies within HHS.  Institutions and

13  their net amount in grant funding from HHS in fiscal year 2018 include:[64]

14    • California Polytechnic State University, San Luis Obispo: $1,352,184

15    • California State University, Bakersfield: $356,689

16    • California State University, Northridge: $8,895,002

17    • California State University, San Marcos: $2,460,508

18    • San Francisco State University: $8,501,370

19    • University of California, Berkeley: $132,824,700

20    • University of California, Davis: $251,243,608

21    • University of California, Irvine: $155,496,306

22    • University of California, Los Angeles: $435,373,496

23    • University of California, Merced: $5,707,704

24    • University of California, Riverside: $30,725,968

25    • University of California, San Diego: $462,800,222

26    • University of California, San Francisco: $694,071,148

27    • University of California, Santa Barbara: $17,647,751

28  [64] Data from HHS TAGGS database, available at https://taggs.hhs.gov/SearchRecip.

37

- University of California, Santa Cruz: $38,331,998

95.     Yet despite the substantial amounts of funding and critical programs at risk, California, and other regulated entities, cannot reasonably anticipate what actions Defendants might deem a violation of the Rule.  The Rule's vague and subjective standards, based on overbroad definitions without regard to statutory definitions and ill-reasoned reversals of prior policy and determinations, invite inconsistent and biased enforcement by Defendants. Defendants' previous recent enforcement efforts of federal conscience laws have been arbitrary and discriminatory, and targeted California unfairly.

96.     And although the Rule says it "adopts the enforcement procedures" of Title VI of the Civil Rights Act of 1964, the Rule ignores many of that scheme's procedural protections, including findings on the record after opportunity for hearing (45 C.F.R. § 80.7), and the Rule's potential fund termination based on the conduct of sub-recipients seems unrestrained by the "pinpoint provision" in which Congress limited termination of funding to the "particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found" (42 U.S.C. § 2000d–1).  Furthermore, whereas a complaint under Title VI "must be filed not later than 180 days from the date of the alleged discrimination" (unless extended), 45 C.F.R. § 80.7, the Rule seeks to re-adjudicate a complaint against California's Department of Managed Health Care under the illegal Rule.  84 Fed. Reg. at 23179.

## IV.   THE RULE IMPOSES ADMINISTRATIVE BURDENS AND ONEROUS IMPLEMENTATION COSTS

97.     The Rule includes burdensome assurance and certification, recordkeeping, and reporting requirements which will impose unreasonable costs of implementation on California. 84 Fed. Reg. at 23233-23246.  The State must submit certifications and assurance, maintain detailed records, and ensure compliance with the Rule on an ongoing basis.

98.     In order to be deemed in compliance, the Rule also requires that providers post lengthy notices on their website and in conspicuous physical locations, and to continuously take

1    steps to ensure that such notices are not altered, defaced, or covered by other material.[65]  84 Fed.

2    Reg. at 23270.  The Rule also appears to require inclusion of the notice in personnel manuals,

3    applications, benefits material, training materials, and handbooks in order to be deemed in

4    compliance.  *Id.*

5         99.     This Rule will result in further fiscal harm to California because it makes California

6    responsible for policing others' compliance, including independent political entities, with the

7    Rule.  This would include, for example, ensuring compliance by California's 58 counties, which

8    are separate legal entities from the State (Cal. Gov. Code § 23000, et seq.).  Here, the Rule asserts

9    "that recipients are responsible for their own compliance with Federal conscience and anti-

10    discrimination laws and implementing regulations, *as well as for ensuring their sub-recipients*

11    *comply with these laws*."  84 Fed. Reg. at 23180 (emphasis added).  The Rule also asserts that the

12    State may be liable for the conduct of any entity it contracts with:  "The Department notes,

13    however, that the conduct and activities of contractors engaged by the Department, a

14    Departmental program, or a State or local government is attributable to such Department,

15    program, or government for purposes of enforcement or liability under the Weldon amendment."

16    *Id.* at 23207.

17         100.    Under the Rule, the term "sub-recipients" is defined to include "any State, political

18    subdivision of any State, instrumentality of any State or political subdivision thereof, or any

19    person or any public or private agency, institution, organization, or other entity in any State,

20    including any successor, assign, or transferee thereof, to whom there is a pass-through of Federal

21    financial assistance or Federal funds from the Department through a recipient or another sub-

22    recipient, but such term does not include any ultimate beneficiary.  The term may include a

23    foreign government, foreign nongovernmental organization, or intergovernmental organization

24    (such as the United Nations or its affiliated agencies)."  84 Fed. Reg. at 23264.

25    / / /

26    / / /

---

27    [65] Although the Rule states that the notice requirement is voluntary, it also states that "OCR will

28    consider the posting of notices as "non-dispositive" evidence of compliance.  84 Fed. Reg. at 23270.

101.   The Rule thus requires California to create a costly bureaucratic structure to ensure that the Rule's expansive and unlawful provisions are complied with, including compliance by any downstream sub-recipients, public or private.

102.   The high costs of implementation and administrative burdens (which will also impact providers, patients, and insurers) are also unnecessary because existing laws already protect conscience rights, while also balancing patient rights to access lawful medical care.

102.   California estimates that the costs of compliance will be well into the millions.

103.   Indeed, the Rule itself estimates that compliance will cost affected entities a total of approximately $1.06 billion in the first five years.  84 Fed. Reg. at 23240.

104.   And the Rule makes clear that OCR will aggressively pursue all remedial actions, including temporarily withholding, suspending, denying, or terminating federal funds, "[i]f OCR determines that there is a failure to comply with Federal conscience and anti-discrimination laws."  84 Fed. Reg. at 23272.

## FOIA STATUTORY FRAMEWORK AND FACTUAL BACKGROUND

### I.   STATUTORY FRAMEWORK

105.   FOIA promotes open government by providing every person with a right to request and timely receive federal agency records.  5 U.S.C. § 552(a)(3)(A).

106.   In furtherance of its purpose to encourage open government, FOIA imposes strict deadlines on agencies to provide responsive documents to FOIA requests.  *Id.* § 552(a)(6)(A).

107.   An agency must comply with a FOIA request by issuing a determination within 20 business days after receipt of the request.  *Id.* § 552(a)(6)(A)(i).

108.   The determination "must at least inform the requester of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions."  *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 186 (D.C. Cir. 2013).

109.   An agency may be entitled to one ten-day extension of time to respond to a request if it provides written notice to the requester explaining "unusual circumstances" exist that warrant additional time.  5 U.S.C. § 552(a)(6)(B).

110.  An agency must immediately notify the requester of its determination whether to comply with a request, and the reasons for it, and of the right of such person to appeal an adverse determination.  *Id.* § 552(a)(6)(A)(i).  Further, an agency shall make available a FOIA public liaison to aid the requestor in limiting the scope of the request so that it may be processed within the statutory time limit.  *Id.* § 552(a)(6)(B)(ii).

111.  An agency's failure to comply with any timing requirements is deemed constructive denial and satisfies the requester's requirement to exhaust administrative remedies.  *Id.* § 552(a)(6)(C)(i).

112.  A FOIA requester who exhausts administrative remedies may petition the court for injunctive and declaratory relief from the agency's continued withholding of public records.  *Id.* § 552(a)(4)(B).

## II.    FOIA FACTUAL BACKGROUND

113.  On April 25, 2018, California sent the Request by mail and via electronic submission to HHS.

114.  By email and letter, on May 10, 2018, HHS confirmed receipt of the Request, which it had received on April 25, 2018.  HHS assigned it Request Number 2018-00934-FOIA-OS.  In its letter, HHS stated that it "may utilize a 10 working day extension to process your request, as permitted pursuant to the FOIA" if one of two "unusual and exceptional circumstances" applied.

115.  In addition, the letter stated that HHS had "initiated a search to locate records falling within the scope of your request.  If our searching units advise us that you have requested a voluminous amount of records that require extensive search and examination, my staff will contact you shortly to discuss your willingness to modify your request."

116.  With regard to the fee waiver, the letter stated that HHS was "not addressing your request for a fee waiver at this time."

117.  The letter further provided that any questions regarding the status of the Request should be directed to the HHS FOIA office.

118.  On June 6, 2018, California reached out to the assigned HHS FOIA Public Liaison to discuss the status of the Request as suggested in the May 10, 2018 letter.  California received no

1    response.  California reached out to the HHS FOIA Public Liaison again on June 12, 2018, noting

2    that California had also called the number located on the May 10, 2018 letter and reached a

3    voicemail box that was full and no longer accepting messages.  On June 19, 2018, California

4    again emailed the HHS FOIA Public Liaison, noting that California had reached someone at the

5    designated HHS phone number; however, California was told that all status requests should be

6    made via email to the HHS FOIA Public Liaison.

7        119.   On June 26, 2018, California sent its fourth request for a status update.  The HHS

8    FOIA Liaison responded that "HHS FOIA has not received any responsive records from the

9    program office tasked to search for responsive records pertaining to your request."  She stated

10   that she has "reached out once again to those offices (the Office for Civil Rights and the

11   Immediate Office of the Secretary) to ascertain when their records search will be completed."

12   (*See* Exhibit D.)  In response, California asked for clarification as to whether its request was

13   placed in the "simple" or complex" queue pursuant to 45 C.F.R. § 5.24(e).  California sent a

14   follow-up email on July 16, 2018, requesting an update and received no response.

15       120.   Then on February 15, 2019, California provided a duplicate copy of the FOIA request

16   and follow up correspondence at a meeting with OMB which was also attended by representatives

17   of OCR.

18       121.   As of the date of this filing, HHS has not objected to the Request, provided any

19   detailed information regarding specific disclosure of the records sought, nor produced any

20   responsive documents in response to California's April 25, 2018 Request.

21       122.   Under FOIA, HHS was required to have provided California with a determination on

22   the scope of the documents it would produce and the exemptions it would claim within 20

23   working days of receiving the request.  5 U.S.C. § 552(a)(6)(A)(i).  At no point has HHS

24   explicitly extended the 20-day time, nor has it provided details of any "unusual circumstances."

25   *Id.* § 552(a)(6)(B).  Under the statute, HHS could only extend the 20-day time period to 10

26   additional working days (for a total of 30 days) or else "make available its FOIA Public Liaison"

27   "[t]o aid the requestor" in "limit[ing] the scope of the request."  *Id.* § 552(a)(6)(B)(i)-(ii).

28

42

123.   The 30-day period expired on May 30, 2018.  HHS has never provided to California the determination required by statute, nor provided any documents, claimed any exemptions, or provided any reasonably segregable portions of records.  The FOIA Public Liaison has failed to respond to California's communications to discuss processing of its Request in a timely manner.

124.   Where Defendants have failed to provide any substantive responses to the Request within the statutory timeframe, they have constructively denied the Request.  As such, California has exhausted its administrative remedies.  *Id.* § 552(a)(6)(C)(i).

125.   Because HHS failed to provide California with the determination required in the statutory timeframe, and has failed to respond to California's communications to discuss limiting the scope of its Request, FOIA prevents HHS from assessing search fees on California for records responsive to the Request.  *Id.* § 552(a)(4)(A)(viii).

126.   Because of HHS's violations of FOIA, California has been required to expend resources to prosecute this action.

# FIRST CAUSE OF ACTION

## (Violation of APA; 5 U.S.C. § 706—Contrary to Law)

127.   Paragraphs 1 through 126 are realleged and incorporated herein by reference.

128.   The Rule, constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 551(4), (13), 704.

129.   The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

130.   The Rule is not in accordance with the law because it expands statutory definitions and conscience laws by allowing an overly broad range of individuals and entities to refuse to provide virtually any lawful healthcare service or coverage for any reason, not just due to religious and moral objections.  In this way, the Rule goes far beyond what is permitted by the Weldon, Church, and Coats-Snowe Amendments, and other statutes the Rule purports to implement or enforce.

/ / /

/ / /

131.   The Rule also conflicts with several other federal statutes, including Title VII of the Civil Rights Act of the 1964, Title X of the Public Health Services Act and the nondirective counseling requirement, and the Emergency Medical Treatment & Labor Act.

132.   The Rule also conflicts with Section 1554 of the ACA, which forbids the HHS Secretary from promulgating "any regulation" that:

> creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; [or] (5) violates the principles of informed consent and the ethical standards of health care professionals.

42 U.S.C. § 18114.  The Rule violates this provision by creating unreasonable barriers to medical care, including admittedly to patients in rural communities, among others.

132.   The Rule further conflicts with Section 1557 of the ACA, which states that an "individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" on the basis of sex.  42 U.S.C. § 18116; 20 U.S.C. § 1681.

133.   Defendants' reversal of their interpretation of the Weldon Amendment as it relates to California's abortion health plan coverage requirement is also unsupported by any legal authority, and is based on a distortion of existing law.  Defendants' unsupported reversal creates uncertainties for the future of the State's entire healthcare system, from state programs, to hospitals, to patients.

134.   Defendants' violation causes ongoing harm to California and its residents and threatens much greater harm should massive amounts of federal funding to the State be revoked.

135.   By promulgating the Rule, Defendants have acted contrary to law.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid and should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706—Exceeded Statutory Authority)**

136.   Paragraphs 1 through 135 are realleged and incorporated herein by reference.

44

1    137.   HHS is an agency under the APA.  5 U.S.C. § 551(1).

2    138.   The APA requires courts to "hold unlawful and set aside" agency action that is "in

3    excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.

4    § 706(2)(C).  The Rule is in excess of statutory jurisdiction, authority, and limitations in several

5    respects.

6    139.   HHS previously acknowledged that "[n]o statutory provision requires the

7    promulgation of rules to implement the requirements of the Church Amendments, Public Health

8    Service (PHS) Act Sec. 245, and the Weldon Amendment.  74 Fed. Reg. 10,207, 10209 (March

9    10, 2009).

10   140.   Nevertheless, Defendants have acted in excess of statutory authority by granting

11   themselves broad powers to expand statutory definitions in these and other federal laws, including

12   in direct contravention to statutory text, and by granting themselves broad enforcement powers

13   unmoored from any statutory scheme.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

14   ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon

15   it.").

16   141.   By promulgating this new Rule, Defendants have taken action in violation of the

17   APA.  The Rule is therefore invalid and should be set aside as arbitrary and capricious under 5

18   U.S.C. § 706(2)(A).

19                               **THIRD CAUSE OF ACTION**

20      **(Violation of APA; 5 U.S.C. § 706—Arbitrary, Capricious, and Abuse of Discretion)**

21   142.   Paragraphs 1 through 141 are realleged and incorporated herein by reference.

22   143.   The Rule constitutes "[a]gency action made reviewable by statute and final agency

23   action for which there is no other adequate remedy in a court."  5 U.S.C. §§ 551(4), (13), 704.

24   144.   The APA requires courts to "hold unlawful and set aside" agency action that is

25   "arbitrary," "capricious," or an "abuse of discretion."  5 U.S.C. § 706(2)(A).  In this case, the

26   Rule is arbitrary and capricious for several reasons.

27   145.   Defendants offer no reasoned explanation for misconstruing and straining well-

28   established statutory language and definitions in federal conscience laws.  Without substantial

45

justification, Defendants have created limitless categories of individuals, entities, and circumstances under which medical information and care can be refused, and also createdconflicts with other federal laws, including the ACA, Title VII of the Civil Rights Act of the 1964, Title X of the Public Health Services Act and the nondirective counseling requirement, and the Emergency Medical Treatment & Labor Act.

146.  Defendants offer no reasoned explanation for Defendants' reversal of their interpretation of the Weldon Amendment as it relates to California's abortion health plan coverage requirement.  Defendants provide no reasonable justification for now ignoring previous constitutional concerns cited by OCR in its June 21, 2016 letter that may result in the widespread termination of federal funding to California, or California's substantial reliance interest on Defendants' prior interpretation.

147.  The Rule is also arbitrary and capricious because Defendants failed to consider important aspects of the problem that were raised by California and others in public comments, including patient harms, particularly to vulnerable patients, including women, LGBTQ individuals, rural patients, and other vulnerable populations.

148.  In promulgating the Rule, Defendants have offered ill-reasoned analysis for their decision, which runs counter to the evidence in the administrative record, is based on outdated data, and rests on speculative conclusions.  Such speculative conclusions include the unsubstantiated conclusion that the Rule will result in an increase in the number of providers and better patient care because greater enforcement of federal conscience laws will cause more providers to enter and stay in the field , and patients will benefit from more open and honest communications with providers.

149.  The Rule is also arbitrary and capricious because it disregards consequential costs of compliance—including the costs to patients and regulated entities such as the State—and is based on a flawed cost-benefit analysis because it relies on unsubstantiated and speculative benefits such as purported increases in the number of providers and better patient care if medical information and care can be broadly denied under the Rule.

46

150.  Defendants' violation causes ongoing harm to California and its residents and threatens to inflict much greater harm by withholding or withholding massive amounts of federal funding to the State.

151.  By promulgating the Rule, without a proper factual or legal basis, Defendants have acted arbitrarily and capriciously, have abused their discretion, have otherwise acted not in accordance with law, and have taken unconstitutional and unlawful action in violation of the APA.

152.  For these reasons, the Rule is unlawful and should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION

### (Violation of the Spending Clause - Coerciveness)

153.  Paragraphs 1 through 152 are realleged and incorporated herein by reference.

154.  While the federal government may "create incentives for states to act in accordance with federal policies," it may not use its Spending Clause powers to coerce States to accept those policy changes without running afoul of our system of federalism.  *NFIB*, 567 U.S. 519, 577-78.

155.  Thus, when conditions on the receipt of federal funds takes the form of threats to terminate significant independent grants, "the conditions are properly viewed as a means of pressuring the States to accept policy changes."  *Id*. at 580.

156.  The Rule violates the Spending Clause because it crosses the line from pressure to compulsion.  It leaves the State with no practical alternative but to surrender and comply with the Rule or risk the loss of a substantial portion of the State's budget.

157.  The Rule is so severe that it forces the State and its entities adopt the Defendants' regulatory scheme and forego enforcement of its state laws and the exercise of its police powers, or risk the loss of billions of dollars in federal funds, including funds for Medicaid, and educational and labor programs.

158.  The Rule is thus tantamount to "a gun to the head."  *NFIB*, 567 U.S. 519, 581.  If California opts out of complying with the Rule (or even "[i]f OCR determines that there is a failure to comply") 84 Fed. Reg. 23170, 23271 (May 21, 2019), California "would stand to lose

47

1    not a relatively small percentage" of its existing federal funding, but billions of dollars of critical

2    funding for its healthcare, education, and labor programs.  *NFIB*, 567 U.S. at 581.

3       159.  As such, the Rule is an unconstitutional abuse of the Spending Clause of the United

4    States Constitution, and is an additional basis to set aside the Rule under the APA.

5                                    **FIFTH CAUSE OF ACTION**

6                        **(Violation of the Spending Clause - Vagueness)**

7       160.  Paragraphs 1 through 159 are realleged and incorporated herein by reference.

8       161.  The federal government's spending powers are not unlimited, and a condition on the

9    states' receipt of federal funds must be done so unambiguously so as to enable the states to

10   exercise their choice knowingly and cognizant of the consequences of their participation.

11   *Pennhurst State Sch. and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

12      162.  The Rule cannot be upheld under the Spending Clause because the Rule is vague and

13   does not provide adequate notice of what specific action or conduct, if engaged in, will result in

14   the withholding of federal funds.  Because of the Rule's vague and subjective standards, which

15   are based on newly expanded definitions that pay no regard to statutory text, California cannot

16   reasonably anticipate what actions Defendants might deem in violation of the Rule.

17      163.  For example, because the Rule now includes such expansive definitions beyond those

18   long-established by statute—allowing, for example, any medical provider or "health care

19   personnel" to refuse medical care without any information about the patient's medical condition

20   or treatment options, not just on the basis of state and federally protected religious and conscience

21   protections, but also on the basis of "ethical[] or other reasons," and applying to any "action that

22   has a specific, reasonable, and articulable connection to furthering a procedure or a part of a

23   health service program or research activity undertaken by or with another person or entity"—the

24   State cannot make a knowing choice as to whether it would be a violation of the Rule if it takes

25   enforcement action against medical providers or programs that deny care and/or who discriminate

26   against its most vulnerable residents.

27   / / /

28   / / /

164.  Also, the Rule is so broadly and vaguely written that it is nearly impossible to ascertain how California should communicate with its sub-recipients in order to obligate them to comply with the Rule in a manner that effectively protects California's own funding.

165.  Terminating California's funding based on the conduct of third parties that California neither controls nor operates would be financially crippling for the State.  For example, federal funding for the State and for all counties could be placed at risk based on the alleged violation of a single county under this vague rule.

166.  Defendants' reversal of their interpretation of the Weldon Amendment as it relates to California's abortion health plan coverage requirement is also unsupported by any legal authority. This unsupported reversal creates uncertainties as to what additional state laws and policies may also now be deemed a violation of the Rule.

167.  And the January 18, 2019 "Notice of Violation" issued against California, although it concluded that further remedial action against California was not warranted, could, under the Rule, be deemed a "determination" that could "inform funding decision-making."  84 Fed. Reg. at 23177, 23262.

168.  Yet despite the substantial amounts of funding and critical programs at risk and the evident set up for a direct confrontation between California and the OCR, California cannot reasonably anticipate what actions Defendants might deem a violation of the Rule.  The Rule's vague and subjective standards, based on overbroad definitions without regard to statutory definitions and ill-reasoned reversals of prior policy and determinations, invite inconsistent and biased enforcement by Defendants.

169.  As such, the Rule is an unconstitutional abuse of the Spending Clause of the United States Constitution, and is an additional basis to set aside the Rule under the APA.

## SIXTH CAUSE OF ACTION

**(Violation of the Spending Clause – Post-Acceptance Conditions on Federal Funds)**

170.  Paragraphs 1 through 169 are realleged and incorporated herein by reference.

171.  The Rule cannot be upheld under the Spending Clause because the Rule constitutes post-acceptance conditions on federal funds.  *Pennhurst*, 451 U.S. 1, 17 ("Though Congress'

49

1    power to legislate under the spending power is broad, it does not include surprising participating

2    States with post acceptance or "retroactive" conditions.); *NFIB*, 567 U.S. 519, 584 (a state could

3    hardly anticipate that the federal government's reservation of the right to alter or amend Medicaid

4    included the power to transform the program dramatically).

5         172.  In this case, the Rule dramatically alters the scope of federal conscience laws,

6    California's ability to enforce its own laws (including laws previously found by OCR not to

7    violate federal conscience laws) and compliance requirements, and threatens to withhold massive

8    amounts of federal funding unless California capitulates to the provisions of the new Rule.

9         173.  The Rule was published in the Federal Register on May 21, 2019.  The Rule is set to

10   go into effect on July 22, 2019.

11        174.  In fact, even before the Rule was finalized, OCR contacted California to re-open its

12   investigation.  See Letter from Roger T. Severino, Dir., Dep't of Health & Human Serv's. Office

13   for Civil Rights, to Xavier Becerra, Att'y. Gen., State of Cal. (Jan. 18, 2019), available at

14   https://www.hhs.gov/sites/default/files/california-notice-of-violation.pdf.

15        175.  As such, the Rule is an unconstitutional abuse of the Spending Clause of the United

16   States Constitution, and is an additional basis to set aside the Rule under the APA.

17                              **SEVENTH CAUSE OF ACTION**

18                        **(Violation of the Spending Clause - Unrelatedness)**

19        176.  Paragraphs 1 through 175 are realleged and incorporated herein by reference.

20        177.  The Rule cannot be upheld under the Spending Clause because the Rule is not

21   rationally related to the federal interest in the particular programs that receive federal funds.  *See*

22   *South Dakota v. Dole*, 483 U.S. 203 (1987); *Massachusetts v. United States*, 435 U.S. 444, 461

23   (1978) (plurality op.) (conditioning federal grants illegitimate if unrelated "to the federal interest

24   in particular national projects or programs").

25        178.  The Rule places various federal grants at risk, including those for Medicaid, HIV

26   prevention, emergency preparedness, education programs, such as those under Individuals with

27   Disabilities Education Act, employment programs, including those under the State

28

1   Unemployment Insurance Program, and block grants to help low-income parents obtain childcare

2   so they are able to work or go to school.

3       179.   But the programs, and so many others, bear no rational relationship between the

4   federal conscience laws Defendants seek to enforce and the federal interest in those programs.

5       180.   As such, the Rule is an unconstitutional abuse of the Spending Clause of the United

6   States Constitution, and is an additional basis to set aside the Rule under the APA.

7   **EIGHTH CAUSE OF ACTION**

8   **(First Amendment–Violation of the Establishment Clause)**

9       181.   Paragraphs 1 through 180 are realleged and incorporated herein by reference.

10       182.   The First Amendment provides that "Congress shall make no law respecting an

11   establishment of religion, or prohibiting the free exercise thereof."  U.S. Const., amend. I.  "The

12   clearest command of the Establishment Clause is that one religious denomination cannot be

13   officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see also*

14   *McCreary County, Kentucky v. ACLU*, 545 U.S. 844, 875 (2005) ("the government may not favor

15   one religion over another, or religion over irreligion").

16       183.   Defendants have used their rule-making authority for the primary purpose of

17   advancing and endorsing religious beliefs, and permitting same to be privileged over secular

18   beliefs as a basis for denying medically necessary information, referrals, and services, including

19   emergency healthcare and healthcare guaranteed under federal and state laws.

20       184.   By promulgating the Rule, Defendants have also violated the Establishment Clause

21   because the new Rule goes too far in accommodating an employee's religious objections, placing

22   an undue burden on third parties— i.e., patients who seek access to care.  *Burwell v. Hobby*

23   *Lobby Stores, Inc*. 134 S.Ct. 2751, 2781 n.37 (2014) (requiring consideration of the burden placed

24   on third parties by a religious accommodation).

25       185.   The Rule is not narrowly tailored and ignores the compelling interest of seamless

26   access to healthcare and necessary medical information.  This crosses the line from acceptable

27   accommodation to religious endorsement and entanglement.

28

186.  As such, the Rule violates the Establishment Clause of the First Amendment of the United States Constitution, and is an additional basis to set aside the Rule under the APA.

## NINTH CAUSE OF ACTION

### (FOIA)

### Claim One (Failure to Conduct Adequate Search)

187.  Paragraphs 1 through 186 are realleged and incorporated herein by reference.

188.  California has a statutory right to have HHS process its FOIA Request in a manner that complies with FOIA.  5 U.S.C. § 552(a)(3).  HHS violated California's rights in this regard when it unlawfully failed to undertake a search that is reasonably calculated to locate all records that are responsive to California's April 25, 2018 Request.

189.  Unless enjoined and made subject to a declaration of California's legal rights by this Court, HHS will continue to violate California's rights to receive public records under FOIA.

### Claim Two (Failure to Respond to Request Within Statutory Timeframe)

190.  Paragraphs 1 through 189 are realleged and incorporated herein by reference.

191.  Defendants failed to respond to the Request within the statutorily mandated timeframe, in violation of California's rights under FOIA, including but not limited to 5 U.S.C. § 552(a)(6)(A)(i) and (6)(B).  Defendants also effectively failed to make available the FOIA Public Liaison to assist in narrowing the scope of California's Request to justify extending the statutorily-mandated timeline.  *Id.* § 552(a)(6)(B)(ii).

192.  Unless enjoined and made subject to a declaration of California's legal rights by this Court, HHS will continue to violate California's rights to receive public records under FOIA.

### Claim Three (Failure to Disclose Non-Exempt Records)

193.  Paragraphs 1 through 192 are realleged and incorporated herein by reference.

194.  HHS violated FOIA by refusing to disclose records responsive to California's April 25, 2018 FOIA Request.

195.  California has a statutory right to the records it seeks.

196.  Unless enjoined and made subject to a declaration of California's legal rights by this Court, HHS will continue to violate California's rights to receive public records under FOIA.

1             **Claim Four (Failure to Provide Reasonably Segregable Portions of Records)**

2        197.  Paragraphs 1 through 196 are realleged and incorporated herein by reference.

3        198.  HHS violated FOIA by failing to provide California with reasonably segregable

4 portions of records (after deletion of portions lawfully exempt under FOIA) that are responsive to

5 California's April 25, 2018 FOIA Request, as required by 5 U.S.C. § 552(b).

6        199.  Unless enjoined and made subject to a declaration of California's legal rights by this

7 Court, HHS will continue to violate California's rights to receive reasonably segregable portions

8 of records (after deletion of portions lawfully exempt under FOIA).

9                         **PRAYER FOR RELIEF**

10        WHEREFORE, the State of California, by and through Attorney General Xavier Becerra,

11 respectfully requests that this Court:

12        With regard to the Rule,

13        1.      Issue a declaratory judgment that the Rule is arbitrary and capricious, not in

14 accordance with law, and Defendants acted in excess of statutory authority in promulgating the

15 Rule;

16        2.      Issue an order vacating and setting aside the Rule in accordance with the APA;

17        3.      Issue a declaratory judgment that the Rule violates the Spending Clause;

18        4.      Issue a declaratory judgment that the Rule violates the Establishment Clause;

19        5.      Issue an order enjoining Defendants from withholding, denying, suspending, and/or

20 terminating federal funding from California in connection with the unlawful Rule, or otherwise

21 unlawfully;

22        6.      Issue a preliminary injunction prohibiting the implementation of the Rule;

23        7.      Issue permanent injunction prohibiting the implementation of the Rule;

24        8.      Award California costs, expenses, and reasonable attorneys' fees; and

25        9.      Grant such other relief as the Court deems just and proper.

26 / / /.

27 / / /

28 / / /

1    With regard to the FOIA claims,

2        1.    Order HHS to conduct searches that are reasonably calculated to locate all records

3    responsive to California's April 25, 2018 FOIA Request, with the cut-off date for such searches

4    being the date the searches are conducted, and to provide California, by a date certain, with all

5    responsive records and reasonably segregable portions of responsive records sought;

6        2.    Declare that HHS's failure to make a timely determination regarding California's

7    April 25, 2018 Request, as alleged above, is unlawful under FOIA, 5 U.S.C. § 552(a)(6)(A)(i) and

8    (6)(B);

9        3.    Declare that HHS's failure to search for and disclose to California all records that are

10   responsive to California's Request, as alleged above, is unlawful under FOIA, 5 U.S.C.

11   § 552(a)(3);

12       4.    Declare that HHS's failure to provide California with reasonably segregable portions

13   of records (after deletion of portions lawfully exempt under FOIA) that are responsive to

14   California's Request, as alleged above, is unlawful under FOIA, 5 U.S.C. § 552(b);

15       5.    Award California its reasonable litigation costs and attorney fees pursuant to 5 U.S.C.

16   § 552(a)(4)(E).

17       6.    Grant such other relief as the Court may deem just and proper.

18   Dated:  May 21, 2019                    Respectfully submitted,

19                                           XAVIER BECERRA
                                             Attorney General of California
20                                           MICHAEL NEWMAN
                                             Senior Assistant Attorney General
21                                           KATHLEEN BOERGERS
                                             Supervising Deputy Attorney General
22

23                                           */s/ Neli N. Palma*

24

25                                           NELI PALMA
                                             KARLI EISENBERG
                                             STEPHANIE YU
26                                           Deputy Attorneys General
                                             *Attorneys for Plaintiff State of California, by*
27                                           *and through Attorney General Xavier*
                                             *Becerra*
28