JOSEPH H. HUNT
Assistant Attorney General
JAMES M. BURNHAM
Deputy Assistant Attorney General
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
MICHELLE BENNETT
Assistant Branch Director, Civil Division
REBECCA M. KOPPLIN (CA Bar # 313970)
BENJAMIN T. TAKEMOTO (CA Bar # 308075)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4252
Fax: (202) 616-8460
E-mail: benjamin.takemoto@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>       Plaintiff,<br><br>       vs.<br><br>ALEX M. AZAR II et al.,<br><br>       Defendants. | No. C 19-02405 WHA<br>*Related to*<br>No. C 19-02769 WHA<br>No. C 19-02916 WHA<br><br>**DEFENDANTS' NOTICE OF MOTION; MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION** |
| STATE OF CALIFORNIA, *by and through* ATTORNEY GENERAL XAVIER BECERRA,<br><br>       Plaintiff,<br><br>       vs.<br><br>ALEX M. AZAR II et al.,<br><br>       Defendants. | Hon. William Alsup<br>Hearing: October 30, 2019, 8:00 a.m. |
| COUNTY OF SANTA CLARA et al.,<br><br>       Plaintiffs,<br><br>       vs.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES et al.,<br><br>       Defendants. | Phillip Burton Federal Building & United States Courthouse, Courtroom 12, 19th Fl., 450 Golden Gate Ave., San Francisco, CA 94102 |

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES .................................................................................................. III

3  NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR

4  SUMMARY JUDGMENT ................................................................................................... XI

5  INTRODUCTION ............................................................................................................... 1

6  BACKGROUND ................................................................................................................. 3

7  I.    Statutory History of Relevant Conscience Protections .......................................... 3

8        A.    The Church Amendments .............................................................................. 3

9        B.    The Coats-Snowe Amendment ...................................................................... 4

10       C.    The Weldon Amendment ................................................................................ 4

11       D.    Conscience Protections in the ACA .............................................................. 5

12 II.   Unchallenged Rules that Require Compliance with the Federal Conscience Statutes ... 6

13 III.  HHS Conscience Protection Regulations ................................................................ 7

14       A.    2008 and 2011 HHS Conscience Protection Regulations ............................. 7

15       B.    Notice of Proposed Rulemaking .................................................................... 7

16       C.    Final Rule ....................................................................................................... 8

17 IV.   This Litigation ......................................................................................................... 9

18 ARGUMENT ..................................................................................................................... 10

19 I.    Legal Standard ....................................................................................................... 10

20 II.   Plaintiffs' Spending Clause and Establishment Clause Claims Are Not Ripe. .......... 10

21 III.  Plaintiffs' Claims Lack Merit. ............................................................................... 12

22       A.    HHS Has Statutory Authority to Issue the Rule. ......................................... 12

23       B.    The Challenged Definitions Are Reasonable Exercises of HHS's Authority
               and Are Not Arbitrary or Capricious. .......................................................... 14

24             1.    "Assist in the Performance" ............................................................... 15

25             2.    "Discrimination" ................................................................................ 16

26             3.    "Health Care Entity" ......................................................................... 17

27             4.    "Referral or Refer For" ...................................................................... 18

28       C.    The Rule Is Consistent with Other Provisions of Law. ................................ 20

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

i

|  |  |  |  |
|---|---|---|---|
| | D. | The Rule Is Not Arbitrary and Capricious. | 25 |
| | | 1. HHS Adequately Explained Why It Changed Course. | 26 |
| | | 2. HHS Reasonably Weighed the Rule's Costs and Benefits. | 27 |
| | E. | The Rule Complies with the Spending Clause. | 30 |
| | F. | The Rule Does Not Violate the Separation of Powers. | 33 |
| | G. | The Rule Complies with the Establishment Clause. | 33 |
| | H. | The Rule Complies with the Free Speech Clause. | 35 |
| | I. | The Rule Complies with the Due Process Clause and Equal Protection. | 36 |
| IV. | | Any Relief Should Be Limited. | 38 |
| CONCLUSION | | | 40 |

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

ii

1

# TABLE OF AUTHORITIES

2

**<u>Cases</u>**

3

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)......................................................................................................... 39

4

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    133 S. Ct. 2321 (2013)................................................................................................... 35

5

*Am. Bioscience v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001)...................................................................................... 10

6

7

*Am. Hosp. Ass'n v. NLRB*,
    499 U.S. 606 (1991)....................................................................................................... 30

8

*Arab Anti-Discrimination Comm. v. Thornburgh*,
    970 F.2d 501 (9th Cir. 1991)..................................................................................... 11, 12

9

10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................... 10

11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................... 10

12

13

*BellSouth Corp. v. FCC*,
    162 F.3d 1215 (D.C. Cir. 1999)...................................................................................... 28

14

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962)....................................................................................................... 25

15

16

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)....................................................................................................... 39

17

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ......................................................................................... 39

18

19

*California v. United States*,
    No. C 05-00328 JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ........................ 10-11

20

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
    626 F. 3d 695 (2d Cir. 2010).......................................................................................... 13

21

22

*Chamber of Commerce of U.S. v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005)........................................................................................ 28

23

*Chavez v. Martinez*,
    538 U.S. 760 (2003)....................................................................................................... 37

24

25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)........................................................................................... 14, 15, 26

26

27

*Chrisman v. Sisters of St. Joseph of Peace*,
    506 F.2d 308 (9th Cir. 1974) ......................................................................................... 34

28

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

iii

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .................................................................................................... 22, 28

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ................................................................................... 39

*Coal. for Econ. Equity v. Wilson*,
  122 F.3d 692 (9th Cir. 1997) ..................................................................................... 37

*Collins v. City of Harker Heights, Tex.*,
  503 U.S. 115 (1992) ..................................................................................................... 37

*Corp. of Presiding Bishop of Church v. Amos*,
  483 U.S. 327 (1987) ................................................................................................ 34, 35

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ..................................................................................................... 38

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) ..................................................................................................... 35

*Doe v. Bolton*,
  410 U.S. 179 (1973) ..................................................................................................... 35

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................................. *passim*

*Fields v. Palmdale Sch. Dist.*,
  271 F. Supp. 2d 1217 (C.D. Cal. 2003), *aff'd*, 427 F.3d 1197 (9th Cir. 2005), *opinion amended on denial of reh'g sub nom.*, 447 F.3d 1187 (9th Cir. 2006) ...................... 37

*Franklin Nat'l Bank of Franklin Square v. New York*,
  347 U.S. 373 (1954) ..................................................................................................... 24

*Gill v. Dep't of Justice*,
  913 F.3d 1179 (9th Cir. 2019) ................................................................................... 25

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ................................................................................................ 38

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) ..................................................................................... 27

*Harris v. McRae*,
  448 U.S. 297 (1980) ..................................................................................................... 37

*Judulang v. Holder*,
  565 U.S. 42 (2011) ....................................................................................................... 15

*Kim v. United States*,
  121 F.3d 1269 (9th Cir. 1997) ................................................................................... 37

*Kong v. Scully*,
  341 F.3d 1132 (9th Cir. 2003), *op. am. on denial of reh'g*, 357 F.3d 895 (9th Cir. 2004) ............... 34

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

iv

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ......................................................................................................... 36, 37

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................................................ 28

*Larson v. Valente*,
   456 U.S. 228 (1982) ............................................................................................................. 34

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ................................................................................................ 38

*Lee v. Waters*,
   433 F.3d 672 (9th Cir. 2005) ................................................................................................ 12

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................................................. 38

*Massachusetts v. Mellon*,
   262 U. S. 447 (1923) ............................................................................................................ 31

*Mayo Found. for Med. Educ. & Research v. United States*,
   562 U.S. 44 (2011) ......................................................................................................... 15, 19

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002) ......................................................................................... 32, 33

*McCrary v. Gutierrez*,
   No. C-08-015292, 2010 WL 520762 (N.D. Cal. Feb. 8, 2010) ............................................ 10

*McDaniels v. Stewart*,
   No. 3:15-CV-05943-BHS-DWC, 2016 WL 499316 (W.D. Wash. Feb. 8, 2016) ................. 38

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir. 2001) ............................................................................................... 39

*Mills v. United States*,
   742 F.3d 400 (9th Cir. 2014) ........................................................................................... 36, 37

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ......................................................................................... 28, 30

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ......................................................................................................... 22, 25

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ............................................................................................................... 25

*Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.*,
   545 U.S. 967 (2005) ......................................................................................................... 16, 26

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*,
   468 F.3d 826 (D.C. Cir. 2006) ............................................................................................. 10

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

v

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
 138 S. Ct. 2361 (2018) ................................................................................ 19, 20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
 538 U.S. 803 (2003) ............................................................................................ 12

*Nat'l Fed. of Indep. Business v. Sebelius*,
 567 U.S. 519 (2012) ...................................................................................... 31, 32

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
 523 U.S. 726 (1998) ...................................................................................... 11, 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
 451 U.S. 1 (1981) ................................................................................................ 32

*Perez-Guzman v. Lynch*,
 835 F.3d 1066 (9th Cir. 2016) ............................................................................ 16

*Pers. Adm'r of Mass. v. Feeney*,
 442 U.S. 256 (1979) ............................................................................................ 38

*Poe v. Ullman*,
 367 U.S. 497 (1961) ............................................................................................ 12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
 566 U.S. 639 (2012) ...................................................................................... 22, 23

*Reno v. Flores*,
 507 U.S. 292 (1993) ............................................................................................ 24

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
 547 U.S. 47 (2006) .............................................................................................. 35

*Rust v. Sullivan*,
 500 U.S. 173 (1991) ...................................................................................... 36, 37

*Samantar v. Yousuf*,
 560 U.S. 305 (2010) ............................................................................................ 18

*San Diego Cty. Gun Rights Comm. v. Reno*,
 98 F.3d 1121 (9th Cir. 1996) ........................................................................ 11, 12

*San Luis & Delta-Mendota Water Auth. v. Locke*,
 776 F.3d 971 (9th Cir. 2014) .............................................................................. 27

*Snoqualmie Indian Tribe v. City of Snoqualmie*,
 186 F. Supp. 3d 1155 (W.D. Wash. 2016) .......................................................... 38

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998) .............................................................................................. 10

*Tenn. Valley Auth. v. Hill*,
 437 U.S. 153 (1978) ............................................................................................ 25

*Texas v. United States*,
   523 U.S. 296 (1998) .................................................................................. 11

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) .................................................................................. 11

*The Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................... 28

*Toilet Goods Ass'n v. Gardner*,
   387 U.S. 158 (1967) .................................................................................. 12

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ............................................................................. 39

*United States v. Marion Cty. Sch. Dist.*,
   625 F.2d 607 (5th Cir. 1980) ............................................................ 13, 14

*United States v. Mattson*,
   600 F.2d 1295 (9th Cir. 1979) ................................................................. 14

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ............................................................................. 12-13

*United States v. Sineneng-Smith*,
   910 F.3d 461 (9th Cir. 2018) ................................................................... 31

*W.E.B. DuBois Clubs of Am. v. Clark*,
   389 U.S. 309 (1967) .................................................................................. 11

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................. 36

*Washington v. Seattle Sch. Dist. No. 1*,
   458 U.S. 457 (1982) .................................................................................. 38

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) .................................................................................. 39

*Western Oil & Gas Ass'n v. Sonoma Cty.*,
   905 F.2d 1287 (9th Cir. 1990) ................................................................. 12

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) .................................................................................. 21

*Yahoo! Inc. v. La Ligue Contre le Racisme et l'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ................................................................. 10

**Statutes**

5 U.S.C. § 301 ..................................................................................... 12, 13

5 U.S.C. § 706(2) ............................................................................................................... 39

22 U.S.C. § 2151b(f) ............................................................................................................ 3

22 U.S.C. § 7631(d) ............................................................................................................ 3

26 U.S.C. § 5000A .......................................................................................................... 3, 6

29 U.S.C. § 669(a)(5) .......................................................................................................... 3

40 U.S.C. § 121(c) ....................................................................................................... 12, 13

42 U.S.C. 263a(f)(1)(E) ..................................................................................................... 14

42 U.S.C. § 238n .................................................................................................... *passim*

42 U.S.C. § 280g-1(d) ......................................................................................................... 3

42 U.S.C. § 290bb-36(f) ...................................................................................................... 3

42 U.S.C. § 300a-7 ................................................................................................. *passim*

42 U.S.C. § 1302 ............................................................................................................... 14

42 U.S.C. § 1315a ............................................................................................................. 14

42 U.S.C. § 1395dd(b)(1)(A) ............................................................................................ 23

42 U.S.C. § 5106i(a) ........................................................................................................... 3

42 U.S.C. § 14406 .............................................................................................................. 3

42 U.S.C. § 18023 ................................................................................................. *passim*

42 U.S.C. § 18032(d)(3)(D)(i) .......................................................................................... 21

42 U.S.C. § 18081 .......................................................................................................... 3, 6

42 U.S.C. § 18113 ................................................................................................. *passim*

42 U.S.C. § 18114 ................................................................................................... 20, 21, 22

42 U.S.C. § 18116 ............................................................................................................. 23

42 U.S.C. § 1320a-1(h) ....................................................................................................... 3

42 U.S.C. § 1320c-11 .......................................................................................................... 3

42 U.S.C. § 1395cc(f) .......................................................................................................... 3

42 U.S.C. § 1395i-5 ............................................................................................................. 3

42 U.S.C. § 1395w-22(j)(3)(B) ........................................................................................... 3

42 U.S.C. § 1395x ........................................................................................................... 3

42 U.S.C. § 1396a(a) ...................................................................................................... 3

42 U.S.C. § 1396f .......................................................................................................... 3

42 U.S.C. § 1396s(c)(2)(B)(ii) ...................................................................................... 3

42 U.S.C. § 1396u-2(b)(3)(B) ....................................................................................... 3

42 U.S.C. § 1397j-1(b) .................................................................................................. 3

Title X of the Public Health Services Act,
    Pub. L. No. 91-572, 84 Stat. 1504 (1970) ........................................................... 24

An Act to Extend through Fiscal Year 1974 Certain Expiring Appropriations Authorizations in the
Public Health Service Act,
    Pub. L. No. 93-45, 87 Stat. 91 (1973) ................................................................. 34

Consolidated Appropriations Act, 2005,
    Pub. L. No. 108-447, 118 Stat. 2809 ..................................................................... 4

Departments of Defense and Labor, Health and Human Services, and Education, and Related
Agencies Appropriations Act, 2019,
    Pub. L. No. 115-245, 132 Stat. 2981 ............................................................ *passim*

Consolidated Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat. 13 ............................................................................ 3

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 10

**Legislative Material**

Balance Budget Downpayment Act, II,
    142 Cong. Rec. S2268 (Mar. 19, 1996) ................................................................ 4

**Adminstrative and Executive Materials**

45 C.F.R. pt. 16 ............................................................................................................ 9

45 C.F.R. pt. 75 ............................................................................................................ 9

45 C.F.R. § 75.207 ....................................................................................................... 6

45 C.F.R. § 75.300(a) .............................................................................................. 6, 13

45 C.F.R. § 75.371 ....................................................................................................... 7

45 C.F.R. 75.374 .......................................................................................................... 9

45 C.F.R. § 88 .............................................................................................................. 7

45 C.F.R. § 88.2 ..................................................................................................... *passim*

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

ix

45 C.F.R. § 88.3 ................................................................................................................ 1, 8

45 C.F.R. § 88.4 ................................................................................................................... 8

45 C.F.R. § 88.5 ................................................................................................................... 9

45 C.F.R. § 88.7 ................................................................................................................... 9

45 C.F.R. § 88.10 ................................................................................................................. 9

45 C.F.R. §§ 75.372–75.375 ................................................................................................ 7

45 C.F.R. §§ 75.501–75.520 ................................................................................................ 7

48 C.F.R. § 301.101(b)(1) .................................................................................................. 13

Nondiscrimination on the Basis of Race, Color, National Origin, Handicap or Age in Programs or
Activities Receiving Federal Financial Assistance; Final Rule,
    68 Fed. Reg. 51,334-01 (Aug. 26, 2003) ................................................................... 33

Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or
Discriminatory Policies or Practices in Violation of Federal Law,
    73 Fed. Reg. 78,072-01 (Dec. 19, 2008)................................................................ 7, 24

Rescission of the Regulation Entitled "Ensuing That Department of Health and Human Services Funds
Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law";
Proposal,
    74 Fed. Reg. 10, 207-01 (Mar. 10, 2009) ................................................................... 7

Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws,
    76 Fed. Reg. 9968-02 (Feb. 23, 2011) ......................................................................... 7

Notice of Proposed Rulemaking, Protecting Statory Conscience Rights in Health Care; Delegations of
Authority,
    83 Fed. Reg. 3888-01 (Jan. 26, 2018)....................................................................... 7, 8

Protecting Statutory Conscience Rights in Health Care; Delegations of Authority,
    84 Fed. Reg. 23,170-01 (May 21, 2019)................................................................. *passim*

**Other Authorities**

Kevin Theriot & Ken Connelly, *Free to Do No Harm: Conscience Protections for Healthcare
Professionals*,
    49 Ariz. Stat. L.J. 549 (2017)...................................................................................... 28

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/ ........................................... 15, 17, 19

Pam Belluck, *Planned Parenthood Refuses Federal Funds over Abortion Restrictions*, N.Y. TIMES
(Aug. 19, 2019),
    https://nyti.ms/2NfgJQc ............................................................................................... 23

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

x

1

2

## NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Please take notice that on August 21, 2019, at 12:00 p.m., before the Honorable William Alsup, Phillip Burton Federal Building & United States Courthouse, Courtroom 12, 19th Fl., 450 Golden Gate Avenue, San Francisco, California 94102, Defendants will and hereby do move to dismiss or, in the alternative, for summary judgment pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure in the three above captioned cases: *City and County of San Francisco v. Azar*, No. 19-2405; *California v. Azar*, No. 19-2769; and *County of Santa Clara v. U.S. Department of Health & Human Services*, No. 19-2916. Defendants' motion is based on this notice, the accompanying memorandum of points and authorities, the administrative record, the Court's files and records in this action, any matter that may be judicially noticed, and any other matter that the Court may consider at any oral argument that may be presented in support of this motion. Pursuant to the Court's July 1, 2019 order, ECF No. 66, Plaintiffs' opposition and cross-motion for summary judgment must be filed by September 12, 2019 at 12:00 p.m., Defendants' reply and opposition must be filed by September 26, 2019 at 12:00 p.m., and Plaintiffs' reply must be filed by October 10, 2019 at 12:00 p.m. The Court has scheduled oral argument on October 30, 2019 at 8:00 a.m.

17

18

19

20

21

22

23

24

25

26

27

28

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

xi

**INTRODUCTION**

Since the beginning of this nation, the United States has recognized the importance of and provided accommodations to protect rights of conscience. This case concerns a number of conscience protections that Congress has enacted in the health care arena. Collectively, these Federal Conscience Statutes[1] protect individuals and entities with religious, moral, or other objection to providing (or, in some cases, providing coverage for) certain services in government-provided or government-funded health care programs.

The Federal Conscience Statutes work by placing conditions on federal funding: those who accept the funds voluntarily accept the anti-discrimination provisions. Plaintiffs in this case are government and private entities that have accepted and plan to continue accepting federal funds subject to the Federal Conscience Statutes. But Plaintiffs apparently now object to the accompanying federal conditions. Of course, it is completely routine and unobjectionable for the federal government to encourage favored conduct through conditions on federal funding. Indeed, it is so routine and unobjectionable that Plaintiffs do not challenge any of the Federal Conscience Statutes. Instead, Plaintiffs bring a collateral challenge to a Department of Health and Human Services (HHS) regulation that describes HHS's process for enforcing the Federal Conscience Statutes as to federal funds that HHS administers. The Rule provides clarifying definitions and explains how HHS will take enforcement action, but the Rule is not the source of HHS's enforcement authority; the Federal Conscience Statutes themselves obligate and compel HHS to meet the Statutes' conditions in disbursing HHS funding. Plaintiffs' challenge to the Rule is therefore misplaced. It is Congress—not HHS—that has made the determination to protect health care entities against government or government-funded discrimination.

Even if that were not the case, Plaintiffs' challenge fails on the merits.

*First*, Plaintiffs' cataclysmic predictions about the potential loss of all of their federal health care funding are not ripe. Before Plaintiffs' fears could come to pass, multiple events would have to occur: Plaintiffs would need to discriminate against a health care entity in violation of a Federal Conscience Statute as implemented by the Rule; HHS would need to take enforcement action against Plaintiffs

---

[1] The Federal Conscience Statutes are listed in the challenged rule. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170, 23,264–69 (May 21, 2019) (to be codified at 45 C.F.R. § 88.3) [hereinafter Rule].

1   pursuant to the mechanisms laid out in the Rule; Plaintiffs' attempts to resolve the dispute through formal

2   or informal means, including any procedures provided for by HHS's grants and contracts regulations, must

3   fail; HHS would then need to withhold at least some funding from Plaintiffs; and Plaintiffs would then

4   have to exhaust their administrative appeals. This highly speculative chain of events has not occurred. The

5   Court thus lacks a concrete setting and important factual information to resolve Plaintiffs' claims, such as

6   the amount of federal funding that Plaintiffs stand to lose and the interaction between any applicable state

7   statutes, the Rule, and the Federal Conscience Statutes.

8       *Second*, the Rule is entirely consistent with the Administrative Procedure Act (APA). The Rule

9   does not change any of the Federal Conscience Statutes' substantive requirements, but rather clarifies

10   HHS's enforcement process. This is squarely within HHS's statutory authority. The definitions in the

11   Rule, moreover, are consistent with the Federal Conscience Statutes. And the Rule is neither arbitrary nor

12   capricious because HHS thoroughly considered all of the concerns presented in comments.

13       *Third*, the Rule comports with the Constitution. Because Plaintiffs' constitutional claims are facial,

14   they must show that the Rule is invalid in all of its applications. However, Plaintiffs rely on a series of

15   outlandish hypotheticals about the results of specific violations of certain Federal Conscience Statutes, as

16   well as speculative enforcement actions by HHS. Those Statutes offer recipients a clear and simple deal:

17   federal funding in exchange for non-discrimination. This offer is well within the bounds of the Spending

18   Clause. If the Statutes themselves do not violate the Spending Clause, then a rule faithfully implementing

19   them also does not. Furthermore, it is well established that when the government acts to preserve neutrality

20   in the face of religious differences, it does not "establish" or prefer religion. Here, the Federal Conscience

21   Statutes, and the Rule that implements them, simply ensure that the targeted federal funds are not used to

22   disadvantage individuals or entities on the basis of objections to certain health care activities, some of

23   which may be rooted in religion. The Rule is also far from unconstitutionally vague; its requirements are

24   clear, and—in practice—any funding recipient can seek additional information from HHS if there is any

25   uncertainty. Nor does the Rule interfere with patients' ability to access abortion services in any way.

26       Plaintiffs are welcome to structure their own health care systems in the lawful manner of their

27   choice—the Federal Conscience Statutes and the Rule are not universal requirements binding on the

28   world. But the Statutes and Rule do require that, if Plaintiffs accept federal funds, they must extend the

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

2

accompanying protections to objecting health care entities. These conditions are longstanding. If Plaintiffs are unwilling to afford such protections, or have become unwilling, then they have the straightforward remedy of no longer accepting the conditioned federal funds. What Plaintiffs may *not* do is accept the benefit of their bargain and then balk at fulfilling their anti-discrimination obligations.

The Court should dismiss this case or, in the alternative, grant summary judgment to Defendants.

## BACKGROUND

### I.    Statutory History of Relevant Conscience Protections

Congress has long acted to protect the rights of individuals and entities to maintain the free exercise of their religious, moral, and ethical convictions in providing government-funded health care. The Rule gives effect to various conscience protection provisions put in place by Congress—known collectively as the Federal Conscience Statutes. The four key laws addressed by the Rule, 84 Fed. Reg. 23,170, and discussed below, are (1) the Church Amendments (42 U.S.C. § 300a-7); (2) the Coats-Snowe Amendment (42 U.S.C. § 238n(a)); (3) the Weldon Amendment (*see, e.g.*, Departments of Defense and Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2019, Div. B., sec. 507(d), Pub. L. No. 115-245, 132 Stat. 2981, 3118 (Sept. 28, 2018)); and (4) the conscience protection provisions in the Patient Protection and Affordable Care Act (i.e., 42 U.S.C. § 18113; 42 U.S.C. § 14406(1); 26 U.S.C. § 5000A; 42 U.S.C. § 18081; 42 U.S.C. § 18023(b)(1)(A) and (b)(4)).[2]

### A.    The Church Amendments

The Church Amendments, which were enacted beginning in the 1970s, apply to entities that

---

[2] Other statutes implemented by the Rule include conscience protections for Medicare Advantage organizations and Medicaid managed care organizations with moral or religious objections to counseling or referral for certain services (42 U.S.C. §§ 1395w-22(j)(3)(B) and 1396u-2(b)(3)(B)); Medicare and Medicaid conscience protections related to the performance of advanced directives (42 U.S.C. §§ 1395cc(f), 1396a(w)(3), and 14406(2)); conscience and nondiscrimination protections for organizations related to Global Health Programs, to the extent such funds are administered by the Secretary of Health and Human Services (Secretary) (22 U.S.C. § 7631(d)); conscience protections, attached to federal funding, regarding abortion and involuntarily sterilization, to the extent such funding is administered by the Secretary, (22 U.S.C. § 2151b(f), *see, e.g.*, the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, Div. F, sec. 7018, 133 Stat. 13, 307); conscience protections from compulsory health care or services generally (42 U.S.C.§§ 1396f and 5106i(a)), and under specific programs for hearing screening (42 U.S.C. § 280g-1(d)), occupational illness testing (29 U.S.C. § 669(a)(5)), vaccination (42 U.S.C. § 1396s(c)(2)(B)(ii)), and mental health treatment (42 U.S.C. § 290bb-36(f)); and protections for religious, nonmedical health care providers and their patients from certain requirements under Medicare and Medicaid that may burden their exercise of their religious beliefs regarding medical treatment (*e.g.*, 42 U.S.C. §§ 1320a-1(h), 1320c-11, 1395i-5, 1395x(e), 1395x(y)(1), 1396a(a), and 1397j-1(b)).

receive certain federal funds and to health service programs and research activities funded by HHS. 42 U.S.C. § 300a–7. The Church Amendments require those entities not to discriminate based on religious beliefs or moral convictions regarding "a lawful sterilization procedure or abortion," or, more generally, "any lawful health service or research activity." *Id.* Such discrimination includes threatening an individual's job and threatening to condition government funding on providing abortions. *See generally id.* Although § 300a–7 does not define its terms, it applies explicitly to both the "performance" of certain procedures or activities and "assist[ing] in the performance of" such procedures or activities. *See id.* § 300a-7(b)(1), (b)(2), (c)(1)(B), (c)(2)(B), (d), (e).

**B.    The Coats-Snowe Amendment**

The Coats-Snowe Amendment, 42 U.S.C. § 238n, was enacted with bi-partisan support in 1996. A sponsor of the statute, Senator Olympia Snowe, described her goal as to "protect those institutions and those individuals who do not want to get involved in the performance or training of abortion" while still maintaining adequate medical training standards for women's gynecological care. Balanced Budget Downpayment Act, II, 142 Cong. Rec. S2268. (Statement of Sen. Snowe) (Mar. 19, 1996). Specifically, the Coats-Snowe Amendment prohibits the federal government and any state or local government that receives federal financial assistance from discriminating against a health care entity that, among other things, refuses to perform induced abortions; to provide, receive, or require training on performing induced abortions; or to provide referrals or make arrangements for such activities. 42 U.S.C. § 238n(a)(1). The statute defines "health care entity" as including an "individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions." *Id.* § 238n(c)(2). The statute also applies to accreditation of postgraduate physician training programs. *Id.* § 238n(b)(1).

**C.    The Weldon Amendment**

Since 2004, Congress has also included nondiscrimination protections, referred to as the Weldon Amendment, in every appropriations bill for the Departments of Labor, Health and Human Services, and Education. *See, e.g.*, Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Title V, § 508(d)(1)– (2), 118 Stat. 2809, 3163 (2004); Pub. L. No. 115-245, Div. B., sec. 507(d), 132 Stat. at 3118. The Weldon Amendment provides, in pertinent part, that "[n]one of the funds made available in this Act may be made available to a federal agency or program, or to a State or local government, if such agency, program, or

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

4

government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." *Id*. The Weldon Amendment's scope and definitions are broad, defining the term "health care entity" as "includ[ing] an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *Id*. HHS must abide by the Weldon Amendment in its use and distribution of funds, through grant programs or otherwise.

### D.    Conscience Protections in the ACA

Congress has also included several conscience protections in the Patient Protection and Affordable Care Act (ACA):

*Section 1553* provides that the federal government, and any state or local government or health care provider that receives federal financial assistance under the ACA, or any health plan created under the ACA

> may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing.

42 U.S.C. § 18113. In § 1553, Congress again defined "health care entity" broadly to "include [] an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *Id.* Section 1553 also designates HHS's Office for Civil Rights (OCR) to receive such complaints of discrimination relating to participation in assisted suicide. *Id.*

*Section 1303* declares that the ACA does not require health plans to provide coverage of abortion services as part of "essential health benefits." 42 U.S.C. § 18023(b)(1)(A)(i). Furthermore, no qualified health plan offered through an ACA exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage for, or refer for, abortions. *See id.* § 18023(b)(4). The ACA also clarified that nothing in the act is to be construed to "have any effect on federal laws regarding—(i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for,

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

5

cover, or refer for abortion or to provide or participate in training to provide abortion." *Id.*
§ 18023(c)(2)(A)(i)–(iii).

**Section 1411** designates HHS as the agency responsible for issuing certifications to individuals who are entitled to an exemption from the individual responsibility requirement imposed under section 5000A of the Internal Revenue Code, including when such individuals are exempt based on a hardship (such as the inability to secure affordable coverage without abortion), are members of an exempt religious organization or division, or participate in a "health care sharing ministry[.]" 42 U.S.C. § 18081(b)(5)(A); *see also* 26 U.S.C. § 5000A(d)(2).

## II.   Unchallenged Rules that Require Compliance with the Federal Conscience Statutes

HHS has issued several rules, in addition to the challenged Rule, that require recipients of federal funds to comply with federal law, including the Federal Conscience Statutes. Notably, one of these requirements is that "Federal funding is expended and associated programs are implemented *in full accordance with U.S. statutory and public policy requirements*: Including, but not limited to, those . . . prohibiting discrimination." 45 C.F.R. § 75.300(a) (emphasis added). If a non–Federal entity fails to comply with *Federal statutes, regulations, or the terms and conditions of a Federal award*, the HHS awarding agency or pass-through entity may impose additional conditions, as described in 45 C.F.R. § 75.207. And if the HHS awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the HHS awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances:

(a) Temporarily withhold cash payments pending correction of the deficiency by the non–Federal entity or more severe enforcement action by the HHS awarding agency or pass-through entity.

(b) Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance.

(c) Wholly or partly suspend (suspension of award activities) or terminate the Federal award.

(d) Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and HHS awarding agency regulations at 2 CFR part 376 (or in the case of a pass-through entity, recommend such a proceeding be initiated by a HHS awarding agency).

(e) Withhold further Federal awards for the project or program.

1     (f) Take other remedies that may be legally available.

2   45 C.F.R. § 75.371 (emphasis added); *see also* 45 C.F.R. §§ 75.372–75.375 (describing how HHS may

3   terminate a federal award); 45 C.F.R. §§ 75.501–75.520 (describing auditing process for federal awards).

4   **III.    HHS Conscience Protection Regulations**

5          **A.    2008 and 2011 HHS Conscience Protection Regulations**

6          In 2008, HHS issued regulations clarifying the applicability of the Church, Coats-Snowe, and

7   Weldon Amendments and designating OCR to receive complaints and coordinate with the applicable HHS

8   funding component to enforce certain statutes. *See* 45 C.F.R. § 88 *et seq.* (2008 Rule); Ensuring That

9   Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or

10  Practices in Violation of Federal Law, 73 Fed. Reg. 78,072 (Dec. 19, 2008). The 2008 Rule recognized

11  (1) the inconsistent awareness of these statutory protections among federally funded recipients and

12  protected persons and entities, and (2) the need for greater enforcement mechanisms to ensure that HHS

13  funds do not support morally coercive or discriminatory policies or practices in violation of the Federal

14  Conscience Statutes. 73 Fed. Reg. at 78,078–81.

15         In 2011, however, HHS rescinded the 2008 Rule in part and issued a new rule with a more limited

16  scope and poorly defined enforcement mechanism after noting concerns about whether the 2008 Rule was

17  consistent with the new administration's priorities. *See* Regulation for the Enforcement of Federal Health

18  Care Provider Conscience Protection Laws 76 Fed. Reg. 9968 (2011 Rule); *see also* Rescission of the

19  Regulation Entitled "Ensuring That Department of Health and Human Services Funds Do Not Support

20  Coercive or Discriminatory Policies or Practices in Violation of Federal Law"; Proposal, 74 Fed. Reg.

21  10,207 (Mar. 10, 2009). The preamble to the 2011 Rule expressed HHS's support for conscience

22  protections for health care providers and indicated the need for enforcement of the Federal Conscience

23  Statutes. *See, e.g.*, *id.* at 9968–69. Nevertheless, the 2011 Rule created ambiguity regarding OCR's

24  enforcement tools and processes, and removed the definitions of key statutory terms. *Id.*

25         **B.    Notice of Proposed Rulemaking**

26         On January 26, 2018, HHS published a Notice of Proposed Rulemaking (NPRM) to revise and

27  expand earlier regulations to implement properly the Federal Conscience Statutes in programs funded by

28  HHS. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 Fed. Reg.

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

7

1    3,880 (proposed Jan. 26, 2018) [hereinafter 2018 NPRM]. HHS's stated goals were to (1) "effectively and

2    comprehensively enforce Federal health care conscience and associated anti-discrimination laws"; (2)

3    establish OCR's overall enforcement responsibility to ensure compliance with these federal laws; and (3)

4    clear up confusion caused by certain OCR sub-regulatory guidance. *Id.* at 3,881, 3,890. In particular,

5    "there [wa]s a significant need to amend the 2011 Rule to ensure knowledge, compliance, and enforcement

6    of the Federal health care conscience and associated anti-discrimination laws." *Id*. at 3,887. For example,

7    the 2011 Rule was inadequate because it covered only three of the Federal Conscience Statutes.

8         **C.    Final Rule**

9              Following a sixty-day comment period, HHS analyzed and carefully considered all comments on

10   the NPRM and made appropriate modifications before finalizing the Rule. *See* 84 Fed. Reg. at 23,180.

11   The Rule implements the Federal Conscience Statutes' nondiscrimination protections for individuals,

12   health care providers, and health care entities with objections to providing, participating in, paying for, or

13   referring for, certain health care services. In addition, the Rule provides procedures for the effective

14   enforcement of those protections. To do this, the Rule clarifies Federal Conscience Statutes' requirements,

15   addresses the inadequate enforcement of conscience rights under existing federal laws, and educates those

16   who lack knowledge of their statutory and civil rights or obligations under HHS-funded or administered

17   programs. 84 Fed. Reg. at 23,175–79. The Rule does not change the substantive law of the Federal

18   Conscience Statutes. *See* 84 Fed. Reg. 23,256.

19             The Rule has five principal provisions. First, the Rule collects the various statutory conscience

20   protections that apply to certain HHS-funded health programs. 84 Fed. Reg. at 23,264–69 (to be codified

21   at 45 C.F.R. § 88.3). Second, the Rule defines certain terms that appear in the Rule, including "assist in

22   the performance," "discriminate or discrimination," "health care entity," and "referral or refer for." *Id.* at

23   23,263–64 (to be codified at 45 C.F.R. § 88.2). Third, the Rule requires recipients of federal funds to

24   provide assurances and certifications of compliance with these conscience requirements. *Id.* at 23,269–70

25   (to be codified at 45 C.F.R. § 88.4). Written assurances and certifications of compliance with the Federal

26   Conscience Statutes must be submitted during the application and reapplication processes associated with

27   receiving federal financial assistance or federal assistance. *Id.* Entities that are already receiving such

28   assistance as of the effective date of the Rule are not required to submit an assurance or certification until

they reapply for such assistance, alter the terms of existing assistance, or apply for new lines of federal assistance. *Id.* OCR may require additional assurances and certifications if it or HHS has reason to suspect noncompliance with the Federal Conscience Statutes. *Id.* Fourth, the Rule explains HHS's enforcement authority. *See id.* at 23,271–72 (to be codified at 45 C.F.R. § 88.7). This authority, which HHS has already set forth in the unchallenged regulations referenced *supra*, includes conducting outreach, providing technical assistance, initiating compliance reviews, conducting investigations, and seeking voluntary resolutions, to more effectively address violations and resolve complaints. *Id.* Where voluntary resolutions are not possible, the Rule provides that HHS may supervise and coordinate compliance using existing and longstanding procedures to enforce conditions on grants, contracts, and other funding instruments. *Id.* (citing, *e.g.*, the Federal Acquisition Regulation and 45 C.F.R. Part 75).[3] To ensure that recipients of HHS funds comply with their legal obligations, as HHS does with other civil rights laws within its purview, the Rule requires certain funding recipients (and sub-recipients) to maintain records and cooperate with OCR's investigations, reviews, or enforcement actions. *Id.* Fifth, the Rule states that HHS will favorably consider a notice summarizing the Federal Conscience Statutes as evidence of compliance. *See* 84 Fed. Reg. at 23,270–71 (to be codified at 45 C.F.R. § 88.5).

The Rule also includes a severability provision. 84 Fed. Reg. at 23,272 (to be codified at 45 C.F.R. § 88.10).

## IV.   This Litigation

Plaintiffs filed suit challenging the Rule and moved for a preliminary injunction. Subsequently, the Court granted the parties' stipulated request to postpone the effective date of the Rule until November 22, 2019 and held Plaintiffs' motions for preliminary injunction in abeyance. The Court then set a briefing

---

[3] Involuntary remedies—such as withholding of funds, termination, suspension, or debarment—will not occur under the Rule itself, but rather, under HHS's separate regulations governing grants and contracts. 84 Fed. Reg. 23,222; *see also* 45 C.F.R. 75.374 (addressing HHS's process when a non-federal entity fails to comply with conditions on a federal award, and requiring that "[u]pon taking any remedy for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action, in accordance with written processes and procedures published by the HHS awarding agency" and "must comply with any requirements for hearings, appeals or other administrative proceedings to which the non-Federal entity is entitled under any statute or regulation applicable to the action involved"); 45 C.F.R. pt. 16 (describing the procedures of the Departmental Grant Appeals Board, which reviews certain grants disputes as specified in Appendix A to Part 16).

1   schedule for cross-motions for summary judgment. Defendants now move to dismiss or, in the alternative,

2   for summary judgment.

**ARGUMENT**

3

4   **I.      Legal Standard**

5          Defendants move to dismiss the complaint under Rules 12(b)(1) and (6) of the Federal Rules of

6   Civil Procedure. Plaintiffs bear the burden to show subject matter jurisdiction, and courts must determine

7   if they have jurisdiction before addressing the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

8   94–95, 104 (1998). If this burden is not met, dismissal under Rule 12(b)(1) is proper. Courts should grant

9   a motion to dismiss under Rule 12(b)(6) if the complaint does not contain "enough facts to state a claim

10  to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare

11  recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

12  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 570).

13         In the alternative, Defendants move for summary judgment under Rule 56. Summary judgment is

14  appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment

15  as a matter of law." Fed. R. Civ. P. 56(a). For APA claims, "the district judge sits as an appellate tribunal"

16  to resolve issues at summary judgment. *McCrary v. Gutierrez*, No. C-08-015292, 2010 WL 520762, at *2

17  (N.D. Cal. Feb. 8, 2010) (quoting *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

18  **II.     Plaintiffs' Spending Clause and Establishment Clause Claims Are Not Ripe.**

19         As a threshold matter, Plaintiffs' Spending Clause and Establishment Clause claims are not ripe

20  for review because Plaintiffs have identified no specific enforcement action against them under the Rule—

21  as indeed, they cannot, given that Defendants have postponed the effective date of the Rule. *See Yahoo!*

22  *Inc. v. La Ligue Contre le Racisme et l'Antisemitisme*, 433 F.3d 1199, 1211 (9th Cir. 2006). Both claims

23  rely on hypotheses about HHS's enforcement of the Rule that are not yet clearly factually defined. At least

24  two courts have declined to decide similarly premature challenges to the underlying Federal Conscience

25  Statutes on standing and ripeness grounds. *See, e.g.*, *Nat'l Family Planning & Reprod. Health Ass'n, Inc.*

26  *v. Gonzales* (*NFPRHA*), 468 F.3d 826, 827 (D.C. Cir. 2006) (dismissing plaintiff's Spending Clause and

27  vagueness challenges to the Weldon Amendment for lack of ripeness and standing, because plaintiff could

28  not show that it would ever be injured); *California v. United States*, No. C 05-00328 JSW, 2008 WL

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

10

1  744840, at *3 (N.D. Cal. Mar. 18, 2008) (dismissing plaintiff's Spending Clause challenges to the Weldon

2  Amendment for lack of standing and ripeness because enforcement against the plaintiff was speculative).

3  Plaintiffs' claims rest on "contingent future events that may not occur as anticipated, or indeed

4  may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide*

5  *Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). If Plaintiffs are concerned that, for example,

6  hypothetically a nurse might object to assisting in an abortion, multiple steps would have to occur before

7  this speculative scenario would implicate the Spending Clause or Establishment Clause. First, a nurse

8  would have to object to assisting in an abortion in a way protected by the Statutes and Rule. Next, a

9  healthcare entity would have to take action against that nurse in violation of the Federal Conscience

10 Statutes. Then, HHS would have to become aware of the situation, find the healthcare entity's actions to

11 be discriminatory, and take enforcement action under the Rule that would endanger Plaintiffs' funding.

12 Finally, that enforcement action would have to be upheld after exhaustion of all available administrative

13 remedies. *See supra* note 3. The occurrence of any of these steps is uncertain, much less all of them. Thus,

14 judicial resolution of Plaintiffs' Spending Clause and Establishment Clause claims "may turn out to [be]

15 unnecessary," and they should be dismissed. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726,

16 736 (1998).

17 In addition, this case also presents no concrete factual situation in which to evaluate Plaintiffs'

18 Spending Clause and Establishment Clause claims. Courts "should not be forced to decide constitutional

19 questions in a vacuum." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996)

20 (quoting *W.E.B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 312 (1967)). Because the Rule has never

21 been enforced, and indeed, no funding has ever been withheld under the Federal Conscience Statutes, the

22 contours of any such enforcement action and the scope of funding that may be at risk is unknown. To

23 exercise jurisdiction before any such enforcement action runs the risk of "entangl[ing]" this Court "in an

24 abstract disagreement" over the Rule's validity before "it [is] clear that [Plaintiff's conduct is] covered by

25 the [Rule]," and before any decision has been made that "affect[s] [Plaintiff] in any concrete way." *See*

26 *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 511 (9th Cir. 1991).

27 These claims are also unripe because Plaintiffs would suffer no hardship as to their Spending

28 Clause and Establishment Clause claims if judicial review were postponed. A party suffers no hardship

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

11

1  warranting review unless governmental action "now inflicts significant practical harm upon the interests

2  that the [plaintiff] advances," *Ohio Forestry Ass'n*, 523 U.S. at 733. *See Nat'l Park Hosp. Ass'n v. DOI*,

3  538 U.S. 803, 810 (2003) (noting that a case is not ripe unless "the impact" of the challenged law is "felt

4  immediately by those subject to it in conducting their day-to-day affairs" (quoting *Toilet Goods Ass'n v.*

5  *Gardner*, 387 U.S. 158, 164 (1967))). Plaintiffs cannot claim hardship based on the mere existence of the

6  Rule. *Western Oil & Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1291 (9th Cir. 1990); *see also San Diego*

7  *Gun Rights Comm.*, 98 F.3d at 1132–33 (case not ripe where plaintiffs faced no credible threat of

8  enforcement); *Am.-Arab Anti-Discrimination Comm.*, 970 F.2d at 511 (same). Here, Plaintiffs' many

9  hypothetical enforcement scenarios (*see, e.g.*, Santa Clara's Compl. ¶ 79) illustrate the difficulty of

10  undertaking an unnecessary quest now to resolve Plaintiffs' imagined Spending and Establishment Clause

11  challenges in the absence of any factual context.

12      Nor are Plaintiffs in any immediate danger. The false choice Plaintiffs present—between

13  abandoning state health care policy or losing billions of dollars in federal funds—is not an "immediate"

14  one justifying review of their premature claims. Should Plaintiffs discriminate in a fashion barred by the

15  Federal Conscience Statutes, and should HHS take enforcement action under the Rule, and should

16  Plaintiffs decide not to comply through informal means, Plaintiffs will then have the opportunity, if

17  necessary, to present their challenges to a court. *Am.-Arab Anti-Discrimination Comm.*, 970 F.2d at 511.

18  Because no "irremediable adverse consequences [will] flow from requiring [Plaintiffs to bring] a later

19  challenge," *Toilet Goods Ass'n*, 387 U.S. at 164, there is no present need to decide Plaintiffs' Spending

20  Clause and Establishment Clause claims. *See Lee v. Waters*, 433 F.3d 672, 677 (9th Cir. 2005); *Poe v.*

21  *Ullman*, 367 U.S. 497, 503 (1961).

22  **III.    Plaintiffs' Claims Lack Merit.**

23      **A.    HHS Has Statutory Authority to Issue the Rule.**

24      HHS's statutory authority is fully set forth in the Rule. *See* 84 Fed. Reg. at 23,183–86. In brief,

25  this authority comes from the Federal Conscience Statutes themselves, 5 U.S.C. § 301, 40 U.S.C. § 121(c),

26  and from more specific provisions in various other statutes.

27      First, the Federal Conscience Statutes implicitly grant HHS the authority to condition its funds on

28  compliance with those statutes and to ensure that recipients comply with their requirements. *See United*

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

12

1    *States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (observing that delegated authority may be explicit or

2    implicit). Congress has granted HHS the authority to disburse funds and has also instructed HHS to

3    condition such funds on the terms of the Federal Conscience Statutes. It follows from these authorizations

4    that HHS may ensure that recipients of its funds comply with the Federal Conscience Statutes and explain

5    its interpretation of those statutes. The converse proposition illustrates its own absurdity. Courts have held

6    that some of the Federal Conscience Statutes do not provide a private right of action. *See, e.g.*, *Cenzon-*

7    *DeCarlo v. Mount Sinai Hosp.*, 626 F. 3d 695, 698–99 (2d Cir. 2010). If HHS could not require funding

8    recipients to comply with federal law, the corresponding lack of a private right of action would leave

9    victims of unlawful discrimination without a remedy. It would be this resultant stripping of conscience

10   protections—not the enforcement of conditions on federal funds—that would truly contravene

11   congressional intent.

12        Second, 5 U.S.C. § 301 and 40 U.S.C. § 121(c) grant HHS the authority to administer its funding

13   instruments. HHS has issued several regulations under these statutes that grant it the same authority as

14   does the Rule. Chief among these are the UAR and HHSAR. The UAR requires "that Federal funding is

15   expended and associated programs are implemented *in full accordance with U.S. statutory* and public

16   policy *requirements*: Including, but not limited to, those protecting public welfare, the environment, and

17   *prohibiting discrimination*." 45 C.F.R. § 75.300(a) (emphasis added). Similarly, the HHSAR permits HHS

18   to include "requirements of law" and "HHS-wide policies" in its contracts. *See* 48 C.F.R. § 301.101(b)(1).

19   Of course, some of the federal statutes with which recipients of federal funds must comply are the Federal

20   Conscience Statutes, which prohibit the government and recipients of federal funds from discriminating

21   against entities that decline to engage in certain activities. The Rule does not alter or amend the obligations

22   of the respective statutes, 84 Fed. Reg. at 23,185, but rather ensures that recipients of federal funds do not

23   violate those statutes through the ordinary grant and contract issuing process.

24        The authority to ensure compliance with grant conditions is consistent with the well-established

25   power of the United States "to fix the terms and conditions upon which its money allotments to state and

26   other governmental entities should be disbursed." *See United States v. Marion Cty. Sch. Dist.*, 625 F.2d

27   607, 609 (5th Cir. 1980) (collecting Supreme Court cases). Inherent in the authority to fix such terms and

28   conditions is the authority to sue for specific performance of the recipient's obligations under the grants

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

13

that it accepts. *See id.*; *United States v. Mattson*, 600 F.2d 1295, 1298 (9th Cir. 1979). Nowhere is this authority exercised with greater prominence than to enforce civil rights. *See Marion Cty. Sch. Dist.*, 625 F.2d at 609. In light of this inherent authority to sue for specific performance, it must be the case that HHS can rely on § 301, the UAR, and the HHSAR to take more modest steps to assure compliance, such as investigating a complaint.

In addition to HHS's authority to enforce the conditions of the grants and contracts that it awards, certain statutes explicitly authorize HHS to promulgate regulations implementing conscience protections. For instance, the ACA authorizes the Secretary to issue regulations setting standards for meeting certain of the statute's requirements, including the prohibition against discrimination on the basis of provision of abortion, 42 U.S.C. § 18023(b)(4), and assisted suicide, *id.* § 18113. *See id.* § 18041(a)(1). The latter statutory provision explicitly authorizes OCR to receive complaints of discrimination regarding assisted suicide. *Id.* § 18113(d). The Secretary is also authorized to promulgate regulations "as may be necessary to the efficient administration of the functions with which" he is charged under Medicare, Medicaid, and the Children's Health Insurance Program. *See* 42 U.S.C. § 1302; *see also id.* (granting rulemaking authority regarding small rural hospitals); 42 U.S.C. 263a(f)(1)(E) (granting rulemaking authority regarding certification of laboratories). And, the Secretary has authority to promulgate regulations related to certain Centers for Medicare & Medicaid Services funding instruments. *See, e.g.*, 42 U.S.C. § 1315a; *see generally* 84 Fed. Reg. at 23,185 (listing statutes).

**B.     The Challenged Definitions Are Reasonable Exercises of HHS's Authority and Are Not Arbitrary or Capricious.**

The definitions section of the Rule is plainly within HHS's statutory authority and is not arbitrary or capricious. In their complaints, Plaintiffs attack four definitions: (1) *assist in the performance*, (2) *discriminate* or *discrimination*, (3) *health care entity*, and (4) *referral* or *refer for*. As California acknowledges, *see* Cal.'s Mem. Points & Auth. in Support of Mot. Prelim. Inj. 12–13, ECF No. 11 [hereinafter Cal.'s PI Mem.], these claims are governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Under this standard, a court first asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If the answer is yes, the court must give effect to Congress's intent. If the answer is no—that is, the statute is ambiguous—"the question for the court is

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

14

whether the agency's answer is based on a permissible construction of the statute."[4] *Id.* at 843. For the reasons set forth below, Plaintiffs' challenge to each definition fails at step one or, in the alternative, at step two of *Chevron*.

### 1.   "Assist in the Performance"

HHS's definition of "assist in the performance" is entirely consistent with the Church Amendments, 42 U.S.C. § 300a-7, the only Federal Conscience Statute that contains the term. Although the term is used in the Church Amendments, it is not explicitly defined. The Rule defines the term "assist in the performance" as follows:

> to take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity. This may include counseling, referral, training, or otherwise making arrangements for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions.

84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2).

*1.* Plaintiffs' challenge fails at *Chevron* step one because Congress has directly spoken to the precise question at issue. The Court need only open the dictionary, *see Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011) (applying a dictionary definition at step one) which contains the same commonsense definition as the Rule: *Merriam-Webster* defines *assist* as "to give usually supplementary support or aid to," https://www.merriam-webster.com/dictionary/assist (last visited Aug. 20, 2019), and *performance* as "the execution of an action," https://www.merriam-webster.com/dictionary/performance (last visited Aug. 12, 2019). The Rule's definition is as close to the dictionary definition of these terms as can be without repeating them verbatim: *assist in the performance* is limited to "specific, reasonable, and articulable" connections between the conscientious objector's action and the medical procedure. 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2). "If the connection between an action and a procedure is irrational, there is no actual connection by which the action specifically furthers the procedure." *Id.* at 23,187.

*2.* Even if the Court determines that the term "assist in the performance" is ambiguous, the Court should still uphold HHS's definition because it is eminently reasonable. "At step two of *Chevron*, [courts]

---

[4] This same standard applies to whether the definitions are arbitrary and capricious. *See Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011).

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

15

must 'accept the agency's construction of the statute' so long as that reading is reasonable, 'even if the agency's reading differs from what the court believes is the best statutory interpretation.'" *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1079 (9th Cir. 2016) (quoting *Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.*, 545 U.S. 967, 980 (2005)).

HHS's definition is reasonable in light of the dictionary definitions of "assist" and "performance" and the Rule's requirement that "a specific, reasonable, and articulable connection" exist between the conscientious objector's action and the medical procedure, 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2); *id.* at 23,187 (prohibiting irrational or excessively attenuated connections). In addition, the Rule furthers the statute's purpose to protect individuals and health care entities from discrimination on the basis of their religious or moral convictions by recipients of federal funds; for example, an individual who schedules a patient's abortion is not outside the scope of the Church Amendments merely because they did not perform the abortion themselves. The Rule recognizes that such individuals are also protected because they provide necessary assistance in the performance of an abortion. *See id.* at 23,188.

### 2.    "Discrimination"

Plaintiffs' challenge to HHS's definition of "discriminate or discrimination" is also meritless. The definition, which consists of a three-point list of examples that apply *only to the extent permitted by the Federal Conscience Statutes*, is by definition reasonable. Virtually all of the Statutes covered by the Rule employ the term "discriminate" and, as with "assist in the performance," do not define it. For example, the Coats-Snowe Amendment provides that government recipients of federal funds "may not subject any health care entity to discrimination" on certain bases, such as the "refus[al] to undergo training in the performance of induced abortions." 42 U.S.C. § 238n(a)(1). But the Coats-Snowe Amendment does not explicitly define "discrimination." Consistent with the varying types of discrimination that the Federal Conscience Statutes prohibit, the Rule provides a non-exhaustive list of actions that may constitute discrimination "as applicable to, and to the extent permitted by the applicable statute." *See* 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2). The definition then provides several safe harbors, consisting of actions that, if taken by a regulated entity, would not constitute discrimination. *See id.*

*1.* Plaintiffs' challenge to this definition fails at *Chevron* step one. By its terms, the definition does not extend beyond the Statutes to which it applies. *See* 45 C.F.R. § 88.2 (defining the term to include

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

16

actions "as applicable to, and to the extent permitted by, the applicable statute"). Therefore, the definition does not exceed Congress's intent because it explicitly *cannot* exceed Congress's intent. Moreover, the common definition of "discrimination" is "to make a difference in treatment or favor on a basis other than individual merit," *Discriminate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ discriminate (last visited Aug. 20, 2019), and the Rule merely makes explicit the various manifestations of that broad definition.

*2.* Even if the term is ambiguous, the Court should uphold HHS's definition at *Chevron* step two. As discussed above, the definition by its terms does not extend beyond the meaning of the Statutes, but rather "must be read in the context of each underlying statute at issue, any other related provisions of the Rule, and the facts and circumstances." 84 Fed. Reg. at 23,192. To provide guidance on the meaning of discrimination without being under-inclusive, HHS used the word "includes" to establish a non-exhaustive list of examples that could, in the context of the particular underlying Federal Conscience Statute, constitute discrimination. *See id.* at 23,190. And, to ensure that the Rule was not over-inclusive, HHS included three provisions to protect entities that seek to accommodate those with religious or moral objections. *See id.* at 23,263 (to be codified at 45 C.F.R. § 88.2).

### 3.    "Health Care Entity"

Plaintiffs' challenge to HHS's definition of "health care entity," which appears in the Weldon Amendment, the Coats-Snowe Amendment, and the ACA, also fails. The Rule defines "health care entity" in two parts:

(1) For purposes of the Coats-Snowe Amendment (42 U.S.C. 238n) and the subsections of this part implementing that law (§ 88.3(b)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; or any other health care provider or health care facility. As applicable, components of State or local governments may be health care entities under the Coats-Snowe Amendment; and

(2) For purposes of the Weldon Amendment (e.g., Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub. L. 115-245, Div. B., sec. 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018)), Patient Protection and Affordable Care Act section 1553 (42 U.S.C. 18113), and to sections of this part implementing those laws (§ 88.3(c) and (e)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a

pharmacy; a provider-sponsored organization; a health maintenance organization; a health insurance issuer; a health insurance plan (including group or individual plans); a plan sponsor or third-party administrator; or any other kind of health care organization, facility, or plan. As applicable, components of State or local governments may be health care entities under the Weldon Amendment and Patient Protection and Affordable Care Act section 1553.

84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

*1.* Beginning with the text, each of these statutes defines the term through a non-exhaustive list of constituent entities. The Coats-Snowe Amendment provides that the term "*includes* an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions." 42 U.S.C. § 238n(c)(2) (emphasis added). The Weldon Amendment and the ACA provide that the term "*includes* an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." 42 U.S.C. § 18113(b) (emphasis added); § 507(d)(2), 132 Stat. at 3118. The term "'include' can signal that the list that follows is meant to be illustrative rather than exhaustive." *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010). Furthermore, the statutes contain catch-all phrases: "a participant in a program of training in the health professions" in the Coats-Snowe Amendment and "other health care professional" and "any other kind of health care facility, organization, or plan" in the Weldon Amendment and ACA. Given these features, the statutes plainly contemplate a broader group of health care entities than merely those explicitly listed.

*2.* Even if the term "health care entity" in these statutes were ambiguous, the Rule's definition is reasonable for the reasons stated above: the statutes explicitly contemplate the inclusion of entities beyond those explicitly listed in the statutes, and Plaintiffs have not identified any entity in the Rule's definition that would not meet the ordinary dictionary definition of "health care entity" or the statutes' catch-all provisions. Furthermore, the Rule recognizes that the definition of "health care entity" is a flexible one that depends on "the context of the factual and legal issues applicable to the situation." 84 Fed. Reg. at 23,196. None of the Rule's definitions applies in all circumstances. *See id.*

### 4.    "Referral or Refer For"

Last, Plaintiffs' challenge to "referral or refer for" is misplaced. As with many of the other definitions in the Rule, "referral or refer for" is not defined in the Weldon Amendment, the Coats-Snowe

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

18

Amendment, or the ACA, the only statutes in which they appear. The Rule defines "referral or refer for" through a list of items that qualify as "referral or refer for": the term

> includes the provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure.

84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

*1.* Congress has directly spoken to the question of what constitutes a referral, and the Rule's definition is consistent with Congress's intent. Although the statutes do not include a definition of "referral or refer for" and the legislative history is silent on the matter, the ordinary dictionary definition of the term indicates Congress's intent. *See Mayo Found. for Med. Educ. & Research*, 562 U.S. at 52. As HHS explained, "The rule's definition of 'referral' or 'refer for' . . . comports with dictionary definitions of the word 'refer,' such as the Merriam-Webster's definition of 'to send or direct for treatment, aid, information, or decision.'" 84 Fed. Reg. at 23,200 (quoting *Refer*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/refer) (citing *Refer*, Dictionary.com, available at https://www.dictionary.com/browse/refer). The statutes' structure also makes Congress's intent clear. The addition of the term "for" following "refer" indicates that Congress did not intend the statutes to be limited to a referral document, but rather to include any referral for abortion (or other health services) in a more general sense. For example, the Coats-Snowe Amendment protects not only a health care entity that declines to refer a patient to an abortion provider, but also a health care entity that decline to refer "for" abortions generally. *See, e.g.*, 42 U.S.C. § 238n(a)(1).

*2.* In the alternative, the Rule's definition should be upheld at *Chevron* step two. In addition to being consistent with dictionary definitions and the statutes' structure, the Rule's definition is faithful to the statutes' remedial purposes. As HHS explained, defining the term "referral or refer for" more narrowly would exclude forms of coercion that the statutes protect against. For example, the Supreme Court recently held that a law requiring health care providers to post notices regarding the availability of state-subsidized abortion likely violated the First Amendment. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378–79 (2018). A narrower definition would not include referrals of this sort, even though

they constitute unconstitutional coercion of a health care entity that has a conscientious objection to abortion. The Weldon Amendment, Coats-Snowe Amendments, and the ACA are not this narrow, and HHS acted reasonably when it interpreted the term accordingly.

The definition is reasonable for another reason: it uses a non-exhaustive list that "guide[s] the scope of the definition," recognizing that the terms "take many forms and occur in many contexts." 84 Fed. Reg. at 23,201. This flexibility means that "the applicability of the rule would turn on the individual facts and circumstances of each case" (i.e., "the relationship between the treatment subject to a referral request and the underlying service or procedure giving rise to the request"). *Id.*

### C.     The Rule Is Consistent with Other Provisions of Law.

Plaintiffs also claim that the Rule conflicts with certain statutes. No such conflict exists.

***Section 1554 of the ACA.*** Plaintiffs claim that the Rule conflicts with Section 1554 of the ACA. *See* Cal.'s Compl. ¶ 132, ECF No. 1; S.F.'s Compl. ¶ 115, ECF No. 1; Santa Clara's Compl. ¶ 215. That provision provides as follows:

> Notwithstanding any other provision of [the ACA], the Secretary of Health and Human Services shall not promulgate any regulation that—
>
> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
>
> (2) impedes timely access to health care services;
>
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
>
> (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
>
> (5) violates the principles of informed consent and the ethical standards of health care professionals; or
>
> (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114. Plaintiffs' claim is meritless. All six subjects of Section 1554's sub-sections involve the *denial* of information or services to patients. The Rule, however, denies nothing. It merely revises the 2011 Rule to ensure knowledge of, compliance with, and enforcement of, the longstanding Federal Conscience Statutes. At bottom, Plaintiffs' objection is not so much to the Rule as to the Federal Conscience Statutes that the Rule interprets. Under Plaintiffs' theory, any time a health care entity declines

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

20

1  to provide a service to which it objects, HHS would violate Section 1554. Plaintiffs' argument, then, is

2  that Congress essentially abrogated the Federal Conscience Statutes through Section 1554. Plaintiffs take

3  this position even as to the Weldon Amendment, which Congress has readopted every year since the

4  ACA's passage.

5        The Court should reject Plaintiffs' untenable position. First, Section 1554 expressly applies

6  "[n]otwithstanding any other provision *of this Act*," 42 U.S.C. § 18114 (emphasis added)—that is, the

7  ACA. The great majority of the Federal Conscience Statutes that the Rule implements, of course, are not

8  part of the ACA. Nor are the statutes that give the Secretary authority to award funding grants part of the

9  ACA. Had Congress intended Section 1554 to extend beyond the ACA, it could have simply specified

10  that it applies "[n]otwithstanding any other provision of law[.]" 42 U.S.C. § 18032(d)(3)(D)(i). By its own

11  terms, Section 1554 does not apply to conscience protection provisions outside of the ACA, and therefore

12  does not undermine the Rule's validity.[5]

13        It is a basic principle of statutory interpretation, moreover, that Congress "does not alter the

14  fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might

15  say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Plaintiffs

16  would have this Court believe that Congress effectively gutted the Federal Conscience Statutes, without

17  any meaningful legislative history so indicating, when it passed Section 1554. That proposition is

18  implausible on its face. To the contrary, Congress went out of its way to clarify that nothing in the ACA

19  undermines the Federal Conscience Statutes:

20        Nothing in [the ACA] shall be construed to have *any effect* on Federal laws regarding (i)
21        conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on
         the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide
22        or participate in training to provide abortion.

23  42 U.S.C. § 18023(c)(2) (emphasis added). This clear expression of congressional intent undercuts

24  Plaintiffs' argument that Section 1554 somehow prevents HHS from giving effect to the Federal

25  Conscience Statutes. And, even if that somehow were not enough, Congress added *additional* conscience

26

27        [5] Another reason that Section 1554 is of no moment is that the Rule does not create, impede,
28  interfere with, restrict, or violate anything. Instead, it simply limits what the government chooses to fund
   (i.e., providers that do not engage in discrimination).

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

21

protections in the ACA. *See, e.g.*, 42 U.S.C. § 18113. The ACA adds to and underscores the importance of the Federal Conscience Statutes, contrary to Plaintiffs' claim.

Defendants' interpretation of Section 1554 also comports with common sense. Section 1554's subsections are open-ended. Nothing in the statute specifies, for example, what constitutes an "unreasonable barrier[]," "appropriate medical care[,]" "all relevant information[,]" or "the ethical standards of health care professionals[,]" 42 U.S.C. § 18114. And there is nothing in the ACA's legislative history that sheds light on this provision. Under these circumstances, it is a substantial question whether Section 1554 claims are reviewable under the APA at all. *See Citizens to Pres. Overton Park*, 401 U.S. at 410 (explaining that the APA bars judicial review of agency decision where "statutes are drawn in such broad terms that in a given case there is no law to apply" (citation omitted)).[6] But even if Section 1554 claims are reviewable, it is inconceivable that Congress intended to subject the entire U.S. Code to these general and wholly undefined concepts and that it did so without leaving any meaningful legislative history.

Other principles point in the same direction. "[I]t is a commonplace of statutory construction that the specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). "[T]he specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v.Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Thus, even if Section 1554 applied to regulations implementing the Federal Conscience Statutes (it does not), and even if Section 1554 and those Statutes were in conflict (they are not), the Federal Conscience Statutes would prevail over Section 1554. Section 1554 is at best a general prohibition of certain types of regulations (very broadly described) and does not speak to conscience objections at all. The Federal Conscience Statutes, by contrast, contain specific protections with respect to specific activities in the context of federally funded health programs and research activities. Section 1554, therefore, must give way to the more specific Federal Conscience Statutes and the Rule interpreting them.

---

[6] Even within the ACA, HHS routinely issues regulations placing criteria and limits on what the government will fund, and on what will be covered in ACA programs. Under Plaintiffs' standardless interpretation of Section 1554, it is far from clear that the government could ever impose any limit on any parameter of a health program—even if the program's own statute requires it. Nor is it evident how a court could possibly evaluate challenges brought under Section 1554 if that provision sweeps as broadly as Plaintiffs claim.

***Section 1557 of the ACA.*** California and Santa Clara further claim that the Rule conflicts with Section 1557 of the ACA, 42 U.S.C. § 18116. *See* Cal.'s Compl. ¶ 132; Santa Clara's Compl. ¶ 215(d). Plaintiffs' claim is meritless. Section 1557 provides that, subject to certain exceptions, "an individual shall not," on the grounds of race, color, national origin, sex, disability, or age, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, . . . ." 42 U.S.C. § 18116(a). Nothing in the Rule runs afoul of this prohibition, and Plaintiffs' argument with respect to Section 1557 fails for essentially the same reasons above.

HHS has explained that it intends "to read every law passed by Congress in harmony to the fullest extent possible so there is maximum compliance with each law," including both the Federal Conscience Statutes and Section 1557. 84 Fed. Reg. at 23,183. Plaintiff's speculation that there could be some situation in which the Rule conflicts with Section 1557 is therefore just that—speculation—and cannot support a facial challenge. Even assuming there could be some conflict, however, Congress expressly stated that nothing in the ACA should be construed to have "*any effect*" on federal conscience protection. 42 U.S.C. § 18023(c)(2) (emphasis added). Plaintiffs' claim under Section 1557 (i.e., that the Rule, which implements the Federal Conscience States is inconsistent with Section 1557) cannot survive such clear contrary instruction from Congress.

***Emergency Medical Treatment and Active Labor Act (EMTALA).*** Plaintiffs also argue that the Rule conflicts with EMTALA, which requires hospitals with emergency departments to either provide emergency care "within the staff and facilities available at the hospital" or transfer the patient to another medical facility in circumstances permitted by the statute. 42 U.S.C. § 1395dd(b)(1)(A). *See* Cal.'s Compl. ¶ 131; S.F.'s Compl. ¶ 116; Santa Clara's Compl. ¶ 215. There is no conflict, however. Once again, HHS "intends to read every law passed by Congress in harmony to the fullest extent possible so that there is maximum compliance with the terms of each law." 84 Fed. Reg. at 23,183. With respect to EMTALA specifically, HHS indicated that it generally agrees with the explanation in the preamble to the 2008 Rule that fulfilling the requirements of EMTALA would *not* conflict with the Federal Conscience Statutes that the Rule interprets. *See id.*

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

23

Plaintiffs point to the possibility that emergency medical personnel may refuse to provide care, as well as the possibility of consequences for non-compliance. *See, e.g.*, Cal.'s PI Mem. 16–17. In considering Plaintiffs' facial challenge to the Rule, however, the Court should not assume that some future, hypothetical conflict between EMTALA and the Rule will come to pass. *See Reno v. Flores*, 507 U.S. 292, 309 (1993). Indeed, HHS has explained that it is "not aware of any instance where a facility required to provide emergency care under EMTALA was unable to do so because its entire staff objected to the service on religious or moral grounds." 73 Fed. Reg. 78,087. Regardless, HHS has stated that "where EMTALA might apply in a particular case, the Department would apply both EMTALA and the relevant law under this rule harmoniously to the extent possible." 84 Fed. Reg. 23,188.

**Title X.** California and Santa Clara also argue that the Rule somehow conflicts with Title X of the Public Health Services Act, *see* Pub. L. No. 91-572, 84 Stat. 1504 (1970), which provides federal subsidies for certain types of family planning services. *See* Cal.'s Compl. ¶ 131; Santa Clara's Compl. ¶ 215(f). They suggest that the Rule may be inconsistent with the requirement that Title X family planning services be "voluntary." *See* Cal.'s Compl. ¶ 76; Santa Clara's Compl. ¶ 215(f). However, nothing in the Rule— which merely facilitates health care entities' exercise of their federal conscience rights—makes anyone accept Title X family planning services against their will. *See, e.g.*, Pam Belluck, *Planned Parenthood Refuses Federal Funds over Abortion Restrictions*, N.Y. TIMES (Aug. 19, 2019), https://nyti.ms/2NfgJQc, (quoting the acting president of Planned Parenthood: "When you have an unethical rule that will limit what providers can tell our patients, it becomes really important that we not agree to be in the program").

**Title VII of the Civil Rights Act of 1964.** Plaintiffs also argue that because the Rule does not include the same "undue hardship" exception that Congress included in Title VII, there is a conflict between that statute and the Rule. *See* Cal.'s Compl. ¶ 131; S.F.'s Compl. ¶ 117; Santa Clara's Compl. ¶ 215(e). Once again, however, the Rule merely implements the substantive requirements of the Federal Conscience Statutes. These statutes, unlike Title VII, do not contain an undue hardship exception. Indeed, that Congress included an "undue hardship" exception in Title VII but declined to do so in the Federal Conscience Statutes is strong evidence that Congress did not intend for such an exception to apply. *See, e.g.*, *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make [an issue] subject to local restrictions, as it has done by express

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

24

1    language in several other instances"). In addition, the Federal Conscience Statutes apply in more specific

2    contexts than does Title VII. Therefore, it is reasonable to infer—given the absence of the "undue

3    hardship" limitation in the Federal Conscience Statutes—that Congress did not intend for that limitation

4    to apply. *See* 84 Fed. Reg. at 23,191; *see also Morales*, 504 U.S. at 384 ("[I]t is a commonplace of statutory

5    construction that the specific governs the general[.]").

6         ***"Non-Directive" Appropriations Rider.*** California and Santa Clara also argue that the Rule

7    somehow conflicts with HHS appropriations language requiring that all pregnancy counseling be non-

8    directive. Cal.'s Compl. ¶ 131 (citing 132 Stat. at 2981); Santa Clara's Compl. ¶ 215(f). Their claim fails.

9    The rider applies only to the Title X appropriation, and the Rule does not require Title X funding recipients

10   to engage in pregnancy counseling at all—much less counseling that directs women to any particular

11   outcome with respect to their pregnancy. The Rule implements the Federal Conscience Statutes. Accepting

12   Plaintiffs' argument that the Rule unlawfully requires withholding information from patients would

13   require the Court to believe that—despite Congress's explicit provisions in the Federal Conscience

14   Statutes—Congress, through an appropriations rider, repealed those protections and compelled health care

15   entities to counsel on all pregnancy options, including abortion, even if they have religious or moral

16   objections to providing such counseling—especially given that the Congress that first adopted the

17   appropriations rider also adopted the Coates-Snowe Amendment. That proposition is wholly implausible

18   and should be rejected. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978).

19         **D.       The Rule Is Not Arbitrary and Capricious.**

20        The Rule easily satisfies the deferential review afforded to agency action under the APA. Such

21   action is not arbitrary and capricious if the agency "examined the relevant data and articulated a

22   satisfactory explanation for its action including a 'rational connection between the facts found and the

23   choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins.*, 463 U.S. 29,

24   43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Courts'

25   "review is 'narrow;' [they] may not 'substitute [their] judgment for that of the agency.'" *Gill v. DOJ*, 913

26   F.3d 1179, 1187 (9th Cir. 2019) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14

27   (2009)). "And, [they] will 'uphold a decision of less than ideal clarity if the agency's path may reasonably

28   be discerned.'" *Id.* at 1187–88 (quoting *State Farm*, 463 U.S. at 43).

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

25

### 1.    HHS Adequately Explained Why It Changed Course.

The Rule undeniably revises HHS's approach to enforcing the Federal Conscience Statutes. But HHS is permitted to "'consider varying interpretations and the wisdom of its policy on a continuing basis,' for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (quoting *Chevron*, 467 U.S. at 863–64). There is no heightened standard when an agency changes its policy so long as the agency shows that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515. HHS has met that standard here.

Contrary to California's position, Cal.'s PI Mem. 18–20, HHS did acknowledge that it was changing its policy, including its policy with respect to the Rule's assurance and certification requirements. HHS determined that the preexisting regulatory structure was insufficient to protect the statutory rights and liberty interests of health care entities. *See* 84 Fed. Reg. at 23,228. And it reasonably judged that the 2011 Rule lacked adequate measures to ensure compliance with the Federal Conscience Statutes and promoted confusion, not clarity, about the scope of those statutory protections. The 2011 Rule referenced to just three of the many Federal Conscience Statutes and did not provide adequate incentives for covered entities to "institute proactive measures to protect conscience, prohibit coercion, and promote nondiscrimination." *Id.* at 23,228. Moreover, the 2011 Rule failed to provide sufficient information concerning the scope of the various Federal Conscience Statutes, especially regarding their interaction with state laws, including state laws adopted since the promulgation of the 2011 Rule. *Id.*; *see also* NPRM, 83 Fed. Reg. at 3,889.

In the same breath that it claims that HHS did not give reasons for the change, California also criticizes one of HHS's stated reasons—the increase in complaints of alleged violations of the Federal Conscience Statutes. Cal.'s PI Mem. 18–19. The increase in complaints is, of course, just "one of the many metrics used to demonstrate the importance of this rule." 84 Fed. Reg. at 23,229. In addition, the Rule is based on HHS's determination (as explained above) that the existing rule provided inadequate mechanisms for HHS to ensure compliance with the Federal Conscience Statutes, and caused confusion about the scope of conscience protections. In any event, the increase in complaints was both real and

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

26

significant. *See* NPRM, 83 Fed. Reg. at 3886; Final Rule, 84 Fed. Reg. at 23,229. Many of these complaints allege violations of religious and conscience-based beliefs in the medical setting, and while a large subset of them complain of conduct that is outside the scope of the Federal Conscience Statutes and the Rule,[7] some do implicate the relevant statutes, *see*, *e.g.*, A.R. 544,188–207, 544,516, 544,612–23. Further, the complaints overall illustrate the need for HHS to clarify the scope and effect of the Federal Conscience Statutes.

### 2.      HHS Reasonably Weighed the Rule's Costs and Benefits.

In addition to HHS's purpose of improving knowledge about and enforcement of the Federal Conscience Statutes, HHS identified four primary benefits of the Rule in its cost-benefit analysis: (1) increasing the number of health care providers; (2) improving the doctor-patient relationship; (3) eliminating the harm from requiring health care entities to violate their conscience; and (4) reducing unlawful discrimination in the health care industry and promoting personal freedom. 84 Fed. Reg. at 23,246. Plaintiffs criticize HHS's conclusion that the Rule will have the benefit of increasing the number of health care providers. *See* S.F.'s Mem. Points & Auth. in Support of Mot. Prelim. Inj. 14–15, ECF No. 14 [hereinafter S.F.'s PI Mem.]; Cal.'s Compl ¶ 149. That Plaintiffs might give the 2009 poll cited by HHS less weight than HHS did is insufficient to show that the agency acted unreasonably in considering it. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (Even "if the only available data is "'weak,' and thus not dispositive," an agency's reliance on such data "does not render the agency's determination 'arbitrary and capricious.'" (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992)). HHS's policy determination relied on its own analysis, the comments it received in response to the NPRM, anecdotal evidence, and the 2009 poll. 84 Fed. Reg. at 23,247. There was nothing unreasonable, arbitrary, or capricious in HHS considering the poll among other non-empirical evidence. *See Fox Television*, 556 U.S. at 521 ("[E]ven in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense. To predict that complete immunity for fleeting expletives, ardently desired by broadcasters, will lead to a substantial increase in fleeting expletives seems to us an exercise in logic rather than clairvoyance."). Plaintiffs criticize HHS for not having run studies

---

[7] For example, many complaints were from patients and/or parents who criticized the vaccination policies at schools and medical offices, *see*, *e.g.*, AR 542,458.

after the 2011 Rule, but the arbitrary-and-capricious standard does not permit outsiders to compel the agency to investigate an issue in a particular way. *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005).

Moreover, HHS scarcely assigned controlling weight to either the 2009 survey or the ramifications of that survey: HHS ultimately concluded merely that it lacked sufficient data to quantify the theoretical effect but that the available data was adequate "to conclude that the rule will increase, or at least not decrease, access to health care providers and services." 84 Fed. Reg. at 23,247; *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008). ("[W]e are to conduct a 'particularly deferential review'" of an "'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . .'" (citation omitted)).[8] Plaintiffs also criticize HHS for not including "evidence" that the Rule will increase the number of health care providers and entities. *See* S.F.'s PI Mem. 14–15. But an agency need not perform an impossible study to determine the specific effects of a rule that does not yet exist, *see BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999).

Whether the Rule would increase or decrease the number of providers is a difficult policy assessment that should be left to the entity with responsibility for making those assessments—HHS. Indeed, "[w]hether [the Court] would have done what the agency did is immaterial," so long as the agency engages in an appropriate decisionmaking process. *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718 (D.C. Cir. 2016). The court asks only whether the decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416. Here, HHS assessed the available evidence and reasonably concluded that the Rule would "increase, or at least not decrease" the number of providers. 84 Fed. Reg. at 23,247.

California suggests that HHS did not adequately account for the existing effects of Title VII, which Plaintiffs cast as a panacea that has adequately protected the consciences of all health care employees. Cal.'s PI Mem. 21–23. But Title VII's protections are distinct from the Federal Conscience Statutes that Congress separately enacted. *See* 84 Fed Reg. 23,191. What is more, HHS reasonably concluded that the

---

[8] HHS also considered other potential benefits of the rule for health care entities, such as the reduction in "harm that providers suffer when they are forced to violate their consciences." 84 Fed. Reg. 23,246 (citing, among other sources, Kevin Theriot & Ken Connelly, *Free to Do No Harm: Conscience Protections for Healthcare Professionals*, 49 Ariz. Stat. L.J. 549, 565 (2017)).

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

28

status quo was not adequately protecting at least some health care entities who object to participating in certain care, in part due to the increasing number of complaints it was receiving. *See* 84 Fed. Reg. 23,254 (rejecting the option of maintaining the status quo because that would "perpetuate the current circumstances necessitating Federal regulation, which include (1) inadequate to non-existent Federal government frameworks to enforce Federal conscience and antidiscrimination laws and (2) inadequate information and understanding about the obligations of regulated persons and entities and the rights of persons, entities, and health care entities . . . under the Federal conscience and antidiscrimination laws"). And while the Rule adopts the Title VII reasonable-accommodation-of-religion framework in part by recognizing that "when appropriate accommodations are made for objections protected by Federal conscience and antidiscrimination laws, those accommodations do not themselves constitute discrimination[,]" HHS sensibly declined to adopt Title VII's "undue hardship" exception because "Congress chose not to place that limitation on the protections set forth in the [later-in-time] Federal conscience and antidiscrimination laws." 84 Fed. Reg. at 23,191.

Plaintiffs also argue that HHS inadequately considered the effect of the Rule on health-care access, Santa Clara Compl. ¶ 205, Cal.'s Compl. ¶ 147, S.F.'s Compl. ¶ 121, but HHS received no data that would "enable[] a reliable quantification of the effect of the rule on access to providers and to care[,]" 84 Fed. Reg. at 23,250. Absent reliable data from which to quantify the effects, HHS was scarcely arbitrary in relying on the data it did have—and that data indicated that, if anything, the Rule would increase the number of available providers, which can reasonably be predicted to improve patient care. *See id.* at 23,180; *see also Fox Television*, 556 U.S. at 521.

Further, HHS explicitly sought comments on "whether this final rule would result in unjustified limitations on access to health care." 84 Fed. Reg. at 23,250; NPRM, 83 Fed. Reg. at 3,900 (request for comment). Ultimately, and as HHS explained, the majority of the comments it received in response to that request focused on preexisting discrimination in health care and did not attempt to answer the question of how the Rule itself would affect access to health care. 84 Fed. Reg. at 23,250; *see also* Cal.'s PI Mem. 24–26 (similarly focusing on preexisting discrimination and making conjectural statements regarding the actual impact of the Rule). HHS studied academic literature relating to preexisting statutes, but found "insufficient evidence to conclude that conscience protections have negative effects on access to health

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

29

1    care." *See id.* at 23,251 & n.345. HHS also considered a report with anecdotal data on discrimination

2    against LGBT patients in states with religious freedom laws. 84. Fed. Reg. at 23,252. But, as HHS

3    explained, that report contained only anecdotal accounts—thus making it unfit for extrapolation—and

4    made no attempt to establish a causal mechanism between the religious freedom laws and the

5    discrimination it reported. *Id.*

6         Many of these questions—the precise effect of the Rule on patient care, the effort that will be

7    required to comply with a new policy—are difficult to answer. Plaintiffs' view seems to be that an agency

8    cannot take an action until it has commissioned or executed studies on every potential repercussion of that

9    action. While that might be a technocrat's dream, it is not what the APA requires. Instead, the APA

10   commits these decisions to the agency's expertise. "Whether [the Court] would have done what the agency

11   did is immaterial[,]" so long as the agency engages in an appropriate decisionmaking process. *Mingo*

12   *Logan*, 829 F.3d at 718. Where, as here, HHS assessed the available evidence on a subject, and reached a

13   reasonable conclusion, this Court should not accept Plaintiffs' invitation to second-guess the agency's

14   policy conclusions.

15        Finally, Santa Clara claims that the Rule provides "little guidance" on how health care entities can

16   provide health care while respecting the conscience rights of their employees. Santa Clara's Mem. Points

17   & Auth. in Support of Mot. Prelim. Inj. 17–18, ECF No. 36 [hereinafter Santa Clara's PI Mem.]. Santa

18   Clara essentially claims confusion about when and how the Rule might apply in certain hypothetical

19   situations. *See id.* But again, Plaintiffs mount a facial challenge, and Santa Clara's uncertainty about the

20   correct outcome in a hypothetical set of facts does not render the entire Rule arbitrary and capricious in

21   all applications. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991). Further, a health care entity can

22   easily request HHS's technical assistance to resolve any questions about a specific set of facts. *See* 84 Fed.

23   Reg. at 23,180.

24        **E.    The Rule Complies with the Spending Clause.**

25        The governmental plaintiffs allege that the Rule violates the Spending Clause for several reasons,

26   Cal.'s Compl. ¶¶ 142-80, S.F.'s Compl. ¶¶ 130-32, Santa Clara's Compl. ¶¶ 253–54, but all of their

27   contentions are wrong. First, although Plaintiffs purport to object to the *Rule*, their true objection is to the

28   Federal Conscience Statutes, the source of the conditions on the government's offer of funds. The Rule

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

30

1   does not alter those substantive conscience requirements. *See* 84 Fed. Reg. at 23,256. Nor can Plaintiffs

2   show that the Rule deviates from the Federal Conscience Statutes in an unconstitutional way; many of

3   their arguments—for example, that the amount of funding at stake is coercively large—apply equally to

4   the Rule and the Federal Conscience Statutes. In other instances, the Rule is clearly *less* susceptible to

5   attack than the statutes—for example, Plaintiffs argue that the conditions on federal grants are ambiguous,

6   but the Rule provides greater clarity. Plaintiffs' requested relief against the Rules would therefore not

7   redress their objections to the Statutes.

8       Furthermore, Plaintiffs' objections under the Spending Clause fail on their merits:

9       ***Coercion.*** A conditional offer of federal funds will be found to be unduly coercive only in the

10  unusual case—"[i]n the typical case we look to the States to defend their prerogatives by adopting 'the

11  simple expedient of not yielding' to federal blandishments." *NFIB*, 567 U.S. at 579 (Roberts, C.J.)

12  (quoting *Massachusetts v. Mellon*, 262 U. S. 447, 482 (1923)). Comparing this case to *NFIB* shows that

13  no unconstitutional coercion has occurred.

14      First, unlike in *NFIB*, where the states were provided with a binary choice—either expand their

15  Medicaid programs or lose their Medicaid funding—here, it is far from clear that noncompliance with the

16  Federal Conscience Statues and the Rule would impact all of the funding sources identified by Plaintiffs.

17  HHS has a variety of enforcement options when the conditions for its grants are not met, and the Rule

18  clarifies that HHS will always begin by trying to resolve a potential violation through informal means. 84

19  Fed. Reg. at 23,271 (explaining that a failure to comply with the Statutes "*will be resolved by informal

20  means whenever possible*" (emphasis added)); *see also supra* note 3 (discussing HHS's enforcement

21  procedures). Far from the "gun to the head" at issue in *NFIB*, 567 U.S. at 581, this possibility of informal

22  enforcement proceedings is not unduly coercive. Plaintiffs' apocalyptic and hypothetical scenarios of

23  complete funding loss—scenarios that have not remotely come to pass in the decades that many of the

24  Federal Conscience Statutes have existed—are of no help. Plaintiffs cannot succeed on their facial

25  challenge by identifying a handful of implausible and speculative circumstances in which the Federal

26  Conscience Statutes and the Rule *might* have a coercive effect; instead, they must show that the Rule has

27  *no* constitutional applications. *See United States v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018).

28  And, the further factual context that would be available if such a scenario did occur would be helpful to

the Court in evaluating the Spending Clause claims, thus highlighting the lack of ripeness at this time.

Second, unlike in *NFIB*, Plaintiffs cannot plead surprise because the Federal Conscience Statutes and their conditions have existed for decades. *See, e.g.*, 42 U.S.C. § 300a-7 (first Church Amendments enacted in 1973). The ACA provisions at issue in *NFIB*, by contrast, required the states to adopt an entirely new Medicaid expansion. *Cf. NFIB*, 567 U.S. at 584 (Roberts, C.J.) (criticizing the Medicaid expansion as an attempt to "enlist[] the States in a new health care program"). If anything, the Rule should be an improvement from Plaintiffs' perspective because the Rule provides additional transparency, notice, and insight into HHS's enforcement processes.

*Ambiguity.* Plaintiffs make no attempt to argue that the Federal Conscience Statutes are ambiguous, likely because each clearly provides unambiguous notice to funding recipients of the anti-discrimination provisions. The Rule—which adds additional clarification and interpretation on top of that provided in the Statutes—is necessarily clearer and less ambiguous than the Statutes. Either passes the ambiguity analysis, which focuses on whether potential recipients are aware that the government has placed conditions on federal funds, rather than on whether every detail of the conditions has been set forth. *See, e.g.*, *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (observing that "conditions may be 'largely indeterminate,' so long as the statute 'provid[es] clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with the conditions.' Congress is not required to list every factual instance in which a state will fail to comply with a condition. . . . Congress must, however, make the existence of the condition itself . . . explicitly obvious." (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24–25 (1981))). In addition, Plaintiffs' concern that they will be penalized for misconduct by sub-recipients, even if they had no knowledge of any violations or attempted to stop them, is rank speculation about hypothetical enforcement actions, and was addressed by HHS in making changes to the Rule based on comments received on the NPRM. 84 Fed. Reg. at 23,220. Plaintiffs' Spending Clause claims are unripe for resolution.

*Retroactivity.* According to Plaintiffs, the Rule retroactively changes the conditions that apply to Plaintiffs. But this is merely a retread of Plaintiffs' statutory authority arguments, which fail for the reasons described above. In any event, there is no Spending Clause barrier to clarifying the terms on which an entity may receive federal funding. *Cf. NFIB*, 567 U.S. at 582–83 (holding that the Medicaid statute

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

32

1   authorized Congress to modify its terms without creating Spending Clause problems, so long as the

2   modifications did not rise to the level of creating a new program).

3        ***Nexus.*** Plaintiffs' allegation that the Rule is not adequately related to the purpose of the targeted

4   funding fails because it is the Federal Conscience Statutes that establish the linkage between conscience

5   protections and federal funding. The purpose of the Statutes is to ensure that federal funds do not subsidize

6   discrimination against individual and institutional health care entities on the basis of their moral, religious,

7   or other beliefs about certain care (or coverage), in service of the government's interests in protecting the

8   free exercise of religion and in encouraging and overseeing a robust health care system. *See Mayweathers*,

9   314 F.3d at 1066–67 (upholding RLUIPA against a Spending Clause challenge because "by fostering non-

10  discrimination, RLUIPA follows a long tradition of federal legislation designed to guard against unfair

11  bias and infringement on fundamental freedoms"). Plaintiffs object that the funding for their "labor and

12  educational programs" might also be at risk, Cal.'s PI Mem. 31, but offer no supporting evidence. The

13  Rule applies only to funds administered or programs conducted by HHS. Plaintiffs should not succeed on

14  their *facial* challenge on the speculative theory that the Rule would somehow affect funds provided by the

15  Departments of Labor or Education.

16       **F.**     **The Rule Does Not Violate the Separation of Powers.**

17       Plaintiffs assert that the Rule violates the separation of powers because an agency "cannot amend

18  or cancel appropriations that Congress has duly enacted." Santa Clara's Compl. ¶ 257. But the Rule does

19  not "usurp powers that have been assigned to Congress," S.F.'s Compl. ¶ 129—rather the Rule *complies*

20  with congressional dictates. As explained above, the Rule does not change the substantive law at all. 84

21  Fed. Reg. 23,256. Agencies commonly enact such regulations implementing Congress's funding

22  conditions. *See, e.g.*, Final Rule, 68 Fed. Reg. 51,334-01 (Aug. 26, 2003) (a regulation by twenty-two

23  agencies implementing Title VI, the Rehabilitation Act, and the Age Discrimination Act). Once again,

24  Plaintiffs' arguments to the contrary are a retread of their erroneous statutory authority arguments.

25       **G.**     **The Rule Complies with the Establishment Clause.**

26       Plaintiffs' Establishment Clause claims fail for several reasons. First, under their theory, it would

27  be the preexisting Federal Conscience Statutes that violate the Establishment Clause by placing anti-

28  discrimination conditions on federal funding that (in Plaintiffs' view) unduly prioritize provider's

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

33

conscience rights over the preferences of others.[9] Yet Plaintiffs do not challenge the Statutes. *See* Santa Clara's PI Mem. 3–5 (describing several of the Statutes with approval). As explained above, the Rule does not change the substantive law that Congress established in the Federal Conscience Statutes. *See* 84 Fed. Reg. at 23,256.

Furthermore, several of the Federal Conscience Statutes have already been upheld against Establishment Clause challenges, and that reasoning is instructive as to the Rule. *See Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 311 (9th Cir. 1974) (upholding a provision of the Church Amendments—Pub. L. No. 93-45, 87 Stat. 95 § 401—because Congress was seeking to "preserve the government's neutrality in the face of religious differences" rather than to "affirmatively prefer[] one religion over another"); *see also Kong v. Scully*, 341 F.3d 1132 (9th Cir. 2003), *op. am. on denial of reh'g*, 357 F.3d 895 (9th Cir. 2004) (upholding several Federal Conscience Statutes concerning payments for nonmedical care of objectors). Like the Statutes, the Rule serves the legitimate secular purpose of alleviating potential burdens of conscience on individual and institutional health care entities. Like the Statutes, the Rule neither promotes nor subsidizes any religious message or belief; rather, it explains the enforcement processes for existing federal statutes. And, like many of the Statutes, the Rule is generally neutral between various religions and between religion and non-religion. *Cf., e.g.*, 42 U.S.C. § 238n (Coats-Snowe Amendment, the applicability of which does not turn on a religious belief); Pub. L. No. 115-245, Div. B., sec. 507(d) (Weldon Amendment, the applicability of which does not turn on religious belief); 42 U.S.C. § 300a-7 (Church Amendments, which equally protect health care providers from discrimination based on religious beliefs or moral convictions); *contra* S.F.'s PI Mem. 19–21 (arguing that the definition of "discrimination," which does not involve religion, improperly advances religion). The Rule, like the Statutes, fits well within the mantra that "there is ample room for accommodation of religion under the Establishment Clause." *Corp. of Presiding Bishop of Church v. Amos*, 483 U.S. 327, 338 (1987).

**Burden on third parties.** Contrary to Plaintiffs' position, the Establishment Clause does not bar

---

[9] The *Santa Clara* Plaintiffs briefly refer to a "strict scrutiny" test, Santa Clara's Mem. 23 (citing *Larson v. Valente*, 456 U.S. 228 (1982)), that applies only to *denominational* preferences. *Larson*, 456 U.S. at 246. Because they cannot show that the Rule prefers religion to non-religion, they certainly cannot show any such sectarian preference.

all religious accommodations that could have an adverse effect on others. For example, in *Amos*, the Supreme Court held that Title VII's religious exemption to the prohibition against religious discrimination in employment was consistent with the Establishment Clause even though it allowed an employer to terminate the plaintiff's employment. *Id.* While the plaintiff was "[u]ndoubtedly" adversely affected, "it was the Church[,] . . . not the Government" that caused that result. *Id.* at 337 n.15. Similarly, in *Doe v. Bolton*, the Supreme Court characterized a state statute allowing hospitals, physicians, and other employees to refrain from participating in abortions as "appropriate protection [for] the individual and [ ] the denominational hospital." 410 U.S. 179, 197–98 (1973). Here, the Federal Conscience Statutes (and, therefore, the Rule) do not directly burden anyone; instead, they simply encourage entities not to discriminate. If any adverse effects occur, they result from the conscience decisions of health care entities, not the government. *See Amos*, 483 U.S. at 337 n.15 (noting plaintiff employee "was not legally obligated" to take the steps necessary to save his job, and that his discharge "was not required by statute"). To the extent that it is appropriate to consider the burdens on third parties and determine if they "override other significant interests," *Cutter v. Wilkinson*, 544 U.S. 709, 720, 722 (2005), Congress has already struck this balance by conditioning federal health care funds on compliance with the Federal Conscience Statutes.

**Coercion.** Nor does the Rule coerce any religious exercise. Quite the opposite: it allows providers to act in accordance with their consciences due to better understanding and enforcement of the Statutes. And, the Federal Conscience Statutes and the Rule do not "dictate" to anyone, *id.*; rather they offer or provide information about conditioned federal funds for recipients to accept or reject. If Plaintiffs do not wish to avoid discriminating as required by Congress, then they are free to decline HHS funds and make their own unfettered decisions. *See* Belluck, *supra*.

## H.   The Rule Complies with the Free Speech Clause.

The right to freedom of speech "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006); *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013). But contrary to the certain plaintiffs' far-fetched claim, Santa Clara's Compl. ¶¶ 232–240,[10] the Rule does not "compel speech"—by Plaintiffs, LGBTQ

---

[10] The plaintiffs in the Santa Clara action, with the exception of the County of Santa Clara itself, bring this particular claim. *See* Santa Clara's Compl. at 67. None describe themselves in their Complaint

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

35

1    individuals, or any other persons—in violation of the Free Speech Clause. As a threshold matter, the

2    plaintiffs attempt to raise this claim on behalf of third-party LGBTQ and other patients. Santa Clara's

3    Compl. ¶¶ 235–39. But as a general rule, a plaintiff "must assert his own legal rights and interests, and

4    cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S.

5    490, 499 (1975). The allegations in the Santa Clara Complaint fail to overcome this general rule, *see*

6    *generally* Santa Clara's Compl., and therefore lack standing to bring this claim. *See Mills v. United States*,

7    742 F.3d 400, 407 (9th Cir. 2014); *Kowalski v. Tesmer*, 543 U.S. 125, 129–130 (2004). But even if they

8    had established standing, the Rule's enforcement of statutorily-protected conscience rights through federal

9    funding conditions does not place any restrictions, speech-related or otherwise, on patients.

10    Indeed, this claim runs headlong into the Supreme Court's decision in *Rust v. Sullivan*, 500 U.S.

11    173, 193 (1991). There, the Court confirmed that the Constitution clearly permits the Government to

12    "selectively fund a program to encourage certain activities it believes to be in the public interest," *id.*, and

13    upheld Title X funding restrictions "prohibiting counseling, referral, and the provision of information

14    regarding abortion as a method of family planning" under the Free Speech clause. *Id.* at 194. Here, the

15    Rule administers much less restrictive funding restrictions: it places no independent restrictions on anyone

16    and merely implements the Federal Conscience Statutes' requirements that health care entities receiving

17    federal funds adhere to the Statute's anti-discrimination provisions. *See* 84 Fed. Reg. at 23,179. As such,

18    plaintiffs' Free Speech claim fails.

19    **I.    The Rule Complies with the Due Process Clause and Equal Protection.**

20    The *Santa Clara* Plaintiffs also claim that the Rule "violates the rights of Plaintiffs' patients to

21    privacy, liberty, dignity, and autonomy," Santa Clara's Compl. ¶ 229, and that the Rule's "purpose and

22    effect . . . are to discriminate against Plaintiffs' patients based on their sex, gender identity, transgender

23    status, gender nonconformity, and exercise of fundamental rights, including the rights to bodily integrity

24    and autonomous medical decisionmaking, the rights of access to abortion and contraceptives, and the

25    rights to live and express oneself consistent with one's gender identity," *id.* ¶ 245. These claims fall

26    because these plaintiffs lack standing to raise claims on behalf of patients. *See Warth*, 422 U.S. at 499;

27

28

as impacted by the Rule as patients. *See id.* ¶¶ 13 –46.

**Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916**

1   *Mills*, 742 F.3d at 407; *Kowalski*, 543 U.S. at 129–130. They also fail on the merits:

2   ***Due process.*** Courts have "always been reluctant to expand the concept of substantive due process

3   because guideposts for responsible decisionmaking in this unchartered area are scarce and openended,"

4   *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). Accordingly, plaintiffs must provide

5   "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v.*

6   *Martinez*, 538 U.S. 760, 775–76 (2003); *see also Fields v. Palmdale Sch. Dist.*, 271 F. Supp. 2d 1217,

7   1222 (C.D. Cal. 2003), *aff'd*, 427 F.3d 1197 (9th Cir. 2005), *opinion amended on denial of reh'g sub nom.*,

8   447 F.3d 1187 (9th Cir. 2006). "Where a fundamental right is not implicated . . . governmental action need

9   only have a rational basis to be upheld against a substantive due process attack." *Kim v. United States*,

10   121 F.3d 1269, 1273 (9th Cir. 1997). Here, the plaintiffs provide only broad and conclusory descriptions

11   of any fundamental rights potentially at issue, Santa Clara Compl. ¶¶ 226–31, which is not sufficient to

12   state a claim.

13   Regardless, the Rule does not infringe on any fundamental rights that could possibly be at issue.

14   As with the plaintiffs' Free Speech claim, *Rust* disposes of their Due Process claim. "The Government has

15   no constitutional duty to subsidize an activity merely because the activity is constitutionally protected,"

16   and funding restrictions "'place[] no governmental obstacle in the path of a woman who chooses to

17   terminate her pregnancy.'" *Rust*, 500 U.S. at 201 (quoting *Harris v. McRae*, 448 U.S. 297, 315 (1980)).

18   Similarly, here, the Rule merely ensures that, consistent with the Federal Conscience Statutes, federal

19   funds do not subsidize discrimination against health care entities that object to performing certain health

20   care activities. The Rule, thus, places no governmental obstacles in the path of patients' rights to "privacy,

21   liberty, dignity, and autonomy," Santa Clara's Compl. ¶ 229.

22   ***Equal protection.*** Plaintiffs' equal protection claim also fails. "A denial of equal protection entails,

23   at a minimum, a classification that treats individuals unequally." *Coal. for Econ. Equity v. Wilson*, 122

24   F.3d 692, 707 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Aug. 21, 1997), *as*

25   *amended* (Aug. 26, 1997). Here, however, the Rule does *not* create classifications of patients based on

26   "sex, gender identity, transgender status, gender nonconformity," Santa Clara's Compl. ¶ 245, or any other

27   kind of classification; nor does it infringe on a fundamental right, as explained *supra*. The Rule, again,

28   merely administers the Federal Conscience Statutes' prohibition of discrimination against those who

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

37

1   object to performing certain health care services. *See* 84 Fed. Reg. 23,179. Thus, the Rule is facially

2   neutral regarding any of the groups that Plaintiffs identify.

3   Even if the Rule were to have a disparate impact on certain groups—which Plaintiffs do not

4   establish—the "mere fact that a facially neutral policy has a 'foreseeably disproportionate impact' on a

5   protected group, without more, does not rise to the level of an equal protection violation." *McDaniels v.*

6   *Stewart*, No. 3:15-CV-05943-BHS-DWC, 2016 WL 499316, at *7 (W.D. Wash. Feb. 8, 2016) (quoting

7   *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001)); *see also Snoqualmie Indian Tribe v. City*

8   *of Snoqualmie*, 186 F. Supp. 3d 1155, 1164 (W.D. Wash. 2016) ("[D]isparate impact alone cannot show

9   intentional discrimination absent a 'stark' and 'clear' pattern, 'unexplainable on grounds other than

10  [suspect class].'" (citation omitted)). That is because the Supreme Court has long recognized that

11  "*purposeful discrimination* is the condition that offends the Constitution," *Washington v. Seattle Sch. Dist.*

12  *No. 1*, 458 U.S. 457, 484 (1982) (emphasis added) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256,

13  274 (1979)); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 207 (2008) ("[W]ithout proof

14  of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional.").

15  Plaintiffs have not shown any discriminatory purpose. The Rule aims to reduce "confusion over what is

16  and is not required under" the Federal Conscience Statutes and to expand "OCR's enforcement processes."

17  84 Fed. Reg. at 23,175. These aims are not only plainly legitimate, they are supported by HHS's own

18  experiences with enforcement under the 2011. *See id.* Because the Rule is facially neutral and rationally

19  related to several legitimate governmental purposes, and because the plaintiffs fail demonstrate any

20  purposeful or intentional discrimination in issuing the Rule, the plaintiffs' Equal Protection claim has no

21  basis and should be dismissed.

22  **IV.    Any Relief Should Be Limited.**

23  For the reasons discussed above, the Court should dismiss these cases or grant summary judgment

24  to Defendants and deny Plaintiffs' forthcoming motion for summary judgment. But even if the Court were

25  to disagree, under the Court's constitutionally prescribed role, any relief should be limited to redressing

26  the injuries of the parties before this Court. *See Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933–34 (2018).

27  Equitable principles likewise require that any relief "be no more burdensome to the defendant than

28  necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S.

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

38

753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Here, Plaintiffs fail to show that nationwide relief is necessary to redress their alleged injuries. To start, Plaintiffs' choice to bring a facial challenge does not justify nationwide relief. *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244–45 (9th Cir. 2018) (vacating nationwide scope of injunction in facial constitutional challenge to executive order). Nor does Plaintiffs' decision to bring APA claims necessitate a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). Accordingly, the Court should construe the "set aside" language in Section 706(2) as applying only to the named Plaintiffs, especially as no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would do so for more than fifteen years thereafter, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring). Nationwide relief would be particularly harmful here given that three other district courts in Washington, New York, and Maryland are currently considering similar challenges. If the government prevails in all three other jurisdictions, nationwide relief here would render those victories meaningless as a practical matter. It would also preclude appellate courts from testing Plaintiffs' factual assertions against the Rule's operation in other jurisdictions.

Similarly, should the Court decide to set aside or enjoin any portion of the Rule, the Court should allow the remainder to go into effect. In determining whether severance is appropriate, courts look to both the agency's intent and whether the regulation can function sensibly without the excised provision(s). *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

Here, the intent of the agency is clear: Section 88.10 of the Rule provides that, if a provision of the Rule is held to be invalid or unenforceable, "such provision shall be severable[,]" and "[a] severed provision shall not affect the remainder of this part . . . ." 84 Fed. Reg. at 23,272; *see also id.* at 23,226. Nor is there any functional reason why the entire Rule must fall if the Court agrees with Plaintiffs' attacks

Defs.' Notice, Mot. & Mem., Nos. 19-2405, 19-2769, 19-2916

39

1    on particular provisions. The Rule implements a variety of statutory provisions protecting conscience, but

2    Plaintiffs have not alleged harms stemming from compliance with the Rule with respect to each and every

3    one of those statutes. Moreover, the various definitions in Section 88.2 that Plaintiffs challenge can operate

4    independently, as can the other provisions in the Rule. And there is certainly no logical basis for setting

5    aside or enjoining the entire Rule if the Court disagrees with some of Plaintiffs' challenges.

6        Finally, if the Court does set aside the Rule or enter an injunction, the Court should make clear

7    that this relief does not prevent HHS from continuing to investigate violations of, and to enforce, federal

8    conscience and anti-discrimination laws under the prior 2011 Rule or the Federal Conscience Statutes

9    themselves. Such investigations are independent of the Rule that is the subject of this lawsuit and require

10   the investment of significant resources, and therefore HHS should not be prevented from continuing to

11   pursue them, or from acting under its existing statutory or regulatory enforcement authority, even if the

12   Court were to otherwise set aside or enjoin the Rule.

13                                         **CONCLUSION**

14       For the foregoing reasons, the Court should grant Defendants' motion.

15   Dated: August 21, 2019                    Respectfully Submitted,

16                                              JOSEPH H. HUNT
                                                Assistant Attorney General
17

18                                              JAMES M. BURNHAM
                                                Deputy Assistant Attorney General
19

20                                              CHRISTOPHER A. BATES
                                                Senior Counsel to the Assistant Attorney
21                                              General

22                                              MICHELLE BENNETT
                                                Assistant Branch Director
23                                              Civil Division

24                                              */s/ Benjamin T. Takemoto*
                                                REBECCA M. KOPPLIN
25                                              (CA Bar # 313970)
                                                BENJAMIN T. TAKEMOTO
26                                              (CA Bar # 308075)
                                                Trial Attorneys
27                                              United States Department of Justice
                                                Civil Division, Federal Programs Branch
28                                              P.O. Box 883, Ben Franklin Station

1                         Washington, DC 20044
                              Tel: (202) 532-4252

2                         Fax: (202) 616-8460
                              E-mail: benjamin.takemoto@usdoj.gov

3

4                         *Attorneys for Defendants*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Having considered Defendants' motion to dismiss or, in the alternative, for summary judgment and any opposition, reply, and oral argument presented, it is HEREBY ORDERED that the Defendants' motion is GRANTED.

IT IS SO ORDERED.

Dated: _____          _____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE