XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS, State Bar No. 213530
NELI N. PALMA, State Bar No. 203374
KARLI EISENBERG, State Bar No. 281923
STEPHANIE T. YU, State Bar No. 294405
1300 I Street, Suite 125, P.O. Box 944255
Sacramento, CA 94244-2550
Tel: (916) 210-7522; Fax: (916) 322-8288
E-mail:  Neli.Palma@doj.ca.gov
*Attorneys for Plaintiff State of California, by
and through Attorney General Xavier Becerra*

JAMES R. WILLIAMS, State Bar No. 271253
County Counsel
GRETA S. HANSEN, State Bar No. 251471
LAURA S. TRICE, State Bar No. 284837
MARY E. HANNA-WEIR, State Bar No. 320011
SUSAN P. GREENBERG, State Bar No. 318055
H. LUKE EDWARDS, State Bar No. 313756
Office of the County Counsel, Co. of Santa Clara
70 West Hedding Street, East Wing, 9th Fl.
San José, CA 95110-1770
Tel: (408) 299-5900; Fax: (408) 292-7240
Email: mary.hanna-weir@cco.sccgov.org
*Attorneys for Plaintiffs County of Santa Clara*

DENNIS J. HERRERA, State Bar No. 139669
City Attorney
JESSE C. SMITH, State Bar No. 122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar No. 184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar No. 173594
SARA J. EISENBERG, State Bar No. 269303
JAIME M. HULING DELAYE, State Bar No. 270784
Deputy City Attorneys
City Hall, Rm 234, 1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102-4602
Tel: (415) 554-4633, Fax: (415) 554-4715
E-Mail: Sara.Eisenberg@sfcityatty.org
*Attorneys for Plaintiff City and County of San
Francisco*

LEE H. RUBIN, State Bar No. 141331
Mayer Brown LLP
3000 El Camino Real, Suite 300,
Palo Alto, CA 94306-2112
Tel: (650) 331-2000, Fax: (650) 331-2060
Email:  lrubin@mayerbrown.com
*Attorneys for Plaintiffs County of Santa Clara, et
al.*

*Additional Counsel Listed on Signature Pages*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Plaintiff,<br><br>    vs.<br><br>ALEX M. AZAR II, et al.,<br><br>    Defendants. | No. C 19-02405 WHA<br>No. C 19-02769 WHA<br>No. C 19-02916 WHA<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, WITH MEMORANDUM OF POINTS AND AUTHORITIES; AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| STATE OF CALIFORNIA, by and through ATTORNEY GENERAL XAVIER BECERRA,<br><br>    Plaintiff,<br><br>    vs.<br><br>ALEX M. AZAR, et al.,<br><br>    Defendants. | |
| COUNTY OF SANTA CLARA, et al.<br><br>    Plaintiffs,<br><br>    vs.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>    Defendants. | Date:         October 30, 2019<br>Time:        8:00 AM<br>Courtroom:  12<br>Judge:      Hon. William H. Alsup<br>Action Filed: 5/2/2019 |

# TABLE OF CONTENTS
(continued)

**Page**

Notice of Motion and Motion for Summary Judgment .................................................................. 1

Introduction ................................................................................................................................. 1

Statement of Facts ....................................................................................................................... 2

    I.     The Asserted Statutory Bases for the Rule ................................................................ 2

    II.    Regulatory Background ............................................................................................... 3

    III.   The Rule's Immediate and Detrimental Effect on Plaintiffs .................................... 4

          A.     Devastation of California's Public Health Programs and Laws ................. 4

          B.     The Rule's Impact on the City and County of San Francisco .................... 6

          C.     Impact on the County of Santa Clara, Providers, and Patients .................. 8

Argument .................................................................................................................................... 11

    I.     Plaintiffs Have Standing to Raise Their Claims .................................................... 11

    II.    Plaintiffs' Spending and Establishment Clause Claims Are Ripe ......................... 13

    III.   The Rule Is Arbitrary and Capricious and Thus Invalid Under the APA ............. 15

          A.     Defendants Failed to Adequately Consider the Rule's Impact on Patients ...................................................................................................... 16

          B.     Defendants Failed to Respond Meaningfully to Comments Detailing Impacts on Providers, Impracticability, and Costs of Compliance ................................................................................................ 20

          C.     The Supposed Benefits of the Rule are Speculative and Unsupported ................................................................................................ 22

          D.     The Record Does Not Support the Need for Defendants' Changed Policy ...................................................................................................... 24

          E.     The Religious-Accommodation Framework is Illogical and Unjustified ................................................................................................ 25

    IV.   The Rule Exceeds HHS's Statutory Authority ....................................................... 27

          A.     HHS Lacks Authority to Promulgate Regulations Implementing Church, Coats-Snowe, and Weldon ......................................................... 28

          B.     The Rule Impermissibly Expands HHS's Enforcement Authority .......... 29

          C.     HHS's Definitions of Statutory Terms Exceed Congress's Intent ........... 30

    V.    The Rule Conflicts with Existing Healthcare Laws ............................................... 35

          A.     The Rule Conflicts with Section 1554 of the ACA ................................. 35

          B.     The Rule Violates EMTALA ................................................................... 36

          C.     The Rule Violates the ACA's Nondiscrimination Provision ................... 37

          D.     The Rule Contravenes Title X ................................................................. 37

    VI.   The Rule Violates the Spending Clause .................................................................. 38

          A.     The Rule Is Unconstitutionally Coercive ................................................ 38

i

1

**TABLE OF CONTENTS**
(continued)

2
**Page**

3
      B.      The Rule Is Unconstitutionally Ambiguous ............................................... 39

      C.      Conditions on Funding Already Accepted ................................................ 40

4

      D.      The Conditions on Funding Are Unrelated to Conscience

5
               Objections ................................................................................................ 42

6
    VII.    The Rule Violates the Establishment Clause ..................................................... 42

      A.      The Rule Burdens Patients and Other Third Parties ................................ 43

7
      B.      The Rule Advances and Endorses Certain Religious Beliefs .................. 45

8
      C.      The Rule Coerces Patients and Healthcare Providers to Adhere to
               HHS's Favored Religious Practices and Entangles Government

9
               with Religion ........................................................................................... 46

10
    VIII.    The Rule Violates Equal Protection ....................................................................... 47

    IX.    The Rule Violates Plaintiffs' Patients' Due Process Rights ................................ 48

11
    X.    The Rule Violates Plaintiffs' Patients' Free Speech Rights ................................ 51

12
    XI.    The Rule Violates Separation of Powers ............................................................. 52

    XII.    The Court Should Vacate the Rule ....................................................................... 54

13
Conclusion ............................................................................................................................ 55

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Labs. v. Gardner*
    387 U.S. 136 (1967) ...................................................................................13, 14

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*
    570 U.S. 205 (2013) ..............................................................................................50

*Air Alliance Houston v. EPA*
    906 F.3d 1049 (D.C. Cir. 2018) ...........................................................................29

*All. for the Wild Rockies v. United States*
    907 F.3d 1105 (9th Cir. 2018).............................................................................54

*Allied Local & Reg'l Mfrs. Caucus v. EPA*
    215 F.3d 61 (D.C. Cir. 2000) ..............................................................................21

*Am. Bar Ass'n v. U.S. Dep't of Educ.*
    370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................16

*Am. Fed'n of Gov't Employees, Local 2924 v. Fed. Labor Relations Auth.*
    470 F.3d 375 (D.C. Cir. 2006) ............................................................................26

*Am. Library Ass'n v. FCC*
    406 F.3d 689 (D.C. Cir. 2005) ............................................................................29

*Am. Petroleum Inst. v. U.S. EPA*
    52 F.3d 1113 (D.C. Cir. 1995) ............................................................................28

*Ansonia Bd. of Educ. v. Philbrook*
    479 U.S. 60 (1986)...............................................................................................26

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*
    273 F.3d 1229 (9th Cir. 2001)..............................................................................24

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
    548 U.S. 291 (2006).............................................................................................39

*Arroyo Gonzalez v. Rossello Nevarez*
    305 F. Supp. 3d 327 (D.P.R. 2018)......................................................................49

*Atl. City Elec. Co. v. FERC*
    295 F.3d 1 (D.C. Cir. 2002) ................................................................................28

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ayotte v. Planned Parenthood of N. New Eng.*
  546 U.S. 320 (2006) ...................................................................................11

*Bowen v. Georgetown Univ. Hosp.*
  488 U.S. 204 (1988) ...................................................................................28

*Bruff v. N. Miss. Health Servs., Inc.*
  244 F.3d 495 (5th Cir. 2001) ......................................................................26

*Burwell v. Hobby Lobby Stores, Inc.*
  573 U.S. 682 (2014) ...................................................................................43

*Cal. Indep. Sys. Operator Corp. v. FERC*
  372 F.3d 395 (D.C. Cir. 2004) ..............................................................28, 29

*California v. Azar*
  385 F. Supp. 3d 960 (N.D. Cal. 2019) ........................................21, 35, 38

*California v. Azar*
  911 F.3d 558 (9th Cir. 2018)................................................................13, 55

*California v. Azar*
  927 F.3d 1068 (9th Cir. 2019) ....................................................................36

*California v. United States*
  2008 WL 744840 (N.D. Cal. Mar. 18, 2008)...............................15, 36, 37

*Carey v. Population Servs. Int'l*
  431 U.S. 678 (1977) ...................................................................................49

*Cent. Delta Water Agency v. U.S.*
  306 F.3d 938 (9th Cir. 2002).......................................................................13

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*
  467 U.S. 837 (1984) ...............................................................16, 28, 31, 33

*Chrisman v. Sisters of St. Joseph of Peace*
  506 F.2d 308 (9th Cir. 1974).......................................................................44

*Chrysler Corp. v. Brown*
  441 U.S. 281 (1979) ...................................................................................29

*Chubb Custom Ins. v. Space Sys.*
  710 F.3d 946 (9th Cir. 2013).......................................................................36

iv

# TABLE OF AUTHORITIES
### (continued)

Page

*City & Cty. of S.F. v. Trump*
  897 F.3d 1225 (9th Cir. 2018)......................................................................................53, 54, 55

*City & Cty. of SF v. Sessions*
  372 F. Supp. 3d 928 (N.D. Cal. 2019) ......................................................................................40

*City of Arlington v. F.C.C.*
  569 U.S. 290 (2013)......................................................................................52, 53

*City of Boerne v. Flores*
  521 U.S. 507 (1997)......................................................................................45

*City of Portland, v. EPA*
  507 F.3d 706 (D.C. Cir. 2007) ......................................................................................21

*Clinton v. City of New York*
  524 U.S. 417 (1998)......................................................................................54

*Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hr'g*
  903 F.2d 635 (9th Cir. 1990)......................................................................................40

*Conant v. Walters*
  309 F.3d 629 (9th Cir. 2002)......................................................................................52

*Corporation of the Presiding Bishop of the Church of Latter-Day Saints v. Amos*
  483 U.S. 327 (1987)......................................................................................45

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*
  365 F. Supp. 3d 28 (D.D.C. 2019) ......................................................................................24

*Cty of Allegheny v. ACLU Greater Pittsburgh Chapter*
  492 U.S. 573 (1989)......................................................................................45

*Cutter v. Wilkerson*
  544 U.S. 709 (2005)......................................................................................43, 45

*Doe ex rel. Doe v. Yunits*
  2000 WL 33162199 (Mass. Super. Oct. 11, 2000) ......................................................................................51

*Doe v. Bolton*
  410 U.S. 179 (1973)......................................................................................45

*Doe v. Harris*
  772 F.3d 563 (9th Cir. 2014)......................................................................................51

v

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

*E. Bay Sanctuary Covenant v. Trump*
4
    932 F.3d 742 (9th Cir. 2018)......................................................................................55

5
*Earth Island Inst. v. Hogarth*
    494 F.3d 757 (9th Cir. 2007)......................................................................................24

6
*Edwards v. Aguillard*
7
    482 U.S. 578 (1987)....................................................................................................42

8
*EEOC v. Abercrombie & Fitch Stores, Inc.*
    135 S. Ct. 2028 (2015)................................................................................................34
9

10
*Eisenstadt v. Baird*
    405 U.S. 438 (1972)....................................................................................................12

11
*Encino Motorcars, LLC v. Navarro*
12
    136 S. Ct. 2117 (2016).......................................................................16, 23, 27, 49

13
*Estate of Thornton v. Caldor*
    472 U.S. 703 (1985)..............................................................................................43, 44
14

15
*Evancho v. Pine-Richland Sch. Dist.*
    237 F. Supp. 3d 267 (W.D. Pa. 2017)........................................................................47

16
*Ferrer v. CareFirst, Inc.*
17
    265 F. Supp. 3d 50 (D.D.C. 2017)..............................................................................37

18
*Foothill Church v. Rouillard*
    371 F. Supp. 3d 742 (E.D. Cal. 2019)........................................................................25
19

20
*Franklin v. Gwinnett Cty. Pub. Sch.*
    503 U.S. 60 (1992)......................................................................................................40

21
*Gonzales v. Carhart*
22
    550 U.S. 124 (2007).......................................................................................11, 15, 49

23
*Gonzales v. Oregon*
    546 U.S. 243 (2006)....................................................................................................28
24

25
*Grant v. Fairview Hosp. & Healthcare Servs*.
    2004 WL 326694 (D. Minn. Feb. 18, 2004) ..............................................................26

26
*Griswold v. Connecticut*
27
    381 U.S. 479 (1965)....................................................................................................11

28

# TABLE OF AUTHORITIES
## (continued)

Page

*Harold v. Corwin*
  846 F.2d 1148 (8th Cir. 1988)..................................................................................33

*Henderson v. Kennedy*
  253 F.3d 12 (D.C. Cir. 2001) ...................................................................................46

*Henkle v. Gregory*
  150 F. Supp. 2d 1067 (D. Nev. 2001) ......................................................................51

*Hernandez-Montiel v. INS*
  225 F.3d 1084 (9th Cir. 2000)..................................................................................49

*I.N.S. v. Chadha*
  462 U.S. 919 (1983)..................................................................................................53

*In Kong v. Scully*
  341 F.3d 1132 (9th Cir. 2003)..................................................................................44

*In re Aiken Cty.*
  725 F.3d 255 (D.C. Cir. 2013) .................................................................................53

*Inouye v. Kemna*
  504 F.3d 705 (9th Cir. 2007)....................................................................................46

*Isaacson v. Horne*
  716 F.3d 1213 (9th Cir. 2013)..................................................................................11

*Karnoski v. Trump*
  2017 WL 6311305 (W.D. Wash. Dec. 11, 2017)................................................49, 51

*Karnoski v. Trump*
  926 F.3d 1180 (9th Cir. 2019)..................................................................................47

*Kowalski v. Tesmer*
  543 U.S. 125 (2004)..................................................................................................12

*La. Pub. Serv. Comm'n v. F.C.C.*
  476 U.S. 355 (1986)..................................................................................................27

*Larkin v. Grendel's Den, Inc.*
  459 U.S. 116 (1982)..................................................................................................47

*Larson v. Valente*
  465 U.S. 228 (1982)..................................................................................................46

vii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Lawrence v. Texas*
    539 U.S. 558 (2003) .........................................................................................49, 50

4

*Lee v. Weisman*
    505 U.S. 577 (1992) .........................................................................................42, 46

5

6

*Log Cabin Republicans v. United States*
    716 F. Supp. 2d 884 (C.D. Cal. 2010) ....................................................................51

7

8

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) .................................................................................................12

9

10

*Mayo Foundation for Medical Education & Research v. United States*
    562 U.S. 44 (2011) ..................................................................................................33

11

*Mayor & City Council of Baltimore v. Azar*
    2019 WL 2298808 (D. Md. May 30, 2019) ...........................................................35

12

13

*McCreary County v. ACLU of Ky.*
    545 U.S. 844 (2005) ...........................................................................................42, 48

14

15

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*
    375 F.3d 1182 (D.C. Cir. 2004) ..............................................................................23

16

*MD/DC/DE Broadcasters Ass'n v. F.C.C.*
    236 F.3d 13 (D.C. Cir. 2001) ..................................................................................55

17

18

*MedImmune, Inc. v. Genentech, Inc.*
    549 U.S. 118 (2007) .................................................................................................13

19

20

*Mendocino Envtl. Ctr. v. Mendocino Cty.*
    192 F.3d 1283 (9th Cir. 1999) .................................................................................51

21

*Mereigh v. N.Y. & Presbyterian Hosp.*
    2017 WL 5195236 (S.D. N.Y. Nov. 9, 2017) .........................................................26

22

23

*Mills v. U. S.*
    742 F.3d 400 (9th Cir. 2014) ...................................................................................12

24

25

*Missionary Guadalupanas of the Holy Spirit, Inc., v. Rouilllard*
    38 Cal. App. 5th 421 (2019) ................................................................................5, 25

26

*Motion Picture Ass'n of Am. v. FCC*
    309 F.3d 796 (D.C. Cir. 2002) ................................................................................29

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*
463 U.S. 29 (1983) .........................................................................................15, 22, 23

*Nat'l Fuel Gas Supply Corp. v. FERC*
468 F.3d 831 (D.C. Cir. 2006) .....................................................................................27

*Nat'l Inst. of Family & Life Advocates v. Harris*
839 F.3d 823 (9th Cir. 2016)........................................................................................15

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*
538 U.S. 803 (2003).......................................................................................................14

*Navajo Nation v. U.S. Forest Serv.*
535 F.3d 1058 (9th Cir. 2008).....................................................................................46

*New Jersey v. EPA*
517 F.3d 574 (D.C. Cir. 2008) .....................................................................................55

*New York v. United States*
505 U.S. 144 (1992) ......................................................................................................42

*NFIB v. Sebelius*
567 U.S. 519 (2012) ................................................................................5, 38, 39, 41

*Noesen v. Med. Staffing Network*
232 Fed.App'x 581 (7th Cir. 2007)..............................................................................26

*Norsworthy v. Beard*
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ......................................................................47

*Obergefell v. Hodges*
135 S. Ct. 2584 (2015) ...................................................................................48, 49, 50

*Occidental Petroleum Corp. v. S.E.C.*
873 F.2d 325 (D.C. Cir. 1989) .....................................................................................23

*Ohio Forestry Ass'n v. Sierra Club*
523 U.S. 726 (1998) ......................................................................................................14

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*
484 U.S. 97 (1987).........................................................................................................29

*Oregon v. Azar*
389 F. Supp. 3d 898 (D. Or. 2019) .............................................................................35

ix

**TABLE OF AUTHORITIES**
(continued)

Page

*Organized Vill. of Kake v. U.S. Dep't of Agric.*
795 F.3d 956 (9th Cir. 2015) .................................................................. 12

*Pacific Gas and Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*
461 U.S. 190 (1983) .............................................................................. 14

*Palmore v. Sidoti*
466 U.S. 429 (1984) .............................................................................. 48

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) .................................................................................. 39

*Peterson v. Hewlett Packard Co.*
358 F.3d 599 (9th Cir. 2004) .......................................................... 26, 34

*Pharm. Research & Mfrs. of Am. v. U. S. Dep't of Health & Human Servs.*
43 F. Supp. 3d 28 (D.D.C. 2014) ......................................................... 29

*Planned Parenthood of Greater Ohio v. Hodges*
917 F.3d 908 (6th Cir. 2019) ............................................................... 50

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*
699 F.3d 962 (7th Cir. 2012) ............................................................... 50

*Planned Parenthood of Se. Pennsylvania v. Casey*
505 U.S. 833 (1992) .................................................................... 11, 49, 50

*Police Department of Chicago v. Mosley*
408 U.S. 92 (1972) ............................................................................... 51

*PPGNI v. Wasden*
No. 1:18-CV-00555, 2019 WL 3325800 (D. Idaho July 24, 2019) ......... 49

*R.A.V. v. City of St. Paul*
505 U.S. 377 (1992) ............................................................................. 51

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*
867 F.3d 338 (3d Cir. 2017) ................................................................ 45

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................... 55

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*
908 F.3d 476 (9th Cir. 2018) ............................................................... 54

x

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984) ................................................................................. 49

4

5

*Romer v. Evans*
    517 U.S. 620 (1996) ................................................................................. 48

6

*Rosenberger v. Rector & Visitors of Univ. of Va.*
    515 U.S. 819 (1995) ................................................................................. 51

7

8

*Rust v. Sullivan*
    500 U.S. 173 (1991) ........................................................................... 50, 52

9

*Samantar v. Yousuf*
    560 U.S. 305 (2010) ................................................................................. 31

10

*Santa Fe Independent School District v. Doe*
    530 U.S. 290 (2000) ................................................................................. 46

11

12

*Schroer v. Billington*
    577 F. Supp. 2d 293 (D.D.C. 2008) ....................................................... 47

13

14

*Schwenk v. Hartford*
    204 F.3d 1187 (9th Cir. 2000) ................................................................ 47

15

16

*Sec'y of State v. Joseph H. Munson Co.*
    467 U.S. 947 (1984) ................................................................................. 12

17

18

*Shelton v. Univ. of Med. & Dentistry of N.J.*
    223 F.3d 220 (3d Cir. 2000) .................................................................... 26

19

*Singleton v. Wulff*
    428 U.S. 106 (1976) ........................................................................... 11, 12

20

21

*Skidmore v. Swift & Co.*
    323 U.S. 134 (1944) ................................................................................. 28

22

23

*Skinner v. Oklahoma*
    316 U.S. 535 (1942) ................................................................................. 11

24

*Skyline v. Cal. Dep't of Managed Health Care*
    315 F. Supp. 3d 1225 (S.D. Cal. 2018) .................................................. 25

25

26

*Smith v. Metro. Sch. Dist. Perry Twp.*
    128 F.3d 1014 (7th Cir. 1997) ................................................................ 40

27

28

1

2

<div align="center">

**TABLE OF AUTHORITIES**
**(continued)**

</div>

<div align="right">

**Page**

</div>

3

*SmithKline Beecham v. Abbott Labs.*
    740 F.3d 471 (9th Cir. 2014)......................................................................47

4

*South Dakota v. Dole*
    483 U.S. 203 (1987)....................................................................38, 42, 53

5

6

*State by & through Becerra v. Azar*
    927 F.3d 1045 (9th Cir. 2019)..................................................................36

7

8

*State v. U.S. Bureau of Land Mgmt.*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ....................................................25

9

10

*Stenberg v. Carhart*
    530 U.S. 914 (2000)..................................................................................11

11

*Stormans Inc. v. Selecky*
    844 F. Supp. 2d 1172 (W.D. Wash. 2012)...............................................26

12

13

*Sunrise Coop., Inc. v. U. S. Dep't of Agric.*
    891 F.3d 652 (6th Cir. 2018)....................................................................35

14

15

*Sutton v. Providence St. Joseph Med. Ctr.*
    192 F.3d 826 (9th Cir. 1999)....................................................................26

16

*Taylor v. St. Vincent's Hosp.*
    523 F.2d 75 (9th Cir. 1975)......................................................................32

17

18

*Texas Monthly, Inc. v. Bullock*
    489 U.S. 1 (1989)..........................................................................43, 44, 45

19

20

*Texas v. Johnson*
    491 U.S. 397 (1989)..................................................................................51

21

*Texas v. United States*
    201 F. Supp. 3d 810 (N.D. Tex. 2016).....................................................15

22

23

*U. S. v. Mattson*
    600 F.2d 1295 (9th Cir. 1979)..................................................................30

24

25

*U.S. v. Marion County School District*
    625 F.2d 607 (5th Cir. 1980)....................................................................30

26

*U.S. v. Virginia*
    518 U.S. 515 (1996)..................................................................................48

27

28

<div align="center">

xii

</div>

# TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Lee*
455 U.S. 252 (1982)................................................................43

*United States v. Mead Corp.*
533 U.S. 218 (2001)..........................................................28, 31

*United States v. Nova Scotia Food Prods. Corp.*
568 F.2d 240 (2d Cir. 1977)..................................................23

*Virginia v. Am. Booksellers Ass'n*
484 U.S. 383 (1988)................................................................12

*Ward v. Dixie Nat'l Life Ins.*
2007 WL 4293319 (4th Cir. 2007)........................................33

*Washington v. Azar*
276 F. Supp. 3d 1119 (E.D. Wash.) .....................................35

*Weaver v. Nebo Sch. Dist.*
29 F. Supp. 2d 1279 (D. Utah 1998) .....................................51

STATUTES

5 U.S.C. § 301 ...........................................................................3

5 U.S.C. § 301 (1966) .............................................................29

5 U.S.C. § 704 .........................................................................13

5 U.S.C. § 706(2)(A) ..............................................................31

5 U.S.C. § 706(2)(A-B)...........................................................54

5 U.S.C. § 706(2)(C)..........................................................27, 29

15 U.S.C. § 1392 .....................................................................28

19 U.S.C. § 1502(a) .................................................................28

20 U.S.C. § 1682 .....................................................................29

29 U.S.C. § 655(b) ..................................................................28

29 U.S.C. § 794 .......................................................................29

40 U.S.C. § 121(c) ..................................................................29

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

42 U.S.C. § 2000d-1......................................................................................29

4

42 U.S.C. § 238n................................................................................2, 33, 54

5

42 U.S.C. § 238n(a)...........................................................................................3

6

42 U.S.C. § 238n(c)(2).....................................................................................31

7

42 U.S.C. § 263a(f)(1)(E)................................................................................30

8

42 U.S.C. § 300(a)............................................................................................38

9

42 U.S.C. § 300a-7.....................................................................................2, 53

10

42 U.S.C. § 300a-7(b)(1)...................................................................................2

11

42 U.S.C. § 300a-7(b)(2)...................................................................................2

12

42 U.S.C. § 1302..............................................................................................30

13

42 U.S.C. § 1351a............................................................................................30

14

42 U.S.C. § 1395dd(a)......................................................................................36

15

42 U.S.C. § 1395dd(b)(1).................................................................................36

16

42 U.S.C. § 1395dd(c)(1).................................................................................36

17

42 U.S.C. § 2000(e)(j)......................................................................................26

18

42 U.S.C. § 2000e-2(a)(1)................................................................................26

19

42 U.S.C. § 2000e(j).........................................................................................34

20

42 U.S.C. § 6104..............................................................................................29

21

42 U.S.C. § 18023(b)(4)...................................................................................30

22

42 U.S.C. § 18023(c)(2)...................................................................................36

23

42 U.S.C. § 18041(a)(1)...................................................................................30

24

42 U.S.C. § 18113............................................................................................31

25

42 U.S.C. § 18113(d)........................................................................................30

26

42 U.S.C. § 18114............................................................................................35

27

28

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3  42 U.S.C. § 18116(a) ...............................................................................................29

4  Cal. Health & Saf. Code §§ 10100 and 120100 *et seq*. ........................................13

5  Cal. Welf. & Inst. Code § 17000 *et seq*. ...............................................................13

6  Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(1), 123
7      Stat. 3034 ...........................................................................................................33

8  132 Stat. 2981, 3070-71 (2018)..............................................................................38

9  132 Stat. 2981, 3118 (2018).....................................................................................2

10  132 Stat. 2981, 3118, § 507(d) ..............................................................................53

11  **CONSTITUTIONAL PROVISIONS**

12  Cal. Const. Article XI, § 7........................................................................................13

13  U.S. Const., Article I, § 8, cl. 1 ..............................................................................38

14  **OTHER AUTHORITIES**

15  45 C.F.R. § 88.2 .............................................................................................. *passim*

16  45 C.F.R. § 88.2-88.3(a)-(c)....................................................................................30

17  45 C.F.R. § 88.4(a)(1) .............................................................................................14

18  45 C.F.R. § 88.4(a)(2) .............................................................................................14

19  45 C.F.R. § 88.7(i)(3)(iv)-(v) ..................................................................................38

20  119 Cong. Rec. S9595 (Mar. 27, 1973) .................................................................32

21  151 Cong. Rec. H176-77 (Jan. 25, 2005)...............................................................37

22  73 Fed. Reg. 78,072 (Dec. 19, 2008) .......................................................................3

23  74 Fed. Reg. 10,207 (Mar. 10, 2009) .......................................................................3

24  76 Fed. Reg. 9968 (Feb. 23, 2011).......................................................................3, 42

25  83 Fed. Reg. 3880 (Jan. 26, 2018). ................................................................ *passim*

26  84 Fed. Reg. 23,170 (May 21, 2019) .............................................................. *passim*

27

28

xv

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3    84 Fed. Reg. 7714 (Mar. 4, 2019) ....................................................................................38

4    Ctrs. for Medicare & Medicaid Serv., *Glossary*,
5        https://www.cms.gov/apps/glossary/default.asp?Letter= R&Language (last
         visited Sept. 3, 2019)..........................................................................................34

6    Eleanor Barczak, *Ethical Implications of the Conscience Clause on Access to*
7        *Postpartum Tubal Ligations*, 70 Hastings L.J. 1613 (2019) .....................................22

8    Harris Meyer, *HHS accuses Vermont hospital of forcing nurse to assist in*
         *abortion,* Modern Healthcare (Aug. 28, 2019) ........................................................25
9

10   Medicare.gov, *Glossary-R*, https://www.medicare.gov/   glossary/r (last visited
         Sept. 3, 2019) .....................................................................................................33

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that on October 30, 2019 at 8:00 a.m. in Courtroom 12 located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Plaintiffs in above-referenced cases will and hereby do move this Court for summary judgment on each of the causes of action set forth in their complaints because the final rule, "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority," 84 Fed. Reg. 23,170 (May 21, 2019), violates the Administrative Procedure Act and the United States Constitution. Alternatively, Plaintiffs request the Court enter judgment as to those claims the Court sees as fit for resolution at this time.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs—the State of California (State), the City and County of San Francisco (City), the County of Santa Clara (County), and providers and medical associations hailing from all over the country—share a common commitment to ensuring patient access to high-quality comprehensive healthcare. Congress, similarly, has enacted increasingly stronger federal laws to protect patients' access to care, ensure the free flow of accurate information, and prohibit discrimination in the provision of healthcare services. In this landscape also exist decades-old, context-specific statutes and appropriations policy riders that govern conscience objections in healthcare. Under the guise of an "anti-discrimination" framework, the Rule now seeks to completely upend the existing regime by vastly expanding the scope of these federal conscience statutes and riders, allowing virtually anyone involved in the provision of healthcare to refuse to provide vital services and information to patients, including women and lesbian, gay, bisexual, and transgender (LGBT) individuals. The Rule does not require any justification, notice, or referral be given to the patient who is denied care or to an employer who must navigate how to accommodate these refusals. There are no exceptions for emergencies. Far from preventing discrimination, the Rule perpetuates widespread discrimination against populations that have historically faced obstacles to obtaining care—interfering with Plaintiffs' missions to offer quality care to patients, to protect the public health and welfare, and to ensure continued access for vulnerable populations.

The Rule exemplifies arbitrary and capricious rulemaking. It conflicts with federal laws that

1

1   already prohibit discrimination in healthcare and protect access to care and information, far

2   exceeding the scope of the statutes on which it is purportedly based. The Rule is unconstitutional

3   because it favors religion over non-religion and certain religious beliefs over others; jeopardizes

4   access to reproductive and transition-related healthcare; fosters unlawful discrimination; chills

5   protected expression; and exceeds Congress's Spending Clause authority, threatening billions of

6   dollars in federal funding to the State, local governments, and providers across the country.

7   <center>**STATEMENT OF FACTS**</center>

8   **I.   THE ASSERTED STATUTORY BASES FOR THE RULE**

9        The Rule purports to implement certain federal statutes concerning refusals to provide

10  healthcare services due to religious or moral objections, including the Church Amendments (42

11  U.S.C. § 300a-7) (Church), the Weldon Amendment (*see, e.g.*, 132 Stat. 2981, 3118 (2018))

12  (Weldon), and the Coats-Snowe Amendment (42 U.S.C. § 238n) (Coats-Snowe). *See* 84 Fed.

13  Reg. at 23,170-23,173 (statutory history), and Mot. 3, n.2 (collecting statutes).

14       Church prohibits government entities from requiring certain funding recipients to "perform

15  or assist in the performance of any sterilization procedure or abortion . . . contrary to [an

16  individual's] religious beliefs or moral convictions" or to make their facilities or personnel

17  available for the objected-to procedures. 42 U.S.C. §§ 300a-7(b)(1), 300a-7(b)(2). It also bars

18  discrimination in employment or extension of staff privileges against "any physician or other

19  health care personnel" on the basis of beliefs about, or willingness to participate in, abortion or

20  sterilization. *Id.* at § 300a-7(c)(1). Finally, it provides that individuals cannot be required to

21  "perform or assist in the performance of any part of a health service program or research activity"

22  funded under a program administered by HHS if the activity would be contrary to religious

23  beliefs or moral convictions. *Id.* § 300a7(d).

24       Weldon states that no funds in the Labor, Health and Human Services, Education, and

25  Related Agencies Appropriations Act ("Appropriations Act") may be given to governmental

26  entities that discriminate against an "institutional or individual health care entity" because it does

27  not provide, cover, or refer for abortions. *See, e.g.*, 132 Stat. 2981, 3118 (2018).

28       Coats-Snowe prohibits governments receiving funding from discriminating against any

<center>2</center>

1    "health care entity"—narrowly defined as physicians and health profession trainees—that refuses

2    to undergo training to perform abortions, provide referrals for abortions or abortion training, or

3    make arrangements for those activities. 42 U.S.C. § 238n(a).

4    **II.    REGULATORY BACKGROUND**

5            In December 2008, HHS issued a rule purportedly authorized by Church and Weldon,

6    allowing it to terminate and/or compel return of certain federal funds from state and local

7    governments that "discriminat[e] on the basis that [a] health entity does not provide, pay for,

8    provide coverage of, or refer for abortion[,]" and requiring recipients of HHS funds to certify

9    compliance with the rule. 73 Fed. Reg. 78,072, 78,074, 78,098-99 (Dec. 19, 2008). In response to

10   comments expressing concerns that the rule would invite discrimination—including against

11   patients with disabilities, patients with HIV, and on the basis of race or sexual preference—

12   Defendants confirmed that discrimination is "outside the scope" of federal conscience laws:

13   "[G]iven the strong national policies embodied in federal civil rights laws that protect individuals

14   from unlawful discrimination . . . and that ensure that federally supported programs are available

15   to all without discrimination, we believe that federal civil rights protections prevail." *Id*. at 78080.

16   The 2008 rule, with the exception of its certification requirement, went into effect in 2009. 76

17   Fed. Reg. 9968, 9971 (Feb. 23, 2011).

18           In March 2009, HHS proposed to rescind the 2008 rule, noting that a new round of

19   rulemaking was underway. 74 Fed. Reg. 10,207 (Mar. 10, 2009). Then in 2011, it amended the

20   2008 rule by removing definitions and prohibitions, among other changes. *See* 73 Fed. Reg.

21   78,072; 76 Fed. Reg. 9968. It also confirmed that Church, Weldon, and Coats-Snowe do not

22   require "promulgation of regulations for their interpretation or implementation." 76 Fed. Reg. at

23   9975. The 2011 Rule was not issued pursuant to these Amendments, but rather under 5 U.S.C.

24   § 301, which authorizes the head of an Executive department to issue regulations related to

25   departmental housekeeping. *See* 76 Fed. Reg. at 9975. The 2011 rule designated HHS's Office for

26   Civil Rights (OCR) to receive and coordinate handling of complaints with HHS funding

27   components pursuant to this housekeeping authority. *Id*. at 9977.

28           Between 2008 and January 2018, OCR received only 44 complaints related to moral- and

3

1   religious-based objections. 83 Fed. Reg. 3880, 3886 (Jan. 26, 2018). Yet in January 2018, HHS

2   created a new Conscience and Religious Freedom Division within OCR and issued a Notice of

3   Proposed Rulemaking (NPRM) to vastly expand the reach and scope of two dozen narrowly-

4   drawn federal conscience laws. *Id*. The NPRM proposed to create a new regime broadening

5   prerogatives of religious objectors at the expense of providers, physicians, and patients. It did this

6   by defining (or redefining) key statutory terms more broadly than Congress intended and applying

7   them across-the-board, rather than in the limited contexts Congress had specified.

8        For example, the NPRM proposed that not only medical providers, but also anyone with an

9   "articulable connection" to provision of a service (including a referral), may opt out of providing

10   certain healthcare services or information on the basis of "conscience, religious beliefs, or moral

11   convictions." 83 Fed. Reg. at 3881, 3923. Services encompassed include abortion, sterilization,

12   euthanasia, certain vaccinations with a connection to use of "aborted fetal tissue," contraception,

13   gender transition/gender dysphoria, tubal ligations, hysterectomies, assisted suicide, and "other

14   health services." *Id*. at 3903. HHS proposed to grant OCR enforcement responsibility, conferring

15   authority to receive complaints, initiate compliance reviews, conduct investigations, supervise

16   and coordinate compliance, and use broad enforcement tools including temporarily or

17   permanently withholding current or future funding. *Id*. at 3931.

18        HHS received over 242,000 comments on the NPRM. 84 Fed. Reg. at 23,180, n.41.

19   Comments in opposition came from a broad array of individuals, medical associations, public

20   health experts, state and local governments, providers, and patient groups.[1] Despite the volume of

21   comments, HHS issued a largely identical final rule (Rule) in May 2019.

22   **III.   THE RULE'S IMMEDIATE AND DETRIMENTAL EFFECT ON PLAINTIFFS**

23         **A.   Devastation of California's Public Health Programs and Laws**

24        The Rule explicitly targets the State and its laws balancing conscience protections and

25   patient rights, *see* Cal. Compl. ¶¶ 16-40, setting the State up to lose billions of dollars in federal

26   funding should it go into effect. The Rule states that it seeks to resolve "confusion" caused by

---

27   [1] *See, e.g.*, Cal. Att'y Gen. Ltr. 2-6, App'x 38; Cty. of Santa Clara Ltr. 4-8, App'x 63; S.F. Dep't
    of Pub. Health Ltr. 1-3, App'x 162; App'x 402; *see also infra* Section III.B.

28

4

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

OCR's 2016 closing of three Weldon complaints against California, in the State's favor. 84 Fed. Reg. at 23,178-79.[2] HHS previously determined that closing the complaints avoided a "potentially unconstitutional" application of Weldon, given that a violation of Weldon could result in the rescission of all funds appropriated under the Appropriations Act to the State, including funds provided by the Departments of Education and Labor and other agencies. *Id.* (citing *NFIB v. Sebelius*, 567 U.S. 519 (2012)). But the Rule states that HHS no longer agrees with OCR's 2016 interpretation, 84 Fed. Reg. at 23,179, and that despite the previously cited constitutional concerns, HHS remained obligated to not make funding available to entities that, in the agency's view, discriminate in violation of Weldon. 83 Fed. Reg. at 3890.

The Rule also makes clear that an OCR determination of noncompliance will be used to inform HHS's decision whether to approve, renew, or modify federal funding to the recipient and specifically notes that OCR has more recently found the State in noncompliance. 84 Fed. Reg. at 23,177, 23,262.[3] It thus sets the stage for an unavoidable conflict with the State.

The State receives tens of billions of dollars in appropriated and mandatory federal funds for labor, education, and health and human services. These funds support programs run by state agencies and some funds are passed on to local governments and other sub-grantees.[4]

The California Health & Human Services Agency (CHHS), which provides critical services to Californians from all walks of life, expects to receive $77.6 billion in federal funding (almost half of its budget) for fiscal year 2019-2020. Ghaly Dec. ¶¶ 2, 5, 8. Funding at risk includes:

- $63 billion to provide healthcare services for *one-third of Californians* through

---

[2] The complaints alleged that the State agency responsible for regulating health plans contacted seven health plans in 2014 to remind them of their obligation to comply with state law, including not discriminating against women who seek to exercise their right to obtain an abortion. App'x 396. The state agency explained that the Knox-Keene Act requires the provision of basic healthcare services and the California Constitution prohibits health plans from discriminating against women who choose to terminate a pregnancy. App'x 398; *see also Missionary Guadalupanas of the Holy Spirit, Inc., v. Rouilllard*, 38 Cal. App. 5th 421 (2019).

[3] In August 2018, OCR informed the State that it had reviewed a September 2017 complaint based on the previously closed complaints and was reopening the investigation alleging violations of Weldon, Coats-Snowe, and Church. Palma Dec. Ex. B. And in January 2019, OCR sent a letter to the State regarding the State's Reproductive FACT Act, concluding that the State had violated Weldon and Coats-Snowe. 84 Fed. Reg. at 23,177; App'x 397.

[4] Ghaly Dec. ¶ 8, Sturges Dec. ¶ 7; Nunes Dec. ¶ 12; Cantwell Dec. ¶ 7.

5

programs such as Medicaid and the Children's Health Insurance Program. Cantwell Dec. ¶¶ 2, 5, 8; *see also* Ghaly Dec ¶¶ 13-14;

- $1.5 billion for emergency preparedness, chronic and infectious disease prevention, environmental health programs, healthcare facility licensing programs, and other public health programs. Nunes Dec. ¶¶ 5, 9-12, 16; *see also* Ghaly Dec. ¶¶ 17-20;
- $10.8 billion for child welfare and refugee assistance programs and in-home care for seniors and people with disabilities. Ghaly Dec. ¶ 15; Cervinka Dec. ¶¶ 7-16;
- $4.2 million for mental health services. Price Dec. ¶¶ 4-5, 14-15; and
- $89 million to support healthcare for correctional inmates. Toche Dec. ¶¶ 3, 12.

The Rule also places at risk U.S. Department of Labor funding supporting unemployment insurance, apprenticeships, occupational safety, and labor standards (Sturges Dec. ¶¶ 5-9); roughly $8.3 billion in educational funding for state and local programs, including to support instruction for homeless children, special education, vocational education, and childcare and state preschool programs (Palma Dec. Ex. A, 2019-20 Cal. Dep't. Educ. budget, at 11-12) (sum of 2019-20 program expenditures from "Federal Trust Fund"); and hundreds of millions of dollars for public colleges and universities, including the nation's largest system of higher education, and for research (Harris-Caldwell Dec. ¶ 3; Parmelee Dec. ¶¶ 4-9; Buchman Dec. ¶ 11).

**B.   The Rule's Impact on the City and County of San Francisco**

The Rule will cause immediate injury to the City, which must either comply with the Rule in full or risk losing all HHS funds. Either option would cripple the ability of the San Francisco Department of Public Health (SFDPH) to operate as the City's safety-net healthcare provider.

The City has established policies and procedures that protect personnel's religious beliefs while safeguarding SFDPH's obligation to provide high-quality inclusive care to all patients. For example, Zuckerberg San Francisco General (ZSFG) policies allow staff to opt out of providing patient care in conflict with their religious beliefs, but make clear that "the patient's right to receive the necessary patient care will take precedence over the staff member's individual beliefs and rights until other competent personnel can be provided." Chen Dec. Ex. A; *see also* Weigelt Dec. ¶ 4 (discussing conscientious objector provision in City contract with nurses). Because such policies violate the Rule, the City will be required to amend them or forgo HHS funding if the Rule goes into effect. The City would also be required to alter its policies and practices to prohibit involuntary transfers of individuals who have a religious or moral objection to performing critical aspects of their job. This restriction will impede the ability of hospitals and clinics to function

6

efficiently, adversely affecting individual and public health. *See* Colfax Dec. ¶ 22; Drey Dec. ¶¶ 11-13.

Compliance with the Rule would severely compromise patient care at SFDPH facilities in several other ways as well. Patients in the emergency room at ZSFG will die if nurses can categorically refuse to provide care. Colwell Dec. ¶¶ 6-11. This is neither hyperbole nor hypothetical. Every day, patients present in the ZSFG emergency room with life-threatening conditions. Colwell Dec. ¶ 7. Many times every month, those conditions involve serious complications relating to pregnancy or a sexually transmitted disease or infection. *Id.* For example, a young woman recently presented at the ZSFG emergency room who had bled substantially into her abdomen due to an ectopic pregnancy. *Id.* at ¶ 8. Her condition was critical. *Id.* If any member of the team responsible for her care had opted out of her treatment, the woman would have died before other competent personnel could have been substituted in. *Id.*

Moreover, women seeking abortions will be delayed or denied time-sensitive treatment, increasing medical risks and costs with each passing day. Drey Dec. ¶¶ 9-11. Some transgender people will be deterred from accessing safe transition-related care, and will resort to dangerous self-medication like black market hormones or industrial grade silicone injections, which can have serious—even fatal—effects. *See* Pardo Dec. ¶ 12; Zevin Dec. ¶¶ 6-7. LGBT people and other vulnerable populations will delay or avoid seeking care for fear of discrimination. Colfax Dec. ¶ 22; Pardo Dec. ¶¶ 9-13. These delays will lead to worse individual and public health outcomes, and increased costs to the healthcare system. Colfax Dec. ¶ 22.

But the alternative to compliance—potential loss of all HHS funds—would be devastating. In fiscal year 2017-2018, the City expended approximately $1 billion in HHS funds, representing approximately 10% of the City's total operating budget and one-third of SFDPH's budget. *See* Rosenfield Dec. ¶¶ 4-8; Wagner Dec. ¶ 4. Loss of these funds would be catastrophic, and would compromise SFDPH's mission to protect and promote health and well-being.[5] Beyond SFDPH funds, $58 million in TANF funds, nearly $35 million in Title IV-E Foster Care funds, $10

---

[5] Colfax Dec. ¶¶ 4, 23; Wagner Dec. ¶¶ 3-5; Colwell Dec. ¶¶ 11-14; Nestor Dec. ¶¶ 9-16; Siador Dec. ¶¶ 3-8.

1   million in adoption assistance funds, and $8 million in child support enforcement funds also hang

2   in the balance. Rosenfield Dec. ¶ 5. To fully absorb the loss of all HHS funds for even a single

3   year, the City would have to deplete its reserves, suspend capital projects needed to maintain the

4   City's aging infrastructure, and make drastic service cuts in order to maintain a balanced budget,

5   as it is legally required to do. *Id.* All of these actions would result in significant job losses and the

6   abandonment of key safety net services. *Id.* at ¶ 10.

7       **C.    Impact on the County of Santa Clara, Providers, and Patients**

8       Plaintiffs in *County of Santa Clara* include the County; private healthcare facilities that

9   provide reproductive-health services and healthcare services for LGBT people; three national

10  associations of medical professionals; organizations that provide services to the LGBT

11  community; and individual physicians and counselors. If the Rule goes into effect, plaintiff

12  healthcare providers will have to forgo federal funding entirely, or immediately reevaluate and

13  rewrite existing religious-objection, staffing, and emergency policies. Either of these sharp

14  changes in course will seriously impair their operations and missions, causing a cascading series

15  of harms for Plaintiffs, their patients, and public health.[6]

16      The County operates three public hospitals, numerous satellite clinics and pharmacies, a

17  regional public health department covering 15 cities, a behavioral health department, and a public

18  maintenance organization (HMO).[7] It is the only public safety-net health care provider in the

19  County and the second largest such provider in the State, as well as the sole local accreditor of

20  emergency responders. Lorenz Dec. ¶ 5; Miller Dec. ¶ 3. Its hospitals, pharmacies, clinics, and

21  public health department rely on roughly a billion dollars in federal funding for their continued

22  existence and operation. Lorenz Dec. ¶ 22. The Rule puts the County to an impossible choice:

23  forgo that critical federal funding, or implement policies that allow its staff to turn patients away,

24  refuse to help during an emergency, or otherwise stigmatize and harm patients, thereby

25  compromising the County's ability to provide care to the public.

26  ───────────────

[6] *See, e.g.,* Lorenz Dec. ¶¶ 19-20; Miller Dec. ¶ 7; Halladay Dec. ¶ 5; Singh Dec. ¶ 7; Sproul Dec.

27  ¶¶ 4-6; Tullys Dec. ¶ 9; Burkhart Dec. ¶¶ 19-21, 26-27; Barnes Dec. ¶ 20-23.

[7] Lorenz Dec. ¶¶ 2-6; Singh Dec. ¶¶ 2-3; Cody Dec. ¶ 4; Halladay Dec. ¶ 3.

28

8

For example, under the County's current policies, religious objectors must make their managers aware of their objections in advance to permit staffing arrangements that avoid compromising patient care.[8] Workers may raise objections only to the direct provision of care (Lorenz Dec. ¶ 11, Ex. A), subject to the understanding that medical emergencies take precedence (Lorenz Dec. ¶¶ 11, 18; Nguyen Dec. ¶ 4 submitted as Hanna-Weir Dec. Ex. A). Under the Rule, the burden will shift to providers to ask essentially every employee (rather than just medical and nursing staff) about any objections that the employee might have to any job duties. *See* 84 Fed. Reg. at 23,186-88. If the Rule goes into effect, the County will be forced to bear the costs of canvassing thousands of employees and processing responses. *See* Lorenz Dec. ¶ 12. Even then, it may be unable to address religious objections through accommodations and reassignments due to the Rule's scope and restrictions. *See* Nguyen Dec. ¶ 5. And if the County cannot rely on staff to provide care in an emergency, it will not be able to ensure that care is adequately delivered—even with double-staffing or other cost-prohibitive measures. Nguyen Dec. ¶ 6. The barriers to care posed by the Rule will also undermine critical public health initiatives and emergency operations (Cody ¶¶ 4-10; Miller ¶¶ 5-6) and taken together will frustrate the County's ability to budget, plan, and provide care to millions of people (Lorenz Dec. ¶ 19).

Similarly, Plaintiffs specializing in reproductive healthcare and healthcare for LGBT people may be forced to institute costly workarounds and duplicative staffing; to unfairly burden nonobjecting employees; to reduce services; and even to close programs.[9] More patients who fear refusal of care at traditional healthcare facilities will come to them for care, straining their resources.[10] Plaintiffs will need to invest resources to educate the community about the Rule and combat the erosion of community members' confidence in the healthcare system. Shanker Dec. ¶ 14; Valle Dec. ¶ 16. The Rule will also frustrate Plaintiff medical associations' missions of promoting training in abortion care (Backus Dec. ¶ 11) and nondiscriminatory care for LGBT patients (Vargas Dec. ¶¶ 1-2, 6-10; Harker Dec. ¶¶ 1, 6, 9), and will harm their members and

---

[8] Lorenz Dec. ¶ 11, Ex. A; *see* Tullys Dec. ¶ 9; Halladay Dec. ¶ 5.

[9] Shafi Dec. ¶¶ 12-15; Shanker Dec. ¶¶ 13-15; Valle Dec. ¶¶ 16-23; Cummings Dec. ¶¶ 15-19; Manley Dec. ¶¶ 10-13; Burkhart Dec. ¶¶ 19-21, 27; Barnes Dec. ¶ 22.

[10] Shafi Dec. ¶ 20; Cummings Dec. ¶ 15; Shanker Dec. ¶ 13; Barnes Dec. ¶¶ 30-31.

1    members' patients (*id.*; Backus Dec. ¶ 11; Vargas Dec. ¶¶ 6-10).

2          The Rule will also harm the *Santa Clara* Plaintiffs' patients, especially low-income patients

3    (Bolan Dec. ¶ 2; Cummings Dec. ¶¶ 3-4), and interfere with Plaintiffs' adherence to ethical and

4    legal duties (Nguyen Dec. ¶¶ 8-9). The Rule increases the likelihood that patients will be turned

5    away and will incur additional costs and burdens to try to find a willing provider. Lorenz Dec. ¶

6    24; McNicholas Dec. ¶ 31; Cummings Dec. ¶ 9. Some patients will not receive or will be delayed

7    in receiving essential care and treatment, suffering serious physical harm.[11] And patients denied

8    complete information will be stripped of the right to informed consent. Nguyen Dec. ¶ 9;

9    McNicholas Dec. ¶ 18. The Rule will further erode trust between patients and providers, causing

10   worse patient outcomes. Carpenter Dec. ¶¶ 8-9; Henn Dec. ¶ 5.

11         The Rule will deter patients from seeking care for fear of stigma and discrimination and

12   will reduce access to abortion and contraception (Backus Dec. ¶¶ 27-28), exacerbating an

13   increasing national shortage of providers due to restrictive laws and widespread mergers of

14   hospitals with religious facilities. *Id.* ¶¶ 8, 14-17; McNicholas Dec. ¶¶ 19-21. Many patients

15   already travel long distances (and incur associated costs and delays) to obtain care. Phelps Dec. ¶

16   18, 30. If the Rule goes into effect, even more institutions will forgo providing and educating

17   providers in abortion and contraception, decimating access to care throughout the country.[12]

18         The Rule will impose particular burdens on LGBT people, and especially transgender and

19   gender-nonconforming people. The Rule mischaracterizes gender-affirming care for transgender

20   patients as "sterilization," specifically inviting religious and moral objections to providing that

21   care. 84 Fed. Reg. at 23,178, 23,205.[13] LGBT people already face acute health disparities and

22

23   [11] Shanker Dec. ¶ 5; Cummings Dec. ¶¶ 11-12; Phelps Dec. ¶ 18. Others will be traumatized or
     stigmatized. Shafi Dec. ¶ 18; Bolan Dec. ¶¶ 6-9; Henn Dec. ¶ 3; McNicholas Dec. ¶ 44; Ettner

24   Dec. ¶¶ 48, 56.

     [12] Phelps Dec. ¶¶ 26-30, 34-35; Backus Dec. ¶¶ 18, 38-39; McNicholas Dec. ¶¶ 26-30.

25   [13] Equating gender-affirming treatment with "sterilization" is medically inaccurate, contrary to
     medical and commonsense understandings of the term, and endorses a particular religious view of

26   gender identity. Ettner Dec. ¶ 46. Procedures undertaken for the purpose of sterilization are
     distinct from procedures undertaken for other purposes that incidentally affect reproductive

27   function. *Id.*; Fountain Dec. ¶ 13. For some transgender people, reproduction may be possible
     even after completing treatment for gender dysphoria. Ettner Dec. ¶ 47; Fountain Dec. ¶ 13.

28

barriers to care, problems that will be compounded by the Rule.[14] Many LGBT patients fear going to healthcare providers because of past experiences of hostility, discrimination, and denials of care when they have disclosed to providers their sexual orientation, history of sexual conduct, gender identity, transgender status, or past gender-affirming medical treatment.[15] LGBT patients are disproportionately likely to delay preventive screenings and necessary treatment, causing more acute health problems and more adverse outcomes.[16] The Rule makes it more likely that these patients will be denied care, will remain closeted when seeking care, or will be deterred from seeking care, hurting the patients and the public health. *Id.*

<div align="center">

**ARGUMENT**

</div>

## I.    PLAINTIFFS HAVE STANDING TO RAISE THEIR CLAIMS

Defendants challenge the third party standing of the physician plaintiffs in the *County of Santa Clara* action to bring Free Speech, Equal Protection and Due Process claims on behalf of their patients. Mot. 36. This argument fails. The Supreme Court has unequivocally held that physicians have standing to assert the reproductive rights of patients. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 117 (1976); *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013); *Griswold v. Connecticut*, 381 U.S. 479 (1965). The Court recently upheld this unbroken precedent in *Whole Woman's Health v. Hellerstedt*, where physicians vindicated patients' abortion rights. 136 S. Ct. 2299 (2016).[17] If the Rule goes into effect, patients may be denied reproductive care in emergencies and other circumstances in which it is infeasible for them to assert their own rights, and the physician Plaintiffs have standing to vindicate these rights.

This standing extends to LGBT patients seeking to exercise their fundamental right to medical autonomy and bodily integrity on matters central to self-definition under *Skinner v.*

---

[14] Shanker Dec. ¶¶ 5-10; Ettner Dec. ¶¶ 55-56; Cummings Dec. ¶¶ 8-11.

[15] Henn Dec. ¶¶ 3, 6-8; Bolan Dec. ¶¶ 6-9; Carpenter Dec. ¶ 5; Cummings Dec. ¶ 12; Vargas Dec. ¶¶ 4-5, 13; McNicholas Dec. ¶ 26; Pumphrey Dec. ¶¶ 7-9.

[16] Shanker Dec. ¶¶ 8-12; Henn Dec. ¶¶ 3, 5-6; Bolan Dec. ¶¶ 6-9, 11; Carpenter Dec. ¶ 6; Manley Dec. ¶ 8; Cummings Dec. ¶¶ 9, 11-14.

[17] Provider standing to assert rights of abortion patients was assumed by all members of the Court in *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 324 (2006); *see also Gonzales v. Carhart*, 550 U.S. 124, 133 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 922 (2000) (same); *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 845 (1992) (same).

<div align="center">11</div>

*Oklahoma*, 316 U.S. 535 (1942), and *Eisenstadt v. Baird*, 405 U.S. 438, 453-54 (1972). LGBT patients cannot safely secure healthcare without the aid of physicians and are hindered in vindicating their own rights because of concerns over privacy and stigma and the time-sensitive nature of treatment. *See Singleton*, 428 U.S. at 117-18; *supra* Facts III.B-C; Ettner Dec. ¶¶ 21-22, 48-53. Defendants' own cites confirm that third-party standing exists where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Mills v. U. S.*, 742 F.3d 400, 407-08 (9th Cir. 2014). And physicians have standing to challenge restrictions that chill their patients' speech, interfering with their ability to provide care. *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956-58 (1984); *Am. Booksellers Ass'n*, 484 U.S. at 392. Because enforcement of the Rule against Plaintiff providers and physicians will infringe on LGBT and reproductive-healthcare patients' constitutional rights, Plaintiffs' standing is clear. *See infra* Sections VIII-X.

Notably, Defendants do not contest that Plaintiffs have standing to pursue any of the claims they assert on their own behalves. Nor could they. Standing requires (1) "injury in fact," (2) a "causal connection" between the injury and the challenged conduct, and (3) a showing that a favorable ruling will "likely" redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In an APA action, if a plaintiff is an object of the challenged regulation, "there is little question" that the plaintiff has standing. *Id.* at 561-62.

The Rule inflicts numerous concrete injuries on all Plaintiffs. First, the Rule requires Plaintiffs to establish immediate compliance measures, adversely affecting their policies, hiring practices, and patient care.[18] *See Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383 (1988) (finding standing based on costly compliance measures). Second, Plaintiffs are recipients or sub-recipients of federal funds. *See supra* Facts III.A-C; App'x 399 & 400. A "loss of federal funds promised under federal law[ ] satisfies Article III's standing requirement." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc). Third, the Rule burdens Plaintiffs

---

[18] Price Dec. ¶¶ 2-14; Cantwell Dec. ¶¶ 4-12; Nunes Dec. ¶¶ 5-19; Toche Dec. ¶¶ 2-12; Harris-Caldwell Dec. ¶¶ 5-16; Hinze Dec. ¶¶ 3-7; Aizuss Dec. ¶¶ 30-35; Parmelee Dec. ¶ 10; Chen Dec. ¶¶ 5-13; Weigelt ¶ 4; Colwell Dec. ¶¶ 5-10; Buchman ¶ 9-10.

12

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

with long-term increased costs—for example, for unintended pregnancies and untreated medical conditions.[19] *See California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018).

The public entity plaintiffs also have standing to seek judicial review of governmental action that affects the performance of their duties. *Cent. Delta Water Agency v. U.S.*, 306 F.3d 938, 950 (9th Cir. 2002). The Rule will interfere with the State's enforcement of its consumer protection laws and regulation of its medical professionals.[20] And the Rule will interfere with the duties of the City and County to provide medical care for indigent patients, prevent transmission of communicable disease, and protect health and safety. Cal. Const. art. XI, § 7; Cal. Welf. & Inst. Code § 17000 *et seq.*; Cal. Health & Saf. Code §§ 10100 and 120100 *et seq.*

## II. PLAINTIFFS' SPENDING AND ESTABLISHMENT CLAUSE CLAIMS ARE RIPE

Defendants challenge the ripeness of Plaintiffs' Spending and Establishment Clause claims. Mot. 10-12.[21] This argument fails as well. Absent court intervention, the Rule will go into effect on November 22, 2019. Plaintiffs bring these claims now because they must decide—now— whether to forgo federal funding with potentially devastating consequences, or to completely rewrite existing policies, change their operations, incur additional costs and administrative burdens, and, for direct recipients, certify compliance. None of the Plaintiffs can afford to carry the unacceptable risk of an unbudgeted termination of huge swaths of federal funding. And provider Plaintiffs cannot, consistent with their legal and ethical duties and their missions, take a "wait and see" approach to deciding how to handle refusals during medical emergencies. Nor can they wait to set standards ensuring timely, adequate, and compassionate care. Public entity Plaintiffs asserting Spending Clause claims also bear special responsibility to ensure continuity in provision of public health services and care for vulnerable populations and the indigent.

---

[19] Chavkin Dec. ¶¶ 18-19, 24(q); Lara Dec. ¶¶ 21-22; Cantwell Dec. ¶ 12; Cody Dec. ¶ 10; Colfax Dec. ¶ 22; Pardo Dec. ¶ 12; Zevin Dec. ¶ 6.

[20] Lara Dec. ¶¶ 2-30; Kish Dec. ¶¶ 2-15; Cantwell Dec. ¶¶ 11-12; Morris Dec. ¶¶ 2-11; Pines Dec. ¶¶ 2-14; Hinze Dec. ¶¶ 4-7; Lara Dec. ¶ 4.

[21] Because here the APA provides a single cause of action challenging final agency action, 5 U.S.C. §704, challenges to the Rule under any of the bases enumerated under Section 706(2), including constitutional challenges, are necessarily ripe. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) (superseded on other grounds by statute as recognized in *Califano v. Sanders*, 430 U.S. 99, 149 (1977)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).

13

1    Whether a rule violates the Spending and Establishment Clauses of the Constitution is a

2    purely legal question that is ripe for adjudication. *Abbott Labs.*, 387 U.S. at 149. Review is ripe

3    when, as here, (1) delayed review causes hardship to the plaintiff; (2) judicial intervention does

4    not inappropriately interfere with administrative action; and (3) further factual development is

5    unnecessary. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

6    First, a judicial challenge to a regulation is ripe when the rule requires parties to comply

7    with new restrictions or risk serious penalties. *Abbott*, 387 U.S. at 152. Delayed review here

8    would result in such a "substantial hardship." *See Pacific Gas and Elec. Co. v. State Energy Res.*

9    *Conservation and Dev. Comm'n*, 461 U.S. 190, 201 (1983). The Rule's immediate compliance

10   requirements and assurance and certification requirements, 45 C.F.R. § 88.4(a)(1), (2), obligate

11   recipients and sub-recipients to comply throughout the duration of funding and as a condition of

12   continued receipt of funds. 84 Fed. Reg. at 23,269. Thus, Plaintiffs will be forced midway

13   through the fiscal year either to disrupt their budgetary plans to comply with requirements that

14   have an immediate impact on their governance, functioning, business, and patients, or continue to

15   provide services as they always have—believing in good faith that they meet all statutory

16   requirements—but risk losing of funding nonetheless. *See supra* Facts III.A-C. All healthcare

17   provider Plaintiffs will also need to immediately examine and alter their policies, and the Rule

18   targets all Plaintiffs because they are committed to providing reproductive healthcare and LGBT

19   healthcare. *See supra* Facts III.A-C. Thus, the "impact" of the Rule will be "felt immediately"

20   because Plaintiffs will need to alter "their day to day affairs" immediately to comply. Mot. 11-12;

21   *see also Ohio Forestry*, 523 U.S. at 734 (explaining that "agency regulations can sometimes force

22   immediate compliance through fear of future sanctions," which is exactly what the Rule does);

23   *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (concluding that requiring

24   plaintiffs to adjust their conduct immediately is the "major exception" to the presumption that a

25   regulation is not ripe).

26   In *National Family Planning & Reproductive Health Ass'n v. Gonzales*, unlike here, the

27   plaintiffs did not face any immediate regulatory burdens. The expanded definition of the terms

28   "discrimination," "assist in the performance," and "refer" provide precisely the basis for review

14

lacking in *Gonzales*, as recipients' decision to do something as simple as reassigning an employee could be "transform[ed]" into an act of discrimination subject to enforcement and de-funding, 468 F.3d 826, 828-30 (D.C. Cir. 2006). *California v. United States*, 2008 WL 744840, at *2 (N.D. Cal. Mar. 18, 2008), meanwhile, supports review because Defendants' about-face in their application of Weldon to the State and their re-opened investigation constitute "express statutory language or an express statement from a federal official or agency indicating a present conflict between state and federal law," *id.* at *5. *See also Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823, 832 (9th Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2361 (2018).[22]

Second, judicial action will not inappropriately interfere with administrative action because, as Defendants state, there is "no specific enforcement action against [Plaintiffs] under the Rule." Mot. 10. And even if there were, this case presents purely legal questions regarding HHS's authority to issue the Rule and the propriety of the Rule's expansive reach. *See, e.g.*, *Texas v. United States*, 201 F. Supp. 3d 810, 824 (N.D. Tex. 2016) (rejecting assertion that administrative action should block judicial review where issues were purely legal and defendants asserted non-compliance with their interpretation).

Third, factual development is unnecessary. Defendants have made clear that they are promulgating the Rule to foster "robust" enforcement (84 Fed. Reg. at 2179), and as the Rule itself demonstrates, Defendants consider California's laws to currently be in direct conflict with the Rule. Further, all provider Plaintiffs must immediately make policy and staffing changes to comply with the Rule, with recipients required to make assurances and certifications.

### III.   THE RULE IS ARBITRARY AND CAPRICIOUS AND THUS INVALID UNDER THE APA

A regulation is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). When an agency has failed to "give adequate reasons for its decisions," to "examine the relevant data," or to offer a "rational connection between the facts

---

[22] Also telling is the fact that the Rule mentions the State no less than 44 times. *See generally* 84 Fed. Reg. at 23,170. Moreover, there is a current facial conflict between the Rule and the policies of the City and County. *See, e.g.*, Chen Dec. ¶¶ 6-11 & Ex. A; Colwell ¶ 5; Weigelt Dec. ¶ 4.

15

1    found and the choice made," the regulation must be set aside. *Encino Motorcars, LLC v. Navarro*,

2    136 S. Ct. 2117, 2125 (2016). The failure to satisfy those threshold requirements makes a

3    regulation procedurally defective and invalid, so it receives no deference under *Chevron, U.S.A.,*

4    *Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). *Encino Motorcars*, 136 S. Ct. at 2125.

5        HHS acted arbitrarily and capriciously in promulgating the Rule. It adopted a one-sided

6    regulation that is not supported by, and is in fact contrary to, the evidence in the record; and it

7    failed to address important issues raised during the notice-and-comment process. And because the

8    Rule is thus "procedurally defective," the Court need not even reach Plaintiffs' other challenges,

9    including whether the agency has exceeded its authority in order to set aside the agency action.

10   *Id.*; *see also Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 33-34 (D.D.C. 2019).

11       **A.    Defendants Failed to Adequately Consider the Rule's Impact on Patients**

12       HHS received voluminous comments demonstrating that the Rule will harm patients,

13   especially LGBT patients, reproductive-healthcare patients, and patients in rural communities.

14   But HHS brushed those concerns aside. That was arbitrary and capricious.

15       First, commenters explained that the Rule would make it more likely that patients would be

16   refused care or denied critical information based on religious or moral objections,[23] causing them

17   harm.[24] If the Rule takes effect, more individuals and entities will assert religious objections to a

18   wider variety of care, including reproductive care, care for transgender patients, counseling for

19   same-sex partners, and HIV/AIDS treatment.[25] Commenters also showed that the Rule would

20   result in patients being denied information critical to decisions about their care.

21       Second, and relatedly, the Rule includes no exceptions for emergencies, so patients will

22   suffer these harms even when they are seeking urgent and potentially lifesaving care. Many

23   commenters pointed out that the absence of an emergency exception created an unacceptable risk

24

---

25   [23] App'x 139 at 137858-60; 77 at 139356; 143 at 139548-49; 85 at 140156; 37 at 139289-90; 177
26   at 140510-12; 179 at 135453-58; 159 at 66546-47.
     [24] App'x 140 at 140484-85; 405 at 58343-44; 87 at 161182-83; 74 at 63129-30.
27   [25]App'x 95 at 161479-81; 179 at 135454-55; 42 at 135124; 73 at 134958; 77 at 139356; 83 at
     139260; 134 at 160481-84; 135 at 149692-95; 120 at 148104-07.

28

1  that patients would not obtain the care they need in emergency situations.[26] HHS dismisses this

2  risk by suggesting that it is unaware of an instance where an entire staff of an emergency

3  department refused to provide care, *see* Mot. 24, but Plaintiffs describe such experiences among

4  their own patients. *See* Cummings Dec. ¶ 12; Henn Dec. ¶ 6; *see also infra* Section V.B. And

5  HHS's assertion ignores that the delay caused by a single individual's refusal to provide care in

6  emergent circumstances, such as an ectopic pregnancy, may result in injury or death.

7       Third, healthcare denials will disproportionately affect certain patients. Commenters

8  explained that the Rule will harm LGBT patients, who already experience discrimination and

9  other obstacles when seeking healthcare.[27] Providers have refused to treat LGBT patients and

10  their children, even in emergencies.[28] Many LGBT people and people living with HIV have

11  reported providers refusing to touch them or using excessive precautions, using harsh or abusive

12  language, being physically abusive, or blaming them for medical conditions.[29] The Rule will

13  make it more likely that these patients will be refused care or be deterred from obtaining care.[30]

14       Commenters also showed that the Rule will harm patients seeking reproductive healthcare.

15  Religious objections have been asserted to deny rape survivors emergency contraception; to

16  refuse to provide emergency contraception in time to prevent pregnancy; and to deny care to

17  complete miscarriages even when women's lives were in danger.[31] Such incidents will increase

18  under the Rule, which invites denials of care in more circumstances, and seeks to hamstring

19  providers' efforts to accommodate objections safely and compassionately while ensuring

20  adequate and timely care. The Rule creates strong incentives for healthcare entities to curtail or

21  eliminate reproductive healthcare and training, despite national shortages caused by hospital

22  mergers and restrictive laws, compounding logistical and financial hurdles and increasing

23

24  [26] App'x 141 at 137583-84; 21 at 139592; 63 at 55809-13; 49 at 160802-05, 160821; 159 at 66547; 16 at 147981-82; 37 at 139292; 133 at 57530; 29 at 147892; 104 at 161036-37.
   [27] App'x 63 at 55810-11; 49 at 160804-05; 40 at 57542; 119 at 134731-38; 99 at 135770; 71 at

25  139246; 180 at 161205-08; 120 at 148096-101.
   [28] App'x 63 at 55810-11; 44 at 135828-32; 85 at 140154.

26  [29] App'x 78 at 160566-67.
   [30] App'x 141 at 160566-67; 83 at 139260; 120 at 148099.

27  [31] App'x 49 at 160802-03; 89 at 140014-015; 154 at 160755.

28

1  patients' risks of injury and death.[32] The Rule will also undermine access to healthcare in rural

2  communities,[33] where patients—particularly reproductive healthcare and LGBT patients—often

3  have few if any alternatives if a provider refuses to provide care.[34] Economically disadvantaged

4  patients, who lack resources to seek alternate providers, will also suffer disproportionately.[35]

5      HHS admitted that these harms will likely occur. It noted that "[d]ifferent types of harm can

6  result from denial of a particular procedure," including that a "patient's health might be harmed if

7  an alternative is not readily found, depending on the condition," 84 Fed. Reg. at 23,251, and cited

8  examples of individuals' objecting to reproductive and LGBT healthcare as evidence of the need

9  for the Rule. *Id.* at 23,176 & n.27. In other words, some patients will be denied critically needed

10  healthcare. HHS also recognized that a patient denied care likely will incur additional costs

11  searching for an alternative; that "the patient may experience distress associated with not

12  receiving a procedure he or she seeks"; and that the patient ultimately may not receive care. *Id.* at

13  23,251. And HHS conceded that the Rule would adversely affect "rural communities,

14  underprivileged communities, or other communities that are primarily served by religious

15  healthcare providers or facilities," and that "patients in rural areas" will be more likely to "suffer

16  adverse health outcomes as a result." *Id.* at 23,180, 23,253.

17      HHS failed to address these concerns, concluding instead that patient harm is an acceptable

18  price to pay for furthering the ability of employees to impose their religious views on others. HHS

19  attributes this preference to Congress, dismissing evidence that refusals would cause patients

20  distress by asserting that Congress did not want to "establish balancing tests that weigh such

21  emotional distress against the right to abide by one's conscience." 84 Fed. Reg. at 23,251. And it

22  finalized the Rule "without regard to whether data exists on the competing contentions about its

23  effect on access to services" because, it asserted, Congress deemed religious refusals "worth

24  protecting even if they impact . . . access to a particular service, such as abortion." *Id.* at 23,182.

25  ─────────────
   [32] App'x 49 at 160819-20, 160824-25; 128 at 138106-10; 21 at 139587-93; 133 at 57522-30; 182
26  at 67867-68; 31 at 71141-43; 140 at 140485-86; 22 at 56915-16.
   [33] App'x 115 at 68427-28; 153 at 148143; 31 at 71142; 13 at 66627; 148 at 55627; 143 at
27  139551-25; 119 at 134733; 94 at 148163; 130 at 139861-63; 163 at 161320-21.
   [34] App'x 119 at 134733; 56 at 139926; 178 at 67174.
28  [35] App'x 49 at 160803-05, 160810, 160825-26; 177 at 140509; 181 at 66440; 163 at 161318-19.

1   But none of the purported authorizing statutes require—or allow—any of that. Congress

2   established limited protections for religious objectors while also enacting statutes, like EMTALA,

3   to ensure that patients receive all necessary care. *See infra* Section V.B. It is the *Rule* that elevates

4   religious objections over the health of patients, a choice that *HHS* made; Congress did not.

5       Second, HHS suggested that the Rule would "increase, not decrease, access to care" by

6   attracting providers who otherwise supposedly would not practice medicine because of religious

7   objections. 84 Fed. Reg. at 23,180; *see also id.* at 23,247 (same); Mot. 28. HHS's principal

8   support for this assertion was a small, outdated, and unreliable political poll. *See infra* Section

9   III.C. And HHS ignored the fact that attracting new providers who refuse to provide certain

10   medical treatments or to serve certain classes of patients does nothing to help those patients, who

11   are already especially likely to be underserved, excluded, and shamed. HHS also improperly

12   minimized the overwhelming evidence in the record that an increase in religious refusals would

13   cause substantial—and in some cases fatal—harms to patients.[36] And while HHS suggested that

14   there were "too many confounding variables" and "not enough reliable data" for the agency to

15   quantify "the impact of this rule on access to care" (84 Fed. Reg. at 23,252; Mot. 29), it

16   acknowledged that the harms would result, including harms to "the patient's health" (84 Fed.

17   Reg. at 23,251). The only possible question here concerns the ubiquity of those harms, not the

18   fact (or the seriousness) of them; yet HHS dismissed them.

19       Finally, HHS offered no adequate response to the many comments pointing out specific

20   ways in which the Rule would undermine the delivery of care to patients. For example, while

21   many commenters explained the need for an emergency exception,[37] all that HHS would say is

22   that it would consider specific emergency scenarios on a case-by-case basis (84 Fed. Reg. at

23   23,188), an absurd impracticality that would deter healthcare institutions from giving priority to

24   patients in extremis, as medical ethics require (Nguyen Dec. ¶¶ 8-9); and institutions that make

---

[36] As Dr. Chavkin states in her declaration, HHS misread a paper that she authored to find that
there is "insufficient evidence to conclude that conscience protections have negative effects on
access to care." 84 Fed. Reg. at 23,251 n. 345; Chavkin Dec. ¶ 15. In fact, the paper demonstrates
that religious refusals endanger patients. *Id.* ¶ 16. HHS ignored evidence of patient harms even in
the cherry-picked medical-journal articles that it put into the administrative record. *Id.* ¶¶ 23-24.
[37] App'x 16 at 147981-982; 37 at 139292; 133 at 57530; 29 at 147892.

1    the choice to put patients' lives first do so at their peril. Nor did HHS seriously address the

2    likelihood, arising from the Rule's broad definition of "referral," that patients would be denied

3    information about valid treatment options. The agency merely asserted that providers would be

4    required to obtain informed consent before undertaking particular medical procedures (84 Fed.

5    Reg. at 23,189)—which is not at all the same thing as receiving full and fair information about

6    *other* possible procedures. And HHS made the fatuous suggestion that, rather than being able to

7    trust their doctors and other medical staff to be acting in the patients' best interest based on sound

8    medical judgments, patients could seek out information about undisclosed treatment options using

9    Google (*id.* at 23,253 & n. 354). Finally, HHS ignored the many comments explaining that

10   healthcare institutions' existing religious-accommodation policies are more effective than the

11   Rule in protecting patients while still allowing for religious objections in ways that do not

12   compromise patient care.[38]

### B.   Defendants Failed to Respond Meaningfully to Comments Detailing Impacts on Providers, Impracticability, and Costs of Compliance

13

14

15   Defendants ignored a multitude of comments from major medical associations, provider

     groups, academics, and experts who raised concerns that the Rule will be impracticable and

16   exceedingly costly. *See, e.g.*, Cal. Compl. ¶¶ 48-63; App'x 21; S.F. Compl. ¶ 121; S.C. Compl. ¶

17   2015; *see also infra* Section V.

18

19   First, as to costs, major institutes and governmental entities addressed the burdens that the

     Rule would impose. The NPRM itself estimated $ 814.3 million for compliance over the first five

20   years. Boston Medical Center explained that this required expenditure conflicts with the "calls to

21   action and efforts being made to bring down the costs of health care throughout the United

22   States." App'x 37; 101 (Mass. Health & Hosp. Ass'n Ltr.). The California Medical Association

23   (CMA) explained that the NPRM failed to consider "the significant time and resources it takes to

24   continuously implement and enforce" the rule. App'x 41. CMA further explained that these

25   proposed "[e]xcessive administrative tasks" "divert time and focus from providing actual care to

26

27

28

---

[38] *See, e.g.,* App'x 21 at 139591; 63 at 55807; 162 at 134792-793; 37 at 139289; 103 at 64200; 22 at 56917-56918; 29 at 147890; 33 at 68370; 109 at 57601-602.

20

patients." *Id.*; *see also* App'x 20 (American Hospital Association explaining that the Rule is "burdensome" and "unnecessary" and "create[s] a presumption of noncompliance"); App'x 21 (AMA stating that "it remains unclear why OCR would require physicians to make two separate attestations of compliance to the same requirements, particularly given the administration's emphasis on reducing administrative burden"). Defendants failed to respond to these "significant points raised during the public comment period," and failed to consider these "relevant factors." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000); Mot. 28 (Defendants admit that this Court must ensure that they "consider[ed]" "the relevant factors" in promulgating their Rule). On this basis alone, the Rule should be set aside.

Second, as to practicability, several entities stated that the increased regulatory burden of the Rule would adversely affect providers' practices. For example, the American Health Care Association and National Center for Assisted Living stated that the Rule's burdens on providers of long-term and post-acute care providers could reduce time to provide high quality patient-centered care. App'x 19. Numerous providers stressed that the Rule ran contrary to codes of ethics and other state and federal laws. App'x 21 (AMA).

Defendants argue that the *data* from the commenters is insufficient and unreliable to quantify these harms. Mot. 28-29. But there is no requirement that commenters provide a certain type of data before the agency must consider it.[39] On the contrary, whether supported by data or not, an agency must respond to "[s]ignificant points . . . which, if true, raise points relevant to the agency's decision." *City of Portland, v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007). The agency is not free to disregard commenters by complaining about "[un]reliable quantification." Mot. 29.[40]

Indeed, this Court recently adopted the D.C. Circuit's rule that "'[t]he mere fact that the . . . effect[ ] [of a rule] is *uncertain* is no justification for *disregarding* the effect entirely.'" *California v. Azar*, 385 F. Supp. 3d 960, 1017 (N.D. Cal. 2019), *stayed on other grounds pending appeal*, 928 F.3d 1153 (9th Cir. 2019). Per HHS's own Guidelines, "[i]f quantification is not possible,

---

[39] Also, HHS is required independently to assess the impact of its rules. 84 Fed. Reg. at 23,226.

[40] Defendants apply a double standard not permitted by the APA, considering "anecdotal evidence" in support of the Rule (84 Fed. Reg. at 23,247), while disregarding such evidence in comments opposing the Rule (Mot. 28-29).

21

1    analysts must determine how to best provide related information" and "[a]t minimum, analysts

2    should list significant nonquantified effects in a table and discuss them qualitatively." RJN Ex. B.

3    Defendants "failed to consider [these] important aspect[s]" of the rulemaking, thus the Rule must

4    be set aside. *State Farm*, 463 U.S. at 43; *supra* Section III.A.

5         **C.    The Supposed Benefits of the Rule are Speculative and Unsupported**

6         In articulating the supposed benefits of the Rule, HHS's primary contention is that it will

7    increase the number of healthcare providers. *See* 84 Fed. Reg. at 23,246-47; *see also* Mot. 27. The

8    language that HHS uses to describe this purported benefit makes clear that it is pure conjecture.

9    HHS "expects" the Rule to encourage more people to enter the profession. 84 Fed. Reg. at

10   23,247. But it acknowledges that it "is not aware of any data enabling it to quantify any effect the

11   Rule may have on increasing the number of health care providers." *Id.* It merely "assumes" that

12   the Rule will result in a greater number of providers. *Id.*

13        This "assumption" is based primarily on decade-old polling concerning "conscience rights"

14   in healthcare conducted by Kellyanne Conway's company on behalf of the Christian Medical and

15   Dental Associations. App'x 404. The firm conducted two phone surveys of American adults—

16   one in 2009 and one in 2011—and an online survey of members of faith-based medical

17   organizations, including members of the Christian Medical Association. App'x 403 & 404.

18        HHS cites these results a dozen times in the Rule. *See, e.g.*, 84 Fed. Reg. at 23,246 n.309;

19   *id.* at 23,247 nn.316–18. No other survey is cited more frequently and no other data is more

20   central to HHS's argument. But this data cannot bear the weight that HHS places upon it. The

21   research is outdated, having been conducted before the Catholic Church became one of the largest

22   healthcare providers in the country. *See* Eleanor Barczak, *Ethical Implications of the Conscience*

23   *Clause on Access to Postpartum Tubal Ligations*, 70 Hastings L.J. 1613, 1621 (2019) (today the

24   Church "operat[es] 649 hospitals and 1614 continuing care facilities across the country, and

25   provid[es] care for one in six patients receiving medical attention every day"). More importantly,

26   the participants in the online survey were "self-selecting." App'x 404. Accordingly, even the

27   pollster herself acknowledged that the poll was "intended to demonstrate the views and opinions

28   [solely] of members surveyed" and was "not intended to be representative of the entire medical

22

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1    profession [or even] of the entire membership rosters of these organizations." *Id.*[41]

2        This non-representative poll is the *only* data that HHS cited in support of its assertion that

3    the Rule will increase the number of healthcare providers.[42] And the assertion is belied by other

4    evidence in the record. For example, even though the 2008 rule was largely rescinded in 2011,

5    religious providers did not leave the industry. Instead, religious providers such as Ascension, the

6    "nation's largest religiously affiliated non-profit health care system," are thriving and providing

7    approximately $2 billion in care, equal to Kaiser Permanente. 84 Fed. Reg. at 23,248.

8        HHS nonetheless asks this Court to defer to the agency even if its evidence is "weak" (Mot.

9    27), because this is a "difficult policy assessment that should be left" to the agency. Mot. 28. But

10   courts "do not defer to the agency's conclusory or unsupported suppositions." *McDonnell*

11   *Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (citing *State*

12   *Farm*, 463 U.S. at 440); *Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 342 (D.C. Cir.

13   1989) (requiring more than "conclusory statement" regarding substantial competitive harm).

14       In short, the principal benefit that HHS asserted is unsubstantiated by competent evidence

15   and "do[es] not suffice to explain its decision." *Encino Motorcars*, 136 S. Ct. at 2127. The other

16   benefits that HHS identifies fare no better. First, HHS contends (Mot. 27) that the Rule will

17   improve the doctor-patient relationship by "facilitating open communication between providers

18   and their patients." 84 Fed. at Reg. at 23,249; *see also id.* at 23,246. HHS cites a medical journal

19   article for the proposition that it is important for patients to feel confident that their religious

20   beliefs will be honored by their medical providers, *id.* at 23,249 nn. 333-334. But the article in

21   _____

22   [41] In the NPRM, by contrast, the polls were cited only once, and only for the limited proposition that 39% of respondents reported pressure or discrimination from administrators or faculty based on their moral, ethical, or religious beliefs. 83 Fed. Reg. at 3887 & n.24. If Plaintiffs had known

23   that HHS would rely on the polls so extensively to support a broad assertion that the Rule will increase access to healthcare, Plaintiffs would have addressed the shortcomings of the survey in

24   their comments on the NPRM. Where "the failure to notify interested persons of the scientific research upon which the agency was relying actually prevented the presentation of relevant

25   comment, the agency may be held not to have considered all 'the relevant factors.'" *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977).

26   [42] In addition to the study, HHS purports to rely simply on "its own analysis, the comments received in response to the NPRM, [and] anecdotal evidence." Mot. 27. Unidentified and

27   unquantified anecdotes cannot provide adequate basis for HHS's counterintuitive assertion that a rule allowing medical professionals to refuse to provide care will increase access to healthcare.

28

1    fact enumerates many barriers to the use of health services among minorities, including

2    discourteous care and stereotypical or discriminatory attitudes from healthcare providers

3    (Chavkin Dec. ¶ 24(h); App'x 383)—all of which will increase as a result of the Rule. Moreover,

4    ensuring that doctors honor a patient's" religious beliefs is altogether different from—and often

5    the opposite of—ensuring that healthcare workers' beliefs are *imposed* on patients.[43]

6         Finally, HHS contends that the Rule will "eliminat[e] the harm from requiring health care

7    entities to violate their conscience" and will "reduc[e] unlawful discrimination in the health care

8    industry and promot[e] personal freedom." 84 Fed. Reg. at 23,246; Mot. 27. But as explained in

9    Section III.D. below, HHS has received only a small number of complaints alleging violations of

10   conscience rights, showing that existing laws and policies adequately protect healthcare entities

11   from being forced to violate their conscience, and many of those complaints would not be

12   remedied by the Rule. *See Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp.

13   3d 28, 50 (D.D.C. 2019) (a regulation is arbitrary and capricious where "the government failed to

14   explain why the [existing] safeguards as a whole would not prevent against the risk" purportedly

15   addressed). The Rule is a solution in search of a problem.

16        **D.    The Record Does Not Support the Need for Defendants' Changed Policy**

17        Defendants admit that HHS must "show[]" "'that there are good reasons'" for the new

18   policy. Mot. 26. They argue that there are "good reasons" for their Rule because of an "increasing

19   number of complaints" and because of a need to "provide adequate incentives" to covered

20   entities. Mot. 26; *id.* at 29. The evidence in the record does not support these arguments. And

21   courts "need not" defer to agency analysis "when the agency's decision is without substantial

22   basis in fact." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007); *Ariz. Cattle*

23   *Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1244 (9th Cir. 2001) (agency action must

24   be "supported by the record" and not based on "speculation").

25        OCR received only 44 complaints between 2008 and January 26, 2018, alleging violations

26

27   ---
     [43] Another article that HHS cites in support of this notion, 84 Fed. Reg. at 23,246 n.310, in fact
     concludes that "[p]olicies that allow *some* [conscience-based refusals] *while also ensuring*

28   *patients' access to the requested service* may yield better overall medical quality." App'x 377 at
     000537893. In enacting the Rule, HHS ignored the critical qualification.

24

1   of conscience rights. 83 Fed. Reg. at 3886. Although Defendants report that they received 343

2   complaints in fiscal year 2018, the purported "increase" does not justify the Rule. First, 81% of

3   the complaints concern objections to state vaccination mandates which, HHS concedes, the Rule

4   does not preempt. Chance Dec. ¶ 11; 84 Fed. Reg. at 23,212. Second, while seven of the

5   complaints were objections to health insurance companies' covering abortions, including

6   complaints about the State's August 22, 2014, letters to health plans regarding abortion coverage,

7   this State law has been upheld by state and federal courts.[44] And most of the complaints were

8   asserted by individuals who are not covered by the Rule or relate to activities not addressed the

9   supposedly authorizing laws. Chance Dec. ¶ 13; Mot. 27, n.7. Also, the 343 complaints that

10  Defendants rely on amount to less than 2% of the more than 30,000 complaints of discrimination

11  and privacy violations received by OCR.[45] 84 Fed. Reg. at 23,299. These figures demonstrate that

12  rulemaking to enhance enforcement of religious refusal laws is manifestly unwarranted.

13        Further, even while HHS argues that the Rule is necessary, it is engaging in "robust"

14  enforcement of the federal conscience statutes, Mot. 40, this Court's order delaying

15  implementation notwithstanding.[46] An administration change does not authorize HHS's

16  unreasoned and unsupported reversal of course. *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp.

17  3d 1106, 1123 (N.D. Cal. 2017) (a new administration must give reasoned explanations for

18  regulatory changes and address the factual findings underpinning a prior regulatory scheme).

19        **E.    The Religious-Accommodation Framework is Illogical and Unjustified**

20        The Rule creates an unworkable process for accommodating religious and moral objections

21  by requiring that any accommodation be voluntary and by prohibiting any inquiry into whether

22  job applicants may have religious objections to core duties. 45 C.F.R. § 88.2. The Rule substitutes

23  Title VII's established religious-accommodation process with a process that would be

24  _____

25  [44] *See Missionary Guadalupanas*, 38 Cal. App. 5th at 421; *Skyline v. Cal. Dep't of Managed Health Care*, 315 F. Supp. 3d 1225 (S.D. Cal. 2018); *Foothill Church v. Rouillard*, 371 F. Supp. 3d 742 (E.D. Cal. 2019).

26  [45] RJN Exh. A at 147.

27  [46]*See, e.g.*, Harris Meyer, *HHS accuses Vermont hospital of forcing nurse to assist in abortion,* Modern Healthcare (Aug. 28, 2019), https://www.modernhealthcare.com/law-regulation/hhs-accuses-vermont-hospital-forcing-nurse-assist-abortion.

28

fundamentally unworkable for health care employers and would jeopardize patient care, rendering the Rule "illogical on its own terms."[47] *See* 42 U.S.C. § 2000e-2(a)(1); *Am. Fed'n of Gov't Employees, Local 2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006).

The Rule arbitrarily creates a distinct hiring process for regulated entities with regard to religious objections—a process that jeopardizes patient care and impedes providers' efficient management of the workforce.[48] The Rule forbids regulated entities (and possibly sub-recipients and contractors) to inquire in advance as to a prospective employee's objections. An employer "may," after hiring and no more than once per calendar year thereafter except with "persuasive justification," require an employee to inform the employer of any conscience objections. 84 Fed. Reg. at 23,263. Employers will thus be in an untenable position in which they may be hiring individuals who will not perform the core duties of the position. And employers may unknowingly staff an employee in a position that the employee can no longer perform because, unbeknownst to the employer, new objections arose in the course of employment.

The accommodation process is also illogical and unsupported in the administrative record. Under Title VII, employers are required to reasonably accommodate an employee's religion unless doing so would constitute an undue hardship (*e.g.*, "more than a de minimis cost" to the employer). 42 U.S.C. § 2000(e)(j); *Ansonia Bd. of Educ.*, 479 U.S. at 68-69 ("A sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one the employee suggests or prefers, and it need not be the one that least burdens the employee.").[49] With little explanation, the Rule provides that the employer avoids potential

---

[47] Religious accommodations in healthcare have been examined under Title VII. *See Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172, 1201 (W.D. Wash. 2012); *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 227 (3d Cir. 2000); *Grant v. Fairview Hosp. & Healthcare Servs.*, 2004 WL 326694 (D. Minn. Feb. 18, 2004); *Mereigh v. N.Y. & Presbyterian Hosp.*, 2017 WL 5195236 (S.D. N.Y. Nov. 9, 2017); *Noesen v. Med. Staffing Network*, 232 Fed.App'x 581 (7th Cir. 2007); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001).

[48] In contrast, for example, under Title VII, "courts have noted that bilateral cooperation is appropriate [and consistent with Congress's goal of flexibility] in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986); *Shelton*, 223 F.3d at 227.

[49] Also, "an employer is not liable under Title VII when accommodating the employees' religious beliefs would require the employer to violate federal or state law," or if it would result in discrimination. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830-31 (9th Cir. 1999); *Peterson v. Hewlett Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004).

liability for discrimination only if the employee "voluntarily accepts an effective accommodation." 84 Fed. Reg. at 23,191. If there is no "effective" accommodation or the employee is unwilling to accept any of the options offered, the Rule is silent on what the employer can do without violating the Rule. Presumably, the employer cannot transfer or fire the employee because that would be "discrimination" under the Rule.

Though Congress did not expressly incorporate the framework for religious accommodation from Title VII into the statutes that HHS purports to interpret, that does not release HHS from its obligation to "give adequate reasons for its decisions," *Encino Motorcars*, 136 S. Ct. at 2125, particularly when departing from a long-standing statutory framework that has previously been applied in this context. Defendants cite no authority for their proposition that Congress did not intend for undue-hardship exemptions to apply to federal conscience statutes. Mot. 24-25 (relying on case that finds a "clear conflict" between local restrictions and national banking law). HHS has merely expressed an unlawful preference for certain religious objections, *see infra* Sections VII and IX, and has provided no support for its cursory assertion that Congress intended to impose by means of the supposedly authorizing statutes a regime entirely different from Title VII. Congress clearly never intended for those statutes to put employers and employees in limbo, where objections cannot be resolved and patients are harmed.

The federal conscience laws and Title VII have fact co-existed for decades. Simply put, the Rule supplants Congress's judgments and the courts' settled jurisprudence without demonstrating a genuine need for this radical change. *Cf. Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (vacating order where agency "provided no evidence of a real problem").

## IV. THE RULE EXCEEDS HHS'S STATUTORY AUTHORITY

It is well settled that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). Accordingly, agency action must be set aside if it is found to be "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). Here, the Rule exceeds HHS's statutory authority in three ways: (a) HHS lacks authority to promulgate legislative regulations implementing Church, Coats-Snowe, and Weldon; (b) Congress has not delegated to HHS the

27

broad enforcement powers that the agency arrogates to itself; and (c) HHS purports to define critical statutory terms in a manner that far exceeds Congress's intent.

### A. HHS Lacks Authority to Promulgate Regulations Implementing Church, Coats-Snowe, and Weldon

HHS's power to promulgate legislative regulations "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988). If no statute vests an agency with authority to promulgate a particular rule, the agency's action is "plainly contrary to law and cannot stand." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (internal quotation marks omitted). Because federal agencies have no free-standing legislative authority, it is "incumbent upon [the agency] to demonstrate that some statute confers upon it the power it purport[s] to exercise." *Cal. Indep. Sys. Operator Corp. v. FERC,* 372 F.3d 395, 398 (D.C. Cir. 2004); *see also Gonzales v. Oregon*, 546 U.S. 243, 258 (2006). The agency must affirmatively demonstrate this by pointing to specific statutory authority. *Am. Petroleum Inst. v. U.S. EPA,* 52 F.3d 1113, 1120 (D.C. Cir. 1995). There are many examples of such specific grants of rulemaking authority. *See, e.g.*, 29 U.S.C. § 655(b) (authorizing OSHA to issue occupational safety and health standards), 15 U.S.C. § 1392 (directing NHTSA to issue motor vehicle safety standards).

Defendants do not, because they cannot, point to any similar language in Church, Coats-Snowe, or Weldon. Instead, they argue that these Amendments "*implicitly* grant HHS the authority" to issue the Rule. Mot. 12 (emphasis added). Defendants cite *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001), for the proposition that delegated authority may be implicit. But there, Congress had explicitly "charged," *id.* at 227, the agency with "establish[ing] and promulgat[ing] . . . rules and regulations." *Id.* at 222 (quoting 19 U.S.C. § 1502(a)). Given this "generally conferred authority," *id.* at 229, the Court concluded that Congress could have implicitly delegated some interpretive authority to the agency as well, such as authority to "fill a particular gap," *id.* Even with this delegation, the *Mead* court *still* held that the agency's action did not "qualify" for *Chevron* deference. *Id.* at 227 (reversing and remanding for a determination of whether there is some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). And here, there is no "generally conferred authority" or other evidence of Congressional intent to give

28

1    HHS broad authority to promulgate regulations implementing the Amendments.

2         HHS also relies on its general housekeeping authority under 5 U.S.C. § 301 (1966). Mot.

3    13. But that statute is "simply a grant of authority to the agency to regulate its own affairs"—not

4    the affairs of Plaintiffs. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979). And HHS cites

5    the Federal Property and Administrative Services Act of 1949, which authorizes agencies to

6    "issue orders and directives that the agency head considers necessary to carry out" other specified

7    regulations. 40 U.S.C. § 121(c). But Congress could not have intended these statutes, which long

8    pre-date passage of the conscience statutes, to have granted HHS carte blanche to issue rules and

9    regulations implementing unknown and yet-undrafted laws.[50]

10        When Congress has not conferred the asserted regulatory authority, courts do not hesitate to

11   "hold unlawful and set aside" agency regulations under APA Section 706(2)(C). *See, e.g.*, *Air

12   Alliance Houston v. EPA*, 906 F.3d 1049, 1060-66 (D.C. Cir. 2018); *Motion Picture Ass'n of Am.

13   v. FCC*, 309 F.3d 796, 807 (D.C. Cir. 2002); *Am. Library Ass'n v. FCC*, 406 F.3d 689, 708 (D.C.

14   Cir. 2005); *Pharm. Research & Mfrs. of Am. v. U. S. Dep't of Health & Human Servs.*, 43 F.

15   Supp. 3d 28, 37-45 (D.D.C. 2014). Here, HHS cannot demonstrate that "some statute confers

16   upon it the power it purported to exercise." *Cal. Indep. Sys. Operator Corp.,* 372 F.3d at 398.

17        **B.    The Rule Impermissibly Expands HHS's Enforcement Authority**

18        Defendants have improperly conferred broad enforcement powers on OCR without

19   statutory basis. 5 U.S.C. § 706(2)(C); *see* 84 Fed. Reg. at 23,220 (asserting "authority to enforce

20   the Federal Conscience and anti-discrimination laws"). Congress knows how to authorize

21   enforcement authority such as the Rule's funding termination provisions. *See, e.g.*, 42 U.S.C.

22   § 2000d-1 (Title VI), 20 U.S.C. § 1682 (Title IX); 42 U.S.C. § 6104 (Age Discrimination Act); 29

23   U.S.C. §794 (Rehabilitation Act of 1973), 42 U.S.C. § 18116(a) (Section 1557 of the ACA). The

24   "silen[ce]" of the statutes on which HHS relies "contrasts sharply with the[se] other enforcement

25   provisions." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987).

26        Although the Rule purports to enforce more than two dozen statutes, only one speaks

27

28   ───────────────
     [50] Nor can HHS grant itself authority through its own regulations. *See* Mot. 13 (citing UAR (45
     C.F.R. § 75.300(a)) and HHSAR (48 C.F.R. § 301.101(b)(1))).

1   directly to HHS's power to enforce. Section 1553 of the ACA designates OCR "to receive

2   complaints of discrimination based on this section." 42 U.S.C. § 18113(d). The plain text of the

3   statute confers on OCR the power to receive complaints *only under the ACA's prohibition against*

4   *discrimination based on refusals related to assisted suicide*. There is no direct grant of authority

5   to OCR—under that section or any cited statute—of "robust" enforcement tools that could halt or

6   reverse all federal funding for all the reasons covered by the Rule. 84 Fed. Reg. at 23,254. Nor

7   does the plain language of any of the statutory sources that Defendants have cobbled together

8   grant, either individually or collectively, the enforcement over Plaintiffs that HHS asserts. *See*

9   Mot. 14 (citing 42 U.S.C. § 18023(b)(4) (ACA exchange plans); *id*. at § 18041(a)(1) (ACA

10  exchanges); *id*. at § 1302 (small rural hospitals); *id*. at § 263a(f)(1)(E) (certification of

11  laboratories); *id*. at § 1351a (authorizing the Center for Medicare and Medicaid Innovation).

12      The cases Defendants cite— *U.S. v. Marion County School District*, 625 F.2d 607 (5th Cir.

13  1980) and *U. S. v. Mattson*, 600 F.2d 1295 (9th Cir. 1979)—do not support a finding of inherent

14  regulatory enforcement authority. *See* Mot. 13-14. *Marion County* simply held that the attorney

15  general could sue to enforce contractual assurances of compliance with Title VI—it does not

16  support any "inherent" authority to impose such contractual assurances in the first instance.

17  *Marion*, 625 F.2d at 617. When the Ninth Circuit was faced with a similar question, it *rejected* the

18  attorney general's argument that he had inherent authority to bring suit to enforce civil rights laws

19  against a recipient of federal funds, and dismissed the case. *Mattson*, 600 F.2d at 1299 (noting the

20  "repeated failure of Congress to authorize such suits").

21      **C.    HHS's Definitions of Statutory Terms Exceed Congress's Intent**

22      Although the Rule purports to do nothing more than implement existing federal law, HHS's

23  definitions of several statutory terms—specifically, "health care entity," "assist in the

24  performance," "referral or refer for," and "discriminate or discrimination" (collectively

25  "Challenged Definitions")[51]— far exceed the substantive bounds of their legislative origins. *See*

26  *e.g.*, 45 C.F.R. § 88.2-88.3(a)-(c). "Health care entity," "assist in the performance," and "referral"

27  increase the number of prospective objectors from clinical staff to a potentially limitless group of

28  ———————————
[51] The Challenged Definitions can be found in full at 45 C.F.R. § 88.2.

30

1    workers, while "discrimination" prescribes unworkable limitations on a provider's ability to learn

2    of and address possible objections among this expanded group of workers, undermining

3    providers' ability to provide undisrupted patient care. Defendants contend that these definitions

4    accord with the statutes and are reasonable interpretations entitled to deference under *Chevron*.

5    Defendants are wrong on both counts.

6         As an initial matter, *Chevron* applies only when Congress delegated authority to an agency

7    to make rules carrying the force of law, and the agency's action involves the exercise of that

8    authority. *See Mead*, 533 U.S. at 229. For the reasons explained above, Congress did not delegate

9    authority to HHS to promulgate legislative rules concerning Church, Coats-Snowe, or Weldon.

10   *See supra* Section IV.A. Accordingly, *Chevron* is inapplicable. Moreover, none of the underlying

11   statutes extends an unqualified religious-objection right to every person employed by a healthcare

12   provider. Even assuming that HHS had authority to issue a rule here, *this* Rule would still deserve

13   no deference because the definitions are contrary to the "unambiguously expressed intent of

14   Congress." *Chevron*, 467 U.S. at 842-43. They are thus "in excess of statutory . . . authority" and

15   should be set aside. 5 U.S.C. § 706(2)(A).

16        ***Health Care Entity.*** The term "health care entity" is expressly defined in Coats-Snowe and

17   Weldon. Coats-Snowe defines it to include "an individual physician, a postgraduate physician

18   training program, and a participant in a program of training in the health professions." 42 U.S.C.

19   § 238n(c)(2). Weldon defines it to include "an individual physician or other health care

20   professional, a hospital, a provider-sponsored organization, a health maintenance organization, a

21   health insurance plan, or any other kind of health care facility, organization, or plan." 42 U.S.C.

22   § 18113. The Rule ignores this plain language, adding several additional categories of individuals

23   and entities. Citing to *Samantar v. Yousuf*, 560 U.S. 305 (2010), HHS argues that the use of the

24   word "include" in both Coats-Snowe and Weldon indicates that the specific list of "health care

25   entities" contained in those laws is illustrative, not exhaustive. Mot. 18. But *Samantar* does not

26   stand for the proposition that the word "include" should *always* be treated as preceding an

27   illustrative list; merely that it may do so. And certainly, anything added to an "illustrative" list

28   should be similar to the enumerated items. Here Coats-Snowe and Weldon are aimed at

31

1   healthcare professionals and organizations. By contrast, the Rule's definition of "health care

2   entity" includes, at a minimum, all members of the workforce of a healthcare entity, which spans

3   almost every kind of actor involved in healthcare, including volunteers, contractors, medical staff

4   and nonmedical staff from pharmacy clerks to medical billing trainees—entities and individuals

5   with very different roles and functions from those included by Congress. This unprecedented

6   body of persons and entities is empowered to refuse care according to the definitions below.

7       ***Assist in the Performance.*** The Rule defines "assist in the performance" to include

8   "tak[ing] an action that has a specific, reasonable, and articulable connection to furthering a

9   procedure or a part of a health service program or research activity undertaken by or with another

10  person or entity," including "counseling, referral, training, or otherwise making arrangements for"

11  a procedure. 45 C.F.R. § 88.2. This sweeps much more broadly than Congress intended. HHS

12  argues that the Rule's definition is consistent with Church, ignoring the context and history of

13  that law. Church was passed in 1973 as a reaction to the Supreme Court's decision in *Roe v.*

14  *Wade* and a Montana district court decision that imposed a temporary restraining order

15  "compelling a Catholic hospital, contrary to Catholic beliefs, to allow its facilities to be used for a

16  sterilization operation." 119 Cong. Rec. S9595 (Mar. 27, 1973); *see also Taylor v. St. Vincent's*

17  *Hosp.*, 523 F.2d 75, 76 (9th Cir. 1975). As Senator Church made clear, "[t]he amendment is

18  meant to give protection to the physicians, to the nurses, to the hospitals themselves, if they are

19  religious affiliated institutions . . . . There is no intention here to permit a frivolous objection from

20  someone unconnected with the procedure to be the basis for a refusal to perform what would

21  otherwise be a legal operation." 119 Cong. Rec. S9595. Yet, the Rule's definition of "assist in the

22  performance" extends refusal rights well beyond this focused legislative intent, including to

23  "referral[s]" (despite the separation of these terms in the statutes), thus extending such rights to

24  individuals with little connection to the actual provision of healthcare. For example, HHS

25  explicitly intends this definition to include nonmedical tasks such as "[s]cheduling an abortion or

26  preparing a room and the instruments for an abortion." 84 Fed. Reg. at 23,186. HHS contends that

27  "an individual who schedules a patient's abortion is not outside the scope of the Church

28  Amendments merely because they did not perform the abortion themselves." Mot. 16. Yet this

1   expansion is exactly what Congress declined to implement.[52]

2       *Referral or Refer for.* The Rule's use of the terms "referral or refer for" also go well

3   beyond what Congress intended in Weldon and Coats-Snowe, sweeping in the "provision of

4   information" in any form "where the purpose or reasonably foreseeable outcome . . . is to assist a

5   person in receiving funding or financing for, training in, obtaining, or performing a particular

6   health care service, program, activity, or procedure." 45 C.F.R. § 88.2. HHS argues that the

7   "addition of the term 'for' following 'refer' indicates that Congress did not intend the statutes to

8   be limited to a referral document, but rather to include any referral for abortion (or other health

9   services) in a more general sense." Mot. 19. That argument strains the plain language of both

10   statutes with respect to who is covered and what information constitutes a referral. Coats-Snowe

11   anchors "refer for" and "referral" to the training of induced abortions and applies only to an

12   "individual physician, a postgraduate physician training program, and a participant in a program

13   of training in the health professions." 42 U.S.C. § 238n. Weldon uses the term "refer for" in the

14   context of abortion, stating that none of the funds appropriated in the appropriations act may be

15   made available to governmental entities that discriminate against any "institutional or individual

16   health care entity" because the entity "does not provide, pay for, provide coverage of, or refer for

17   abortions." Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(1), 123 Stat.

18   3034.[53]

---

19   [52] Relying on *Mayo Foundation for Medical Education & Research v. United States* 562 U.S. 44,
20   52 (2011), HHS argues that the dictionary definitions of several of the challenged definitions
    illustrate that Congress has "directly spoken" on an issue, satisfying the first step in *Chevron,*
21   Mot. 15, 17, 19. Aside from the broader point that *Chevron* is inapplicable here, *Mayo* rejected
    the agency's assertion that the dictionary definition proved that Congress had directly addressed
22   the question at issue. And the term at issue in *Mayo* was "student"—not a medical term for which
    a *medical* dictionary should be consulted. "Assisting in the performance" of a medical procedure
23   has a specific meaning that is not fairly or accurately captured by stitching together two separate
    definitions from a non-medical dictionary. *See e.g.*, *Ward v. Dixie Nat'l Life Ins.*, 2007 WL
24   4293319, at *1 (4th Cir. 2007)("'actual charges' [was] a term of art rather than two words to be
    separately defined"); *Harold v. Corwin*, 846 F.2d 1148, 1151 (8th Cir. 1988); *see also* Chen Dec.
    ¶¶ 14-16; Zevin Dec. ¶¶ 8-10.
25   [53] Moreover, the medical regulatory backdrop makes clear that Congress intended the word
    "referral" to have its normal meaning in the healthcare setting—for a provider to direct a patient
26   to another provider for care. *See, e.g.*, Medicare.gov, *Glossary-R*, https://www.medicare.gov/
    glossary/r (last visited Sept. 3, 2019) (defining referral as "[a] written order from your primary
27   care doctor for you to see a specialist or get certain medical services"); Ctrs. for Medicare &
    Medicaid Serv., *Glossary*, https://www.cms.gov/apps/glossary/default.asp?Letter= R&Language

33

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1    HHS's interpretation would extend the Rule's reach to the provision of any information by

2    anyone employed in the healthcare industry, depriving patients of information relevant to their

3    treatment, without giving them any hint that crucial information for making informed decisions is

4    being withheld from them. There is no statutory support for HHS's position.

5         ***Discriminate or Discrimination.*** Finally, the Rule's definition of "discriminate or

6    discrimination" goes far beyond what Congress intended by placing unprecedented limits on

7    healthcare providers' accommodation policies and preventing them from ensuring patient health

8    and safety. Under the Rule, "[d]iscrimination" means any change to an objecting employee's

9    "position," "status," "benefit[s]," or "privilege[s]" in employment, as well as use of any

10   "policies[] or procedures" that subject the objector to "any adverse treatment." 84 Fed. Reg. at

11   23,263, § 88.2. The Rule encompasses almost any adverse employment action toward religious

12   objectors without considering what may be legally justifiable—in stark contrast to how

13   discrimination is understood throughout federal civil rights law. In that regard, federal law

14   recognizes a number of rationales and defenses to justify adverse employment actions, including

15   that an employer need not accommodate an employee's religious beliefs when the

16   accommodation would cause undue hardship to the employer. *See* 42 U.S.C. § 2000e(j); *EEOC v.*

17   *Abercrombie & Fitch Stores, Inc*., 135 S. Ct. 2028, 2032 (2015); *Peterson v. Hewlett-Packard*

18   *Co*., 358 F.3d 599, 607 (9th Cir. 2004). But under the Rule, a healthcare entity could be deemed

19   to have engaged in unlawful discrimination simply by taking measures that are reasonably

20   necessary to find out about religious objections and to ensure that those objections do not

21   compromise patient care. Only the few actions within the definition's narrow and restrictive

22   exceptions are excluded—and then only if the employee agrees. *See supra* Section III.E.

23        Congress did not intend its prohibition on "discrimination" to require healthcare entities to

24   put the wishes of religious objectors above the needs of all others. Rather, Congress recognized

25   in, for example, the ACA and EMTALA that providers have obligations to provide healthcare and

26   information, especially in emergency circumstances. Yet in its definition of "discrimination,"

27   (last visited Sept. 3, 2019) ("referral is defined as an actual document obtained from a provider in
     order for the beneficiary to receive additional services."); *id*. (referral is a "written OK from your
28   primary care doctor for you to see a specialist or get certain services").

34

1    HHS declined to consider the legitimate needs of healthcare providers. And by elevating religious

2    objections over the needs of patients, HHS enables new and unjustified forms of discrimination—

3    turning Congress's mandate not to "discriminate" on its head.

4          In short, in enacting the Challenged Definitions, HHS effectively used the rulemaking

5    process to rewrite the underlying law. This exceeds HHS's statutory authority.

6    **V.    THE RULE CONFLICTS WITH EXISTING HEALTHCARE LAWS**

7          **A.    The Rule Conflicts with Section 1554 of the ACA**

8          Congress was clear in the ACA's directive to HHS: The Secretary "shall not promulgate

9    any regulation that—(1) creates any unreasonable barriers to the ability of individuals to obtain

10   appropriate medical care; (2) impedes timely access to health care services; [or] (3) interferes

11   with communications regarding a full range of treatment options between the patient and

12   provider." 42 U.S.C. § 18114 . "When Congress speaks clearly," as it did here, "administrative

13   agencies must listen." *Sunrise Coop., Inc. v. U. S. Dep't of Agric.*, 891 F.3d 652, 654 (6th Cir.

14   2018). The Rule creates barriers to, impedes, and interferes with access to healthcare for women,

15   people with disabilities, LGBT people, and rural communities by permitting discrimination by

16   providers. *See supra* Facts III.A-C. It violates Section 1554 and must be set aside.

17         Defendants argue that this Court should read Section 1554 into obscurity, but their

18   argument fails. First, Section 1554 prohibits regulations that "create[]," "impede[]," "interfere[]

19   with," "restrict[]," or "violate[]," healthcare access, not the "denial of information or services."

20   *Cf.* Mot. 20. Second, whereas Defendants contend that certain terms in Section 1554 are so open-

21   ended as to be unreviewable under the APA, several courts have applied Section 1554, and none

22   found it too "open-ended" to be enforced.[54] Taking Defendants' argument to its logical

23   conclusion, the APA itself, which defines neither "arbitrary" nor "capricious," would also be

24   unenforceable. *See Chubb Custom Ins. v. Space Sys.*, 710 F.3d 946, 966 (9th Cir. 2013) (it is

25

26   _____

     [54] *See, e.g.*, *California*, 385 F. Supp. 3d at 998-1000; *Mayor & City Council of Baltimore v. Azar*,
     2019 WL 2298808, at *8-9 (D. Md. May 30, 2019); *Oregon v. Azar*, 389 F. Supp. 3d 898, 914-15

27   (D. Or. 2019), *stayed on other grounds pending appeal*, 928 F.3d 1153 (9th Cir. 2019);
     *Washington v. Azar*, 276 F. Supp. 3d 1119, 1130 (E.D. Wash.), *stayed on other grounds pending*

28   *appeal*, 928 F.3d 1153 (9th Cir. 2019).

1    "inappropriate to adopt a textually dubious construction that threatens to render the entire

2    provision a nullity"). Finally, the canon that the "specific governs the general" is irrelevant unless

3    statutes are irreconcilably conflicting, which HHS admits "they are not." Mot. 22.

4        Defendants rely on the phrase "[n]otwithstanding any other provision of this Act," arguing

5    that Section 1554's prohibitions do not apply to the conscience statutes. Mot. 21. The plain

6    meaning of that clause is that the Secretary cannot engage in the type of rulemaking proscribed by

7    Section 1554 even if another provision of the ACA could be construed to permit it.[55]

8        Defendants cite to 42 U.S.C. § 18023(c)(2),[56] arguing that Congress intended the ACA to

9    support, not undermine, federal conscience statutes. But Section 18023(c)(2) and Section 1554

10   work together because Section 18023(c)(2) does not "create[]," "impede[]," "interfere[] with,"

11   "restrict[]," or "violate[]," healthcare rights or access. The Rule does exactly that.

12   **B.    The Rule Violates EMTALA**

13       EMTALA requires hospitals participating in the federal Medicare and Medicaid programs

14   with emergency rooms, including those owned and operated by the City and the County, to screen

15   patients to determine "whether or not an emergency medical condition . . . exists" and, if so, to

16   stabilize the patient or transfer her to another facility. 42 U.S.C. §§ 1395dd(a), (b)(1), (c)(1).

17   Courts construing federal conscience protections have concluded that a balancing test is necessary

18   in cases of emergency care. *See, e.g.*, *California v. United States*, 2008 WL 744840, at *4 (N.D.

19   Cal. Mar. 18, 2008) (there is no indication "from the express language of [Weldon] . . . that

20   enforcing . . . EMTALA [or California's equivalent law] to require medical treatment for

21   emergency medical conditions would be considered 'discrimination' under [Weldon] if the

22   required medical treatment was abortion-related services.").[57] The Rule fails to provide for any

23   ----

24   [55] Any reliance on *California v. Azar*, 927 F.3d 1068, 1078 (9th Cir. 2019), would be misplaced because this decision is being reheard en banc and "shall not be cited as precedent by or to any court of the Ninth Circuit." *State by & through Becerra v. Azar*, 927 F.3d 1045, 1046 (9th Cir.

25   2019). And it discusses the "[n]otwithstanding" clause only in dicta. *See* 927 F.3d at 1079 n.4.

26   [56] "Nothing in this Act shall be construed to have any effect on Federal laws regarding— (i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide

27   or participate in training to provide abortion." 42 U.S.C. § 18023(c)(2).

28   [57] *See also* 151 Cong. Rec. H176-77 (Jan. 25, 2005) (statements by Rep. Weldon acknowledging

36

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1    balancing. Defendants insist that HHS intends to "harmon[ize]" EMTALA with the federal

2    conscience protection statutes to the fullest extent possible (Mot. 23), but that that empty

3    assurance gives cold comfort to regulated entities like Plaintiffs, who must immediately

4    determine how to comply or risk losing hundreds of millions of dollars in federal funding. Nor

5    does it assuage patients' well-founded fears. HHS's assertion that it is unaware of any instance

6    when a facility's entire emergency medical care staff objected to providing care ignores the

7    examples of real patient harm in the record.[58] The Rule must be vacated on this ground alone.

8        **C.    The Rule Violates the ACA's Nondiscrimination Provision**

9        Section 1557 of the ACA prohibits discrimination under any health program or activity on

10   the basis of race, color, national origin, sex, disability, or age. The Rule violates Section 1557

11   because it permits providers, insurers, plan sponsors (i.e., employers) and other healthcare

12   personnel and entities to exempt themselves from providing a broad range of benefits and

13   services—including contraceptives (84 Fed. Reg. at 23,176), emergency miscarriage management

14   (*id*. at n.27), tubal ligations and hysterectomies (but not vasectomies) (*id*.), and treatment for

15   gender dysphoria (*id*.)—to women and to the LGBT community. *See supra* Facts III.B-C.[59]

16   Though HHS says once again that it "intends" to "harmon[ize]" the law to the fullest extent

17   possible (Mot. 23), that argument again fails for the reasons just explained.

18       **D.    The Rule Contravenes Title X**

19       The Rule also contravenes Title X of the Public Health Service Act which states that Title

20   X "family planning projects" "*shall* offer a broad range of acceptable and effective family

21   planning methods and services," 42 U.S.C. § 300(a)—Congress' requirement that "all pregnancy

22   counseling shall be nondirective," e.g., 132 Stat. 2981, 3070-71 (2018)—which Defendants have

23   _____

24   EMTALA and that Weldon prohibits coercion in "nonlife-threatening situations," but when the "mother's life is in danger a healthcare provider must act to protect the mother's life.").

[58] *See* App'x 148, n.8; App'x 49; App'x 74, n.18; App'x 5 at 160898 (ACLU Cal.); 83 Fed. Reg.

25   at 3888 n.36, 3889 (hospital denied emergency medical care to a woman who experienced pregnancy complications likely to result in her injury or death and fetal death); 84 Fed. Reg. at

26   23,176, n.27 (same); Colwell Dec. ¶¶ 6-10.

[59] *See, e.g.*, *Ferrer v. CareFirst, Inc*., 265 F. Supp. 3d 50, 52-54 (D.D.C. 2017) (denial of full

27   coverage resulting in women paying for lactation services violates the ACA); Commission Decision on Coverage of Contraception, EEOC 2000 WL 33407187 (Dec. 14, 2000).

28

37

1   conceded permits grantees to present pregnant women with options, including abortion, where the

2   provider "is not suggesting or advising one option over another," and where "clients take an

3   active role in [. . .] identifying the direction of the interaction." 84 Fed. Reg. at 7716.[60] The Rule's

4   overbroad definitions of "discrimination" and "assist in the performance of" put Title X grantees

5   in an impossible situation: ensure that they (and their employees) abide by federal statutory

6   mandates and thereby risk violating the Rule, or abide by the Rule and thereby risk violating Title

7   X when employees refuse to "assist in the performance of" family planning methods and services.

8   Because these definitions have expanded the reach of federal conscience statutes, Defendants'

9   argument that the Rule merely implements existing law is meritless. *See supra* Section IV.C.

10  Moreover, Defendants' contention that entities can simply decline to accept Title X funding

11  belies the harm that the Rule will wreak should it go into effect.

12  **VI.   THE RULE VIOLATES THE SPENDING CLAUSE**

13          Under the Spending Clause, U.S. Const., art. I, § 8, cl. 1, Congress may not impose

14  conditions on federal funds that are (1) so coercive as to compel (rather than merely encourage)

15  States to comply, (2) ambiguous, (3) retroactive, or (4) unrelated to the federal interest in a

16  particular program. *NFIB*, 567 U.S. at 575–82; *South Dakota v. Dole*, 483 U.S. 203, 206–08

17  (1987). The Rule violates all four of these prohibitions because it puts states and localities at risk

18  of ruinous sanctions by allowing HHS to wield its newly expanded authority to terminate, deny or

19  withhold federal funds. 45 C.F.R. § 88.7(i)(3)(iv)-(v). Defendants erroneously contend that

20  Plaintiffs are challenging the underlying statutes and they argue that the Rule merely "provides

21  greater clarity" about those statutes. Mot. 31. But Plaintiffs do not challenge the underlying

22  statutes. Rather, Plaintiffs challenge HHS's massive expansion of these laws via an invalid rule.

23      **A.   The Rule Is Unconstitutionally Coercive**

24          The Rule is an unconstitutionally coercive "gun to the head." *NFIB*, 567 U.S. at 581. In

25  *NFIB*, the Supreme Court explained that because "Medicaid spending accounts for over 20

26  percent of the average State's total budget, with federal funds covering 50 to 83 percent of those

27

28  [60] Defendants' new interpretation of the nondirective mandate is the subject of separate litigation, *see California*, 385 F. Supp. 3d 960, appeal docketed, No. 19-15974 (9th Cir. May 6, 2019).

38

1   costs," and because States "have developed intricate statutory and administrative regimes" in

2   reliance on receiving that funding, the threatened loss of the funding impermissibly affords

3   recipients "no real option but to acquiesce." *Id.* at 581–82. Here, the Rule is even more coercive

4   than the threatened loss of Medicaid funding in *NFIB*. For one, the Rule threatens *all* funding

5   under a vast array of health, education, and employment programs in the State, City, and County.

6   *See supra* Facts IIIA-C. Additionally, the unbounded, discretionary nature of HHS's enforcement

7   authority, *see* 84 Fed. Reg. at 23,272, impermissibly bootstraps the potential consequences of a

8   Weldon violation to apply to two dozen now-expanded federal conscience laws. And whereas the

9   conditions that could result in a loss of funding in *NFIB* were clear, the Rule is not. Given the

10  billions of dollars of federal funding at stake, the loss of which would decimate public services in

11  the country's most populous state and localities, the Rule constitutes "economic dragooning."

12  *NFIB*, 567 U.S. at 581–82.

13       HHS itself previously recognized the constitutional problem that would arise if, in the name

14  of enforcing long-standing and carefully limited federal conscience laws, the federal government

15  asserted sweeping new authority to strip states of funding, as it has done here. App'x 396. This

16  Court should recognize the same and hold that the Rule is unconstitutionally coercive.

17       **B.    The Rule Is Unconstitutionally Ambiguous**

18       If Congress desires to condition Plaintiffs' receipt of federal funds, it "must do so

19  unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because

20  "[t]here can, of course, be no knowing acceptance [of federal funds] if a State is unaware of the

21  conditions or is unable to ascertain what is expected of it," *id.*, courts evaluate statutes "from the

22  perspective of a state official who is engaged in the process of deciding whether the State should

23  accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of*

24  *Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

25       Contrary to Defendants' contention that the Rule merely "mirror[s]" existing federal law,

26  84 Fed. Reg. at 23,222, it changes the landscape of religious conscience objections, greatly

27  expanding the power of objectors to deny care via the Rule's apparently unbounded definitions,

28  which are untethered from prior constructions of the supposedly authorizing statutes. Defendants

39

1    concede that the Spending Clause demands that States be on "clear notice" as to their federal

2    obligations. Mot. 32. This Rule fails that test. For example, it allows *any* "health care personnel"

3    to deny medical care (or refuse to perform any action that has an "articulable connection" to

4    furthering a procedure) without providing any information about the patient's medical condition

5    or treatment options on the basis of "ethical[] or other reasons." 84 Fed. Reg. at 23,263. Given

6    this sweeping and indefinite language, states and local governments cannot know whether they

7    would violate the Rule if they take action against medical providers or programs that deny care or

8    discriminate against their most vulnerable residents. *Clovis Unified Sch. Dist. v. Cal. Office of*

9    *Admin. Hr'g*, 903 F.2d 635, 646 (9th Cir. 1990) ("broad interpretations of ambiguous language"

10   in a funding condition are fundamentally unfair and violate the Spending Clause.); *City & Cty. of*

11   *SF v. Sessions*, 372 F. Supp. 3d 928, 950 (N.D. Cal. 2019). The Rule's ambiguity is exacerbated

12   by HHS's vague assurances that it will "harmonize" the Rule with federal laws such as

13   EMTALA, without providing concrete guidance as to how Plaintiffs should address the interplay.

14       The Rule is also so broadly and vaguely written that it is impossible to ascertain how

15   Plaintiffs should communicate with and monitor their sub-recipients' compliance (Cantwell Dec.

16   ¶ 7), in a manner that effectively protects governmental funding. 84 Fed. Reg. at 23,180

17   ("[R]ecipients are responsible for their own compliance with Federal conscience and anti-

18   discrimination laws and implementing regulations, *as well as for ensuring their sub-recipients*

19   *comply with these laws*.") (emphasis added). This requirement jeopardizes the State's federal

20   funding even if it had no notice or approval of a sub-recipient's violation. The Spending Clause

21   does not allow such an outcome.[61]

22       **C.    Conditions on Funding Already Accepted**

23       The federal government cannot "surpris[e] participating States with post-acceptance or

24   _____

[61] For example, in the Title IX context, a federal funding recipient cannot be held vicariously
25   liable for harassment perpetrated by its employee if it was not on notice of the harassment. *See*
     *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74-75 (1992) (holding school vicariously liable
26   for teacher's harassment of student because it was on notice of teacher's discrimination and took
     no action); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1030 (7th Cir. 1997) (holding
27   that "[t]o impute liability to a program or activity" based on one person's actions, "even if [the
     governmental entity] acted without notice" of the person's actions, "cannot be used to support a
28   monetary award in a Spending Clause case").

40

1   'retroactive' conditions." *NFIB*, 567 U.S. at 582-83. Yet the Rule does just that. Congress

2   conferred on HHS no authority to "alter, amend, or repeal" the federal conscience laws. *Cf*. Mot.

3   32-33. Nevertheless, the agency seeks to override the existing federal conscience protection

4   framework, dramatically expanding not only those who are covered but also what activities are

5   considered protected and how the laws are enforced. For example, Weldon, Church, and Coats-

6   Snowe refer only to specific circumstances in which healthcare providers or certain enumerated

7   healthcare entities may not be required to participate in abortions, sterilizations, or certain health

8   service programs and research activities, but the Rule greatly expands the scope of the

9   circumstances under which the federal conscience laws may be implicated.[62] This is a

10  transformation in kind, not degree.

11      Public entities such as the State, City, and County accept federal funding with the

12  expectation that they will receive the funds under existing agreements and under existing

13  programs and conditions.[63] State and local programs that depend on pass-through funding would

14  be crippled by being unable to expend anticipated funds because they cannot absorb a loss of such

15  funding without a reduction in staffing, programs, and services.[64] Thus, a sudden disruption in

16  anticipated federal funds would create budgetary and operational chaos for state and local

17  agencies providing critical services for their residents.[65] Notably, DHCS, which administers the

18  State's Medicaid program (Medi-Cal), and other federally funded healthcare programs, will

19  receive more than $63 billion in federal funding for services and operations in Fiscal Year 2018-

20  2019. But much of the Medi-Cal budget is expended up-front by the state in expectation of

21  reimbursement from the federal government. Ghaly Dec. ¶¶ 11, 13. The reconditioning of

---

22  [62] Moreover, Defendants' unsupported reversal of their interpretation of Weldon as it relates to
23  the State's abortion coverage requirement creates post-acceptance uncertainties as to what
    additional state laws and policies may also now be deemed to violate the Rule. Similarly, the
24  January 18, 2019 "Notice of Violation" could, under the Rule, be deemed a "determination" that
    could "inform funding decision-making," even though it concluded that further remedial action
25  against the State was not warranted. 84 Fed. Reg. at 23,177, 23,262.

26  [63] Ghaly Dec. ¶¶ 9-10; Sturges Dec. ¶¶ 6-7; Price Dec. ¶ 16; Parmelee Dec. ¶ 7; Nunes Dec. ¶ 11;
    Lorenz Dec. ¶¶ 22-23.

27  [64] Sturges Dec. ¶ 5; Ghaly Dec. ¶ 8, 16; Price Dec. ¶¶ 14-15; Parmelee Dec. ¶ 9; Nunes Dec. ¶ 10;
    Cervinka Dec. ¶¶ 8, 11, 13, 15; Toche Dec. ¶ 12; Lorenz ¶¶ 23-24; Cody ¶¶ 21-22.

28  [65] Ghaly Dec. ¶¶ 8, 10, 12, 14, 15, 17, 18; Sturges Dec. ¶ 6; Nunes Dec. ¶ 10, Cervinka Dec. ¶ 16;
    Colwell ¶¶ 11-14; Wagner ¶ 5; Colfax ¶ 23.

41

existing funding will harm the state's fisc because those funds would not be reimbursed.

### D.    The Conditions on Funding Are Unrelated to Conscience Objections

The Spending Clause requires that funding conditions "bear some relationship to the purpose of the federal spending," *New York v. United States*, 505 U.S. 144, 167 (1992), and be "reasonably calculated" to address the "particular . . . purpose for which the funds are expended." *Dole*, 483 U.S. at 208-09. "Conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id.* at 207 (quotations omitted). The Rule places various federal grants—such as those for Medicaid, HIV prevention, prevention of child abuse and neglect, foster care placement and adoptions assistance, energy assistance for low-income, elderly and disabled individuals, and many others—at risk even though the purposes of those statutes are wholly unrelated to the protection of conscience objections. Ghaly Dec. ¶¶ 8-9, 12-13. The Rule further jeopardizes funding for numerous labor and educational programs, which lack any nexus or relationship whatsoever to the Rule's healthcare restrictions. 84 Fed. Reg. at 23,170, 23,172; 76 Fed. Reg. at 9970; App'x 396; Sturges Dec. ¶¶ 5-8; Parmelee Dec. ¶¶ 5-9. And over 100 million dollars in grants to provide benefits and services to some of SF's neediest residents through programs such as TANF and Foster Care are at risk. Rosenfield Dec. ¶ 5. There is no nexus between these public benefits and religious refusals.

### VII.   THE RULE VIOLATES THE ESTABLISHMENT CLAUSE

The Rule violates the Establishment Clause principally because it elevates the religious beliefs of objectors over the rights, beliefs, and interests of providers and patients, and because it coerces religious exercise by requiring providers and patients to act in accordance with the objecting employees' religious beliefs. *See generally, e.g.*, *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *Edwards v. Aguillard*, 482 U.S. 578, 584–85 (1987). That some of the statutes that the Rule invokes have been upheld, *cf.* Mot. 33-34, is of no moment because Plaintiffs do not challenge the statutes' constitutionality. Plaintiffs challenge the Rule, which wildly expands the statutes' reach in ways that cannot be squared with Establishment Clause proscriptions or with decisions upholding any statute.

42

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1

### A. The Rule Burdens Patients and Other Third Parties

Governmental accommodations of religion are permissible only if, among other constitutional requirements, they do not detrimentally affect third parties. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 729 n.37 (2014); *Cutter v. Wilkerson*, 544 U.S. 709, 720 (2005). If the government materially burdens or harms third parties when accommodating religious beliefs or exercise, it impermissibly prefers the religion of those who are benefited over the rights and interests of those who are burdened. *See, e.g.*, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989). Thus, in *Estate of Thornton v. Caldor*, 472 U.S. 703, 709 (1985), the Supreme Court invalidated a state law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath," thus impermissibly "command[ing] that . . . religious concerns automatically control over all secular interests at the workplace."[66]

Yet that is precisely what the Rule does: It not only requires Plaintiffs to accede to all religious objections but also mandates that only voluntarily accepted religious accommodations are permissible, affording objecting employees the unilateral and absolute ability to refuse an offered accommodation and to demand more. Plaintiffs, for example, manage hospitals, clinics, and complex health networks with thousands of employees. They maintain policies that are calibrated to accommodate employees' religious objections without harming patients or other employees, and without compromising standards of care, medical ethics, or operational needs. *See* Chen Dec. Ex. A; Weigelt Dec. ¶ 4; Lorenz Dec. ¶¶ 11, 18; Nguyen Dec. ¶ 4; Halladay Dec. ¶ 5; Tullys Dec. ¶ 9; Harris-Caldwell ¶16; Aizuss ¶¶ 17-29; Price ¶ 10. The Rule would supplant these policies and "relieve [workers] of the duty to work" whenever they have a religious reason

[66] Similarly, *Texas Monthly* invalidated a tax benefit for religious periodicals that "burden[ed] nonbeneficiaries markedly" and hence "provide[d] unjustifiable awards of assistance to religio[n]" that "cannot but conve[y] a message of [religious] endorsement" by increasing nonbeneficiaries' tax bills by the amount is needed to offset the benefit bestowed on subscribers to religious publications. And in *Hobby Lobby*, all nine Justices authored or joined opinions recognizing that harmful effects on nonbeneficiaries must be considered in evaluating religious accommodations. 573 U.S. at 693, 729 n.37; id. at 739 (Kennedy, J., concurring); *id.* at 745–46 (Ginsburg, J., dissenting, joined by Breyer, Kagan, & Sotomayor, JJ.); *see also United States v. Lee*, 455 U.S. 252, 261 (1982) (rejecting Amish employer's request for exemption from paying social-security taxes where exemption would impermissibly "operate[] to impose the employer's religious faith on the employees").

43

1    for not wanting to perform even essential job duties, "no matter what burden or inconvenience

2    this imposes on the employer or fellow workers"—or on patients. *Caldor*, 472 U.S. at 708-09

3    (state law impermissibly imposed duty to accommodate even "when the employer's compliance

4    would require the imposition of significant burdens on other employees required to work in the

5    place of" religious objectors); Singh ¶¶ 8-13. And "[t]here is no exception . . . for special

6    circumstances such as" emergencies in which the failure of even one team member to perform his

7    or her duties would put patients' lives at risk. 472 U.S. at 709; Colwell Decl. ¶¶ 7-10.

8            In other words, the Rule "imposes on employers and employees an absolute duty to

9    conform their business practices to the particular religious practices of the employee," *Caldor,*

10   472 U.S. at 709, drastically limiting Plaintiffs' ability even to ask about and plan for religious

11   objections; permitting only voluntary transfers or scheduling changes for objecting employees

12   when Plaintiffs do learn about the objections; requiring Plaintiffs to reassign other employees to

13   cover the work that objecting employees refuse to perform, and to bear the resulting costs and

14   burdens of double-staffing, Lorenz Dec. ¶ 18-19; and ultimately allowing patients to be denied

15   needed care and information required for informed consent. These burdens are far more severe

16   than those that required invalidation of the religious accommodations in *Caldor* and *Texas*

17   *Monthly*. By requiring Plaintiffs to "adjust their affairs to the command of the State whenever [the

18   Rule] is invoked by an employee," 472 U.S. at 709, the Rule violates the Establishment Clause.

19           The cases that the government cites (Mot. 34-35) do not alter the controlling constitutional

20   standards. *In Kong v. Scully*, 341 F.3d 1132, 1134 (9th Cir. 2003), the accommodation did not

21   harm patients or burden anyone else but instead enabled patients to get the care that they sought:

22   The court upheld a law allowing medical reimbursements to healthcare institutions for "the

23   nonmedical care of persons whose religious tenets lead them to reject medical services." *Id*. The

24   court in *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 311 (9th Cir. 1974), upheld a

25   provision of Church ensuring that federal funding could not be used to compel a hospital to

26   perform medical procedures against its religious mission, emphasizing that the provision

27   preserved governmental "neutrality" with respect to religion. It did not, as here, give special

28   privileges to religion or prefer particular religious views. *See infra* Sections VII.B.-C. *Doe v.*

44

1  *Bolton*, 410 U.S. 179, 198 (1973), did not address the legality of an unchallenged portion of a

2  statute permitting a hospital to decline to provide abortions; rather, it held only that also requiring

3  hospitals to establish a committee to approve abortions was unduly restrictive of patients' rights.

4  And *Corporation of the Presiding Bishop of the Church of Latter-Day Saints v. Amos*, 483 U.S.

5  327, 339 (1987), supports Plaintiffs, underscoring that the Establishment Clause forbids

6  government to "give[] the force of law to" employees' religious views by "requir[ing]

7  accommodation by the employer regardless of the burden which that constitute[s] for the

8  employer or other employees," or for patients.[67]

9        **B.    The Rule Advances and Endorses Certain Religious Beliefs**

10         The Rule also violates the Establishment Clause because the government may require

11  accommodation of religion only to alleviate substantial government-imposed burdens on religious

12  practice. *Cutter*, 544 U.S. at 720; *Cty of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492

13  U.S. 573, 613 n.59 (1989); *Texas Monthly*, 489 U.S. at 15 (plurality opinion). When there is no

14  "exceptional government-created burden[] on private religious exercise," or when the government

15  goes beyond what is needed to alleviate burdens that it, itself, has imposed (*see Cutter*, 544 U.S.

16  at 720), its action crosses the line of permissible religious accommodation and "devolve[s] into

17  'an unlawful fostering of religion,'" *Amos*, 483 U.S. at 334–35.

18         Thus, although the federal government may "lift[] a regulation that burdens the exercise of

19  religion," *Amos* U.S. at 338, when it has imposed that burden to begin with, it may not broadly

20  and absolutely compel *other* entities, whether private actors or state programs, to afford special

21  solicitude to religion, *see City of Boerne v. Flores*, 521 U.S. 507, 532–33, 536 (1997).

22         Additionally, religious exercise is substantially burdened—and therefore may be subject to

23  accommodation—only if the government "forc[es individuals] to choose between following the

---

[67] *Amos* concerned a church's firing of an employee who was not in religious good standing. The exemption from Title VII's bar on religious discrimination did not amount to unconstitutional religious favoritism because it avoided interference with church autonomy and internal church governance—core concerns under both the Establishment and Free Exercise Clauses that are not implicated when, as here, the regulated entities are not churches. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 352 (3d Cir. 2017). And as the government acknowledges, Mot. 35, any harm to the employee in *Amos* resulted from the church's actions, not the government's, 483 U.S. at 337 & n.15. Here the Rule causes the harms.

45

tenets of their religion and receiving a governmental benefit . . . or coerce[s them] to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (applying Religious Freedom Restoration Act); *see also, e.g.*, *Henderson v. Kennedy*, 253 F.3d 12, 16–17 (D.C. Cir. 2001). The Rule is unconstitutionally expansive because it affords religious accommodations for objections that are merely religiously motivated. To comport with the Establishment Clause, the Rule would need at the very least to provide for individualized assessments to determine whether an objector's religious exercise is genuinely at issue and, if so, whether it is substantially burdened as a legal matter. The Rule, however, does none of that.

And finally, the Rule specially favors and protects certain denominations' religious beliefs in opposition to reproductive freedom and LGBT rights over faiths that hold alternative views on those subjects. *Cf.* Elliot N. Dorff, The Jewish Tradition: Religious Beliefs and Healthcare Decisions 10 (2002) (explaining that Jewish law requires preference for life of mother over fetus). It thus constitutes a denominational preference, triggering strict scrutiny and requiring that the Rule be invalidated. *See Larson v. Valente*, 465 U.S. 228, 246 (1982).

### C. The Rule Coerces Patients and Healthcare Providers to Adhere to HHS's Favored Religious Practices and Entangles Government with Religion

"[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise," *Lee*, 505 U.S. at 587; *Inouye v. Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007), for "the machinery of the State" must not be used "to enforce a religious orthodoxy," *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 312 (2000). The Rule does not "simply encourage" nondiscrimination, Mot. 35, but instead employs the threat of withholding or clawing back all HHS funds to coerce Plaintiffs to adhere to the religious beliefs and practices of every employee. In doing so, it also forces patients to live in accordance with those religious preferences, which the Establishment Clause flatly forbids. Relatedly, the Rule impermissibly entangles government with religion by making federal and state laws and local policies subservient to certain religious tenets, and by vesting in federal bureaucrats the religious authority to impose their preferred beliefs through discretionary enforcement. *See Larkin v.*

46

1 | *Grendel's Den, Inc.*, 459 U.S. 116, 126–27 (1982).

2 | **VIII. THE RULE VIOLATES EQUAL PROTECTION**

3 | The non-governmental plaintiffs in the *Santa Clara* action also challenge the Rule on equal

4 | protection grounds on behalf of their patients. The Rule repeatedly mischaracterizes medically-

5 | necessary healthcare procedures sought by transgender patients to treat gender dysphoria as

6 | "sterilization," inviting religious and moral objections to providing such care. *See* 84 Fed. Reg. at

7 | 23,178, 23,205. By targeting transgender patients' transition-related healthcare needs for religious

8 | and moral objection, the Rule intentionally discriminates based on sex, gender identity, and

9 | transgender status. It is binding precedent in this circuit that classifications based on gender

10 | identity or transgender status warrant heightened scrutiny. *See Karnoski v. Trump*, 926 F.3d 1180,

11 | 1200–01 (9th Cir. 2019). Additionally, such discrimination is a form of discrimination based on

12 | sex and merits heightened scrutiny for this reason, too. *See Norsworthy v. Beard*, 87 F. Supp. 3d

13 | 1104, 1119 (N.D. Cal. 2015) (denial of treatment for gender dysphoria constituted sex

14 | discrimination). First, a person's gender identity is a sex-related characteristic. *See, e.g.*, *Evancho*

15 | *v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288-89 (W.D. Pa. 2017). Second,

16 | discrimination based on gender transition is discrimination based on sex, just as firing an

17 | employee because she converts from Christianity to Judaism "would be a clear case of

18 | discrimination 'because of religion.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C.

19 | 2008). Third, such discrimination is rooted in sex stereotypes, as a transgender person's "inward

20 | identity [does] not meet social definitions of masculinity [or femininity]" associated with one's

21 | birth-assigned sex. *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000). Accordingly, the

22 | burden rests with Defendants to demonstrate that the decision to facilitate the denial of care to

23 | transgender patients significantly furthers an exceedingly persuasive governmental interest.

24 | *Karnoski*, 926 F.3d at 1200-02. Defendants must also account for the harms that the Rule causes,

25 | including dignitary harms resulting from imposition of a second-class status. *See SmithKline*

26 | *Beecham v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014).

27 | The Rule fails any level of review because it lacks even a rational relationship to a

28 | legitimate governmental purpose, and Defendants cannot justify the harms to patients or to the

1    public health. The Rule arbitrarily elevates religious objections over the health and well-being of

2    patients, contrary to federal law and the operational needs of healthcare providers. An official

3    preference for certain religious beliefs—whether about transgender people and their healthcare or

4    otherwise—cannot rise to the level of even a legitimate governmental interest, much less an

5    exceedingly persuasive one, but instead bespeaks religious purpose, effect, and endorsement that

6    violate the Establishment Clause. *See generally McCreary*, 545 U.S. at 859-60. Additionally,

7    although the Rule speculates about the possibility that an increased number of healthcare

8    providers will enter the field if permitted to deny certain types of care, 84 Fed. Reg. at 23,247,

9    23,250, HHS admits that it lacks data to support that assertion. Mot. 28-29; *see U.S. v. Virginia*,

10   518 U.S. 515, 533 (1996) (hypothesized justifications inadequate under heightened scrutiny). And

11   even if those additional providers entered the field, discriminatory denials of care would persist,

12   because the new providers would be ones who want to deny reproductive or transition-related

13   care. HHS acknowledges that some patients will be disadvantaged, but concludes that

14   hypothetical benefits of the Rule *to other people* justify it. 84 Fed. Reg. at 23,251-52. Even if the

15   record provided evidence of those benefits, which it does not, that choice is an impermissible

16   government decision to benefit certain patients at the expense of others. *See Romer v. Evans*, 517

17   U.S. 620, 633 (1996) (a bare preference for one group of people over another, simply because of

18   who they are, is a "denial of equal protection in the most literal sense"). Government may not

19   facilitate discrimination by private actors that is forbidden for the government to engage in

20   directly. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *Obergefell v. Hodges*, 135 S. Ct. 2584,

21   2602 (2015) (government may not put its imprimatur on private discrimination by enacting it into

22   policy). The Rule's wide-ranging, harmful effects easily could be avoided with a rule that

23   respects religious objections while ensuring patient health, as Plaintiffs' existing policies do. The

24   existence of obvious less restrictive options dooms the Rule under the Equal Protection Clause.

25   **IX.    THE RULE VIOLATES PLAINTIFFS' PATIENTS' DUE PROCESS RIGHTS**

26        The Fifth Amendment's Due Process Clause protects the right to make intimate decisions

27   concerning procreation, abortion, contraception, gender identity, and self-definition as core to

28   individuals' identity, dignity, autonomy, and ability to "shape [their] destiny." *Obergefell*, 135 S.

48

Ct. at 2593, 2597, 2599; *see Casey*, 505 U.S. at 857; *Lawrence v. Texas*, 539 U.S. 558, 574

(2003); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977). The non-governmental

Plaintiffs in *Santa Clara* have adequately pleaded, S.C. Compl. ¶¶ 158-182, and demonstrated

through extensive evidence in the administrative record and declarations, that the Rule violates

these fundamental rights. Strict scrutiny applies to governmental actions that infringe the rights to

contraception, *Carey*, 431 U.S. at 687, or to define and express one's gender identity, *Obergefell*,

135 S. Ct. at 2593; *Arroyo Gonzalez v. Rossello Nevarez*, 305 F. Supp. 3d 327, 334 (D.P.R.

2018); *Karnoski*, 2017 WL 6311305, at *1 (W.D. Wash. Dec. 11, 2017), *vacated by*

*stipulation*, Case No. 2:17-cv-01297 (Aug. 5, 2019).[68] And, before viability, the government

"may not prohibit any woman from making the ultimate decision to terminate her pregnancy,"

*Gonzales*, 550 U.S. 124, 146 (2007), or impose an undue burden on that right, *Whole Woman's*

*Health*, 136 S. Ct. at 2300, 2309. Where a law's burdens exceed its benefits, those burdens are by

definition undue, and the law is unconstitutional. *Id.* at 2300, 2309-10, 2312, 2318; *see PPGNI v.*

*Wasden*, No. 1:18-CV-00555, 2019 WL 3325800, at *6 (D. Idaho July 24, 2019) (declining

dismissal where undue burden plausibly alleged).

The Rule violates these principles by empowering a broad class of individuals to deny or

"hinder" access to abortion, contraception, and gender-affirming care. *Casey*, 505 U.S. at 851,

877, 894-96; *Carey*, 431 U.S. at 689 (invalidating law that did not ban contraception directly but

limited distribution to pharmacists because it "clearly impose[d] a significant burden on the right

of the individuals to use contraceptives" by decreasing access, competition, and privacy). The

Constitution prohibits unjustified governmental interference, even when the government invokes

the interests of others. *See Casey*, 505 U.S. at 894-96 (invalidating law enabling husband to

---

[68] The substantive protections of the Due Process Clause protect the right of all people to possess and control their own person, and to "define and express their identity." *Obergefell*, 135 S. Ct. at 2597; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (Constitution protects the "ability independently to define one's identity that is central to any concept of liberty"). Gender is fundamental to a person's identity; it is the internalized, inherent sense of who a person is (*e.g.*, male, female, or non-binary). Ettner Dec. ¶ 14; Valle Dec. ¶ 13. This is as true for a transgender person as for a non-transgender person. Ettner Dec. ¶ 14. A person's gender identity is so fundamental that government may not require them to abandon it. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005).

49

1    prevent wife from obtaining abortion as his interest did not permit State to empower him with

2    such "troubling degree of authority over his wife"). Further, the Rule will deter patients from

3    seeking abortion, contraception, and gender-affirming care, based on stigma and fear of

4    judgment, discrimination, and compromised care, especially in rural and low-income

5    communities, *see supra* Facts III.B-C,[69] violating the right to make "choices central to personal

6    dignity and autonomy," 505 U.S. at 851; *Lawrence*, 539 U.S. at 574; *see also Obergefell*, 135 S.

7    Ct. at 2602. And the Rule incentivizes healthcare entities to curtail or eliminate this care, despite

8    national shortages, increasing patients' risk of injury and death. *See supra* Facts III.B-C.[70]

9        Contrary to Defendants' contentions, *see* Mot. 36-37, constitutional protections apply when

10   patients receive services through a government-subsidized program. *See Planned Parenthood of*

11   *Greater Ohio v. Hodges*, 917 F.3d 908, 912-16 (6th Cir. 2019) (en banc) (holding while "the

12   government may refuse to subsidize abortion services," a funding restriction may not "impose an

13   undue burden on a woman's right to an abortion"); *Planned Parenthood of Ind., Inc. v. Comm'r*

14   *of Ind. State Dep't of Health*, 699 F.3d 962, 988 (7th Cir. 2012). The government cannot use grant

15   conditions to achieve purposes—pushing healthcare out of hospitals and enabling third-party

16   denials of care—that are otherwise constitutionally impermissible. *See Hodges*, 917 F.3d at 911

17   (citing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)) ("The

18   government may not deny an individual a benefit, even one an individual has no entitlement to,

19   on a basis that infringes his constitutional rights."). Defendants' reliance on a brief quote from

20   *Rust v. Sullivan,* 500 U.S. 173 (1991), which concluded that a particular funding scheme did not

21   burden abortion rights, fails to refute Plaintiffs' specific showing that the Rule harms patients,

22   will impede access to contraception, abortion, and gender-affirming care, and will deprive

23   transgender patients of the ability to live in accordance with their gender identity for no legitimate

24

25   [69] *See also* S.C. Compl. ¶¶ 77-85, 163-165, 175-178. 165-167, 181-187; McNicholas Dec. ¶¶ 8,
     23, 28-29, 44-47, 43; Phelps Dec. ¶ 34; Barnes Dec. ¶¶ 20-23, 30; Burkhart ¶22, 26, Ettner Dec.

26   ¶¶ 14, 48-56; Valle Dec. ¶ 13; Shanker Dec. ¶¶ 11-12; Vargas Dec. ¶¶ 13-14; Henn Dec. ¶ 5;
     Bolan ¶¶ 8-10; Carpenter Dec. ¶ 11; Manley Dec. ¶ 8; Harker Dec. ¶ 14; Cummings Dec. ¶¶ 13-

27   14; Lorenz Dec. ¶ 16; Sproul Dec. ¶ 13; Burkhart Dec. ¶ 22; McNicholas Dec. ¶ 43.
     [70] *See also* S.C. Compl. ¶¶ 160-167, 174-182, 190-191, 194-198; Phelps Dec. ¶¶ 18, 29, 30, 35,

28   49; Backus Dec. ¶¶ 27-39; McNicholas Dec. ¶¶ 19, 27; Shafi Dec. ¶¶ 12-15, 20; Shanker Dec. ¶¶
     13-15; Valle Dec. ¶¶ 16-23; Cummings Dec. ¶¶ 15-19; Manley Dec. ¶¶ 10-13.

50

1    purpose, failing any level of scrutiny and imposing an unconstitutional undue burden.

2    **X.    THE RULE VIOLATES PLAINTIFFS' PATIENTS' FREE SPEECH RIGHTS**

3        The non-governmental plaintiffs in *Santa Clara* also seek summary judgment on their claim

4    that the Rule violates patients' free speech rights. The Rule impermissibly chills LGBT patients

5    from being open about their gender identity and transgender status, seeking gender-affirming

6    care, and expressing themselves in a manner consistent with their gender identity. Because the

7    Rule targets patients' constitutionally protected speech and expression based on content and

8    viewpoint, it violates the First Amendment. Courts have long held that disclosing one's gender

9    identity or sexual orientation—sometimes referred to as "coming out"—is protected First

10   Amendment expression.[71] Expression of gender identity through one's appearance also is

11   protected expression. *See Doe ex rel. Doe v. Yunits*, 2000 WL 33162199, at *3 (Mass. Super. Oct.

12   11, 2000). A regulation may impermissibly "burden speech" even if it "stops short of prohibiting

13   it." *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014).

14       Here, the Rule has the "inevitable effect of burdening," *Doe*, 772 F.3d at 574, patients'

15   disclosure of their transgender status and gendered expression because they will now reasonably

16   fear denial of healthcare should they make such disclosures, *see Mendocino Envtl. Ctr. v.*

17   *Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (governmental action violates First

18   Amendment if it causes a person of "ordinary firmness" to self-censor). The Rule burdens speech

19   based on content and viewpoint—including by attaching different consequences to the same

20   speech depending on the identity of the speaker, which is a form of impermissible viewpoint

21   discrimination, *see Police Department of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)—thus

22   subjecting the Rule to "the most exacting scrutiny," *Texas v. Johnson*, 491 U.S. 397, 412 (1989)

23   (citation omitted). *See also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (government may

24   not burden speech "because of disapproval of the ideas expressed"); *Rosenberger v. Rector &*

25   *Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). For example, the Rule invites denial of

26   _____

27   [71] *See Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1075-77 (D. Nev. 2001); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85 (D. Utah 1998); *Karnoski*, 2017 WL 6311305, at *9; *Log*

28   *Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 926 (C.D. Cal. 2010), *vacated as moot*, 658 F.3d 1162 (9th Cir. 2011); *see also* Doc. 36, Case No. 5:19-cv-02916-NC, at 33-35.

1  treatment to a transgender woman who discloses her transgender status or engages in gendered

2  expression common to all patients, such as by checking the box "female" at her physician's

3  office—but not to a non-transgender woman at the same office who discloses her gender identity

4  (cisgender) or checks the same box.

5        Defendants mischaracterize Plaintiffs' claims, incorrectly describing them as about

6  "compelled speech" (Mot. 47-48). Quite the opposite. The Rule *chills* LGBT patients' protected

7  speech and expression, coercing them to stay in the closet and self-censor about medical histories

8  and needs, harming both their own health and the public health.[72] Many LGBT patients already

9  fear healthcare providers and are not "out" to their healthcare providers because of past

10  experiences of anti-LGBT bias. Shanker Dec. ¶¶ 10-11; Henn Dec. ¶ 3; *see* Ettner Dec. ¶ 55; *see*

11  *Conant v. Walters*, 309 F.3d 629, 636-37 (9th Cir. 2002) (recognizing, in a First Amendment

12  challenge, that "barriers to full disclosure would impair diagnosis and treatment"). The Rule's

13  unjustified chilling effect on patient speech distinguishes it from *Rust*, cited by Defendants. *Rust*

14  concerned *physician* disclosures, not patient speech and expression long protected under the First

15  Amendment; and it expressly declined to address First Amendment protections for the doctor-

16  patient relationship. 500 U.S. at 200. The Rule lacks justification for the many harms that it will

17  cause to patients and the public health, *see supra* Section III.A-D, goes well beyond readily

18  available alternatives (like Plaintiffs' extant policies protecting religious objectors), and

19  impermissibly burdens constitutionally protected speech.

20  **XI.   THE RULE VIOLATES SEPARATION OF POWERS**

21        The City and the County seek summary judgment on their causes of action that the Rule

22  violates the separation of powers established by the Constitution. These claims are conceptually

23  similar to, but distinct from, Plaintiffs' excess-of-statutory-authority claims. *See City of Arlington*

24  *v. F.C.C.*, 569 U.S. 290, 297 (2013) ("No matter how it is framed, the question a court faces when

25  confronted with an agency's interpretation of a statute it administers is always, simply, *whether*

26  *the agency has stayed within the bounds of its statutory authority*."). Here, HHS "has not even

27

28  _____
[72] Shanker Dec. ¶¶ 11-12; Henn Dec. ¶ 5; Bolan Dec. ¶¶ 8-11 (patients who do not disclose their transgender status may not be given necessary tests and screenings); Carpenter Dec. ¶ 5.

1   attempted to show that Congress authorized" the sweeping conditions it has imposed on broad

2   swaths of federal funding. *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018)

3   (*CCSF*). Nor do Defendants cite any case law in support of their conclusory argument that the

4   Rule comports with this "integral part of the Founders' design." *Id.* at 1232.

5        "The United States Constitution exclusively grants the power of the purse to Congress," not

6   the Executive Branch. *CCSF*, 897 F.3d at 1231; *see also In re Aiken Cty.*, 725 F.3d 255, 259

7   (D.C. Cir. 2013) (separation-of-powers "principles apply to the President *and subordinate*

8   *executive agencies*") (emphasis added). "Congress's power to spend is directly linked to its power

9   to legislate." *CCSF*, 897 F. 3d at 1232. That legislative power is exercised through a "step-by

10  step, deliberate and deliberative process" that cannot be unilaterally altered or amended by the

11  Executive Branch. *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983). Congress may give agencies some

12  discretion in deciding how to use appropriated funds, but that discretion necessarily is cabined by

13  the scope of the delegation. *City of Arlington*, 569 U.S at 297-98. Imposing conditions on federal

14  funds is a power that the Constitution grants to Congress alone. *See Dole*, 483 U.S. at 206. The

15  Executive Branch, therefore, "does not have unilateral authority to refuse to spend . . . funds" that

16  have been appropriated by Congress "for a particular project or program." *In re Aiken Cty.*, 725

17  F.3d at 261 n.1. But HHS seeks to do precisely that. It threatens to withhold billions of dollars of

18  critical federal funds if Plaintiffs fail to comply with the Rule.

19       Congress has not so authorized. Church places conditions only on recipients of funds under

20  the "Public Health Service Act, the Community Mental Health Centers Act, or the Developmental

21  Disabilities Services and Facilities Construction Act." 42 U.S.C. §300a-7. But the Rule imposes

22  conditions on recipients of any HHS funds. Weldon conditions receipt of funds appropriated in

23  the specified Act only on nondiscrimination by a "health care entity," as defined in the Act, with

24  respect to refusal to "provide, pay for, provide coverage of, or refer for abortions." 132 Stat.

25  2981, 3118, Sec. 507(d). But the Rule imposes conditions on those funds for "health care

26  entit[ies]" to whom Weldon does not apply, *see supra* Section III.B, and based on actions and

27  activities unrelated to abortions. Similarly, Coats-Snowe applies to all federal funds, but only

28  with respect to the physicians, medical residents, and other health professional trainees with

1    respect to refusals to perform, or learn how to perform, abortions. 42 U.S.C. § 238n. None of

2    these statutes delegates *any* authority to HHS to interpret or enforce them. Yet HHS has arrogated

3    to itself the authority to impose conditions on all HHS funds related to the operation of entities

4    not covered by these statutes for behavior not regulated by them, and to investigate and adjudicate

5    compliance with its self-created conditions.

6        In doing so, not only is HHS acting in excess of its statutory authority, *see supra* Section

7    III.B, but it is also amending federal conscience laws without any authority to do so, unilaterally

8    adding funding conditions, thus usurping the role of Congress and violating separation of powers

9    principles. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998). HHS is impermissibly using

10   appropriated funds in a way that effectively alters the terms of the anchoring statutes, which

11   Congress has "finely wrought and exhaustively considered" via the legislative process. *Id.* at 439-

12   40. The Rule's radical departure from the statutes that ostensibly authorize it places it well

13   outside any authority Congress has delegated. "In this instance, because Congress has the

14   exclusive power to spend and has not delegated authority to the Executive to condition new grants

15   on compliance with" the refusal laws, its "'power is at its lowest ebb.'" *CCSF*, 897 F.3d at 1233.

16   **XII.  THE COURT SHOULD VACATE THE RULE**

17       The Court should vacate the Rule because it is contrary to law and unconstitutional.

18   5 U.S.C. § 706(2)(A)-(B); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476,

19   511 (9th Cir. 2018) ("'[W]hen a reviewing court determines that agency regulations are unlawful,

20   the ordinary result is that the rules are vacated—not that their application to the individual

21   petitioners is proscribed.'"); *All. for the Wild Rockies v. United States*, 907 F.3d 1105, 1121-1122

22   (9th Cir. 2018) (*"*[O]rdinarily when a regulation is not promulgated in compliance with the APA,

23   the regulation is invalid.").

24       Alternatively, the Court should declare that the Rule is unlawful and issue a nationwide

25   injunction prohibiting Defendants from implementing or enforcing the Rule, or taking any actions

26   to enforce the underlying statutes in a manner contrary to the Court's opinion. Defendants argue

27   that a "nationwide remedy" is inappropriate (Mot. 39), but Plaintiffs have demonstrated that

28   nationwide relief is necessary to "give [the] prevailing parties the relief to which they are

54

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S and A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1   entitled." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citation

2   omitted). "Plaintiffs have established injury that reaches beyond the geographical bounds of the

3   Northern District of California." *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F.

4   Supp. 3d 1011, 1049 (N.D. Cal. 2018) (Alsup, J.), *aff'd,* 908 F.3d 476 (9th Cir. 2018). Plaintiffs

5   include healthcare providers located throughout the country who will be affected by the Rule, and

6   three national associations of medical professionals whose members work in hundreds, if not

7   thousands, of healthcare facilities nationwide. *See* Vargas Dec. ¶ 2; Phelps Dec. ¶ 3; Harker Dec.

8   ¶ 2. If implemented anywhere, the Rule will frustrate the missions of these Plaintiffs, and

9   undermine access to critical healthcare throughout the country. Backus Dec. ¶ 11; Vargas Dec. ¶¶

10   1-2, 10; Harker Dec. ¶¶ 1, 6, 9, 10.[73]

11       Moreover, the Court should reject Defendants' conclusory severance argument.

12   Defendants' failure to suggest which parts of the Rule should be severed makes it impossible to

13   determine whether HHS "would have adopted the severed portion on its own." *New Jersey v.*

14   *EPA*, 517 F.3d 574, 584 (D.C. Cir. 2008). Although the Rule declares that any invalid provision

15   should be severed, 84. Reg. at 23,272, "[w]hether the offending portion of a regulation is

16   severable depends upon the intent of the agency *and* upon whether the remainder of the regulation

17   could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v.*

18   *F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001). Here, the Rule's provisions are so intertwined and the

19   provisions Plaintiffs challenge are so central to its operation that the entire Rule must be vacated.

20   At a minimum, if the Court vacates parts of the Rule but believes others may be severable,

21   Plaintiffs request the opportunity to brief the issue after receiving the benefit of the Court's

22   judgment regarding which parts of the Rule are invalid.

23                                              **CONCLUSION**

24       The Court should grant Plaintiffs' motion, vacate the Rule, and deny Defendants' motion.

25

26   ───────────────
[73] No case cited by Defendants involved *vacatur*. And those addressing nationwide injunctions
     held only that such injunctions must be supported by the record. *Azar*, 911 F.3d at 584; *CCSF*,
27   897 F.3d at 1244-45. *Azar* and *CCSF* approved nationwide relief "when 'necessary to give
     Plaintiffs a full expression of their rights.'" *CCSF*, 897 F.3d at 1244 (citation omitted); *accord*
28   *Azar*, 911 F.3d at 582. Plaintiffs have demonstrated that nationwide relief is necessary here.

55

Plaintiffs' Notice of Mot. And Mot. for Summ. Jdg., with Memo of P'S & A's; and Oppn. to Defendants' Mot. to
Dismiss or, in the Alt., for Summ. Jdg. (Nos. 19-2405 WHA, 19-0276 WHA, 19-2916 WHA)

1    Respectfully Submitted,

2    Dated:  September 12, 2019                    Dated:  September 12, 2019

3    XAVIER BECERRA                                DENNIS J. HERRERA
     Attorney General of California               City Attorney
4    KATHLEEN BOERGERS                             JESSE C. SMITH
     Supervising Deputy Attorney General          RONALD P. FLYNN
5                                                  YVONNE R. MERÉ
     */s/ Neli N. Palma*                          SARA J. EISENBERG
6                                                  JAIME M. HULING DELAYE
     NELI N. PALMA                                 Deputy City Attorneys
7    KARLI EISENBERG
     STEPHANIE YU                                  By: */s/ Sara J. Eisenberg*
8    Deputy Attorneys General
     *Attorneys for Plaintiff State of California, by*   SARA J. EISENBERG
9    *and through Attorney General Xavier Becerra*       Deputy City Attorney
                                                   *Attorneys for Plaintiff City and*
10                                                 *County of San Francisco*

11   Dated:  September 12, 2019                    Dated:  September 12, 2019

12   By: */s/ Lee H. Rubin*                        By: */s/ Mary E. Hanna-Weir*

13   LEE H. RUBIN                                  JAMES R. WILLIAMS
     *lrubin@mayerbrown.com*                       County Counsel
14   Mayer Brown LLP                               GRETA S. HANSEN
     Two Palo Alto Square, Suite 300               Chief Assistant County Counsel
15   3000 El Camino Real                           LAURA S. TRICE
     Palo Alto, California 94306-2112              Lead Deputy County Counsel
16   Tel: (650) 331-2000                           MARY E. HANNA-WEIR
                                                   SUSAN P. GREENBERG
17   MIRIAM R. NEMETZ*                             H. LUKE EDWARDS
     *mnemetz@mayerbrown.com*                      Deputy County Counsels
18   NICOLE SAHARSKY*                              *mary.hanna-weir@cco.sccgov.org*
     *nsaharsky@mayerbrown.com*                    Office of the County Counsel,
19   ANDREW TAUBER*                                   County of Santa Clara
     Mayer Brown LLP                               70 West Hedding Street, East Wing, 9th Floor
20   1999 K Street, Northwest                      San José, California 95110-1770
     Washington, DC 2006-1101                      Tel: (408) 299-5900
21   Tel: (202) 263-3000                           *Counsel for Plaintiff County of Santa Clara*
     *Counsel for Plaintiffs County of Santa Clara,*
22   *Trust Women Seattle, Los Angeles LGBT*
     *Center, Whitman-Walker Clinic, Inc. d/b/a*
23   *Whitman-Walker Health, Bradbury Sullivan*
     *LGBT Community Center, Center on Halsted,*
24   *Hartford Gyn Center, Mazzoni Center,*
     *Medical Students For Choice, AGLP: The*
25   *Association of LGBT+Psychiatrists,*
     *American Association of Physicians For*
26   *Human Rights d/b/a GLMA: Health*
     *Professionals Advancing LGBT Equality,*
27   *Colleen McNicholas, Robert Bolan, Ward*
     *Carpenter, Sarah Henn, and Randy Pumphrey*

28
                                        56

| | |
|---|---|
| 1 | Dated:  September 12, 2019 | Dated:  September 12, 2019 |
| 2 | By: */s/ Richard B. Katskee* | By: */s/ Jamie A. Gliksberg* |

1   Dated:  September 12, 2019

2   By: */s/ Richard B. Katskee*

3   RICHARD B. KATSKEE*
    *katskee@au.org*
4   KENNETH D. UPTON, JR.*
    *upton@au.org*
5   Americans United for Separation
       of Church and State
6   1310 L Street NW, Suite 200
    Washington, DC 20005
7   Tel: (202) 466-3234
    *Counsel for Plaintiffs Trust Women Seattle,*
8   *Los Angeles LGBT Center, Whitman-Walker*
    *Clinic, Inc. d/b/a Whitman-Walker Health,*
9   *Bradbury Sullivan LGBT Community Center,*
    *Center on Halsted, Hartford Gyn Center,*
10  *Mazzoni Center, Medical Students For*
    *Choice, AGLP: The Association of*
11  *LGBT+Psychiatrists, American Association*
    *of Physicians For Human Rights d/b/a*
12  *GLMA: Health Professionals Advancing*
    *LGBT Equality, Colleen McNicholas, Robert*
13  *Bolan, Ward Carpenter, Sarah Henn, and*
    *Randy Pumphrey*
14

15  Dated:  September 12, 2019

16  By: */s/ Genevieve Scott*

17  GENEVIEVE SCOTT*
    *gscott@reprorights.org*
18  RABIA MUQADDAM*
    *rmuqaddam@reprorights.org*
19  Center for Reproductive Rights
    199 Water Street, 22nd Floor
20  New York, NY 10038
    Tel: (917) 637-3605
21  *Counsel for Plaintiffs Trust Women Seattle,*
    *Los Angeles LGBT Center, Whitman-Walker*
22  *Clinic, Inc. d/b/a Whitman-Walker Health,*
    *Bradbury Sullivan LGBT Community Center,*
23  *Center on Halsted, Hartford Gyn Center,*
    *Mazzoni Center, Medical Students For*
24  *Choice, AGLP: The Association of*
    *LGBT+Psychiatrists, American Association*
25  *of Physicians For Human Rights d/b/a*
    *GLMA: Health Professionals Advancing*
26  *LGBT Equality, Colleen McNicholas, Robert*
    *Bolan, Ward Carpenter, Sarah Henn, and*
27  *Randy Pumphrey*

28  SA2019501805 // 14085669.DOCX

Dated:  September 12, 2019

By: */s/ Jamie A. Gliksberg*

JAMIE A. GLIKSBERG*
*jgliksberg@lambdalegal.org*
CAMILLA B. TAYLOR*
*ctaylor@lambdalegal.org*
Lambda Legal Defense and
   Education Fund, Inc.
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Tel: (312) 663-4413

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
Lambda Legal Defense and
   Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Tel: (212) 809-8585

PUNEET CHEEMA*
*pcheema@lambdalegal.org*
Lambda Legal Defense and
   Education Fund, Inc.
1776 K Street NW, 8th Floor
Washington, DC 20006
Tel: (202) 804-6245, ext. 596
*Counsel for Plaintiffs Trust Women Seattle,*
*Los Angeles LGBT Center, Whitman-Walker*
*Clinic, Inc. d/b/a Whitman-Walker Health,*
*Bradbury Sullivan LGBT Community Center,*
*Center on Halsted, Hartford Gyn Center,*
*Mazzoni Center, Medical Students For*
*Choice, AGLP: The Association of*
*LGBT+Psychiatrists, American Association*
*of Physicians For Human Rights d/b/a*
*GLMA: Health Professionals Advancing*
*LGBT Equality, Colleen McNicholas, Robert*
*Bolan, Ward Carpenter, Sarah Henn, and*
*Randy Pumphrey*

* *Admitted pro hac vice*